David L. Bird (00335)
Jamie L. Nopper (10703)
**McKay, Burton & Thurman, P.C.**
15 West South Temple, Suite 1000
Salt Lake City, UT  84101
Phone: (801) 521-4135
dbird@mbt-law.com
jnopper@mbt-law.com

Walter N. Winchester (PHV pending)
Josh Holden (PHV pending)
**Winchester, Sellers, Foster & Steele, PC**
Suite 1000, First Horizon Plaza
800 S. Gay Street
Knoxville, TN 37929
Phone: (865) 637-1980
wwinchester@wsfs-law.com
jholden@wsfs-law.com

*Attorneys for Plaintiff*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE  DISTRICT OF UTAH – NORTHERN DIVISION

| | |
|---|---|
| OLD CHICAGO II FRANCHISING, LLC, | **COMPLAINT** |
|     Plaintiff, | |
| vs. | Case No.:     1:23-cv-00040-DAO |
| TAC VENTURES, LLC; WD VENTURES, LLC; CECIL O'BRATE, an individual; TOM WILLS, an individual; ANDY DANIELS, an individual; and THAD WILLIS, an individual, | Judge:     Daphne A. Oberg |
|     Defendants. | |

Plaintiff Old Chicago II Franchising, LLC ("Plaintiff" or "OC") hereby complains of

Defendants TAC Ventures, LLC; WD Ventures, LLC; Cecil O'Brate; Tom Willis; Andy Daniels; and Thad Willis, and alleges as follows:

## NATURE OF THE ACTION

1.      Plaintiff OC is the holder of a license to use and sublicense a distinctive restaurant system, identified by certain trade names, marks, and menus, that governs the establishment and operation of casual dining restaurants operating under the "Old Chicago®" name.

2.      Plaintiff and Defendant WD Ventures, LLC ("WD") are the current parties to an area development agreement ("the Development Agreement") under which Plaintiff granted WD the right to establish and operate five "Old Chicago®" branded restaurants in a defined development area as an area developer.   Defendant TAD Ventures, LLC ("TAD") is the predecessor to WD's interest in the Development Agreement.

3.      Plaintiff and Defendant WD are also the current parties to a franchise agreement ("the Franchise Agreement") under which Plaintiff, as franchisor, grants and licenses to WD the right to operate an "Old Chicago®" branded restaurant at 1400 North 800 East in Logan, Utah 84341 ("the Restaurant").   Defendant TAD is the predecessor to WD's interest in the Franchise Agreement.

4.      Defendants Cecil O'Brate and Tom Willis are owners of Defendant TAD and are parties to an owners agreement guaranteeing TAD's performance of obligations under the Development and Franchise Agreements and personally subjecting them to various provisions of the Agreements ("the First Owners Agreement").

5.      Defendants Tom Willis, Andy Daniels, and Thad Willis are the owners of Defendant WD and are parties to an owners agreement guaranteeing WD's performance of

obligations under the Development and Franchise Agreements and personally subjecting them to various provisions of the Agreements ("the Second Owners Agreement").

6.      After establishing and operating the Restaurant as an "Old Chicago Pizzeria and Taproom," Defendants breached the Development Agreement and Franchise Agreement by unilaterally re-branding the Restaurant as a competing business and ceasing to make royalty and other payments required under the Franchise Agreement.

7.      Plaintiff now seeks damages for breach of contract and misappropriation of trade secrets under the Defendant Trade Secrets Act, as well as injunctive and declaratory relief.

## PARTIES

8.      Plaintiff OC is a Delaware limited liability company that is owned by Old Chicago Taproom II, LLC, a Delaware limited liability company.

9.      Defendant TAC is a Kansas limited liability company.  Upon information and belief, TAC is owned by Defendants Tom Willis and Cecil O'Brate, who are both citizens and residents of Kansas.

10.     Defendant WD is a Kansas limited liability company.  Upon information and belief, WD is owned by Defendant Tom Willis, a citizen and resident of Kansas; Defendant Andy Daniels, a citizen and resident of Florida; and Defendant Thad Willis, a citizen and resident of Utah.

## JURISDICTION & VENUE

11.     This Court has subject matter jurisdiction pursuant to 11 U.S.C. § 1332(a) because the Plaintiff and Defendants are citizens of different states and complete diversity exists, and because the amount in controversy exceeds $75,000.00, exclusive of costs and interest.  The Court also has subject matter jurisdiction pursuant to 11 U.S.C. § 1331 on the basis of a federal question.

3

12.     This Court is the appropriate venue pursuant to 11 U.S.C. § 1391 because the unlawful and improper acts of the Defendants as described herein occurred in this District and Division.

13.     This Court has personal jurisdiction pursuant to applicable Utah law because the unlawful and improper acts of the Defendants complained of herein occurred in this District and Division.

## GENERAL ALLEGATIONS

14.     On or about March 23, 2018, TAC entered into the Franchise Agreement with OC's predecessor-in-interest (Old Chicago Franchising, LLC), a true and correct copy of which is attached hereto and incorporated herein by reference as Exhibit 1.

15.     In connection with the Franchise Agreement (and attached thereto as Attachment B), Defendants Tom Willis executed the First Owners Agreement, a copy of which is attached hereto and incorporated herein by reference as Exhibit 2.

16.     Upon information and belief, Defendant Cecil O'Brate also executed the First Owners Agreement.

17.     On or about March 23, 2018, TAC and OC's predecessor-in-interest also entered into the Development Agreement, a copy of which is attached hereto and incorporated herein by reference as Exhibit 3.

18.     On or about September 18, 2018, TAC and OC's predecessor-in-interest amended the Franchise Agreement to select a location for the Restaurant and to define a protected area.  A true and correct copy of the amendment is attached hereto and incorporated herein by reference as Exhibit 4.

19.     Pursuant to an assignment, OC is the successor in interest to and holds all rights of predecessor-in-interest Old Chicago Franchising, LLC under the Development Agreement and the Franchise Agreement, including, but not limited to, the ability to enforce all rights and seek all remedies available as provided in said agreements.

20.     Effective October 29, 2019, OC and the Defendants entered into an assumption agreement ("the Assumption Agreement"), whereby, among other things, (1) TAC assigned its rights under the Development Agreement and the Franchise Agreement to WD; (2) TAC and owner Cecil O'Brate ("the Former Franchisee Defendants") agreed to remain liable under the Development and Franchise Agreements for obligations arising prior to the effective date and for all post-termination obligations; and (3) OC consented to such assignment.  A true and correct copy of the Assumption Agreement is attached hereto and incorporated herein by reference as Exhibit 5.

21.     In connection with the Assumption Agreement (and attached thereto as Exhibit D), Defendants Tom Willis, Andy Daniels, and Thad Willis, owners of the new franchisee, Defendant WD, executed the Second Owners Agreement, a copy of which is attached hereto and incorporated herein by reference as Exhibit 6.

**The Franchise Agreement**

22.     Section 4.2 of the Franchise Agreement requires that the Defendants pay OC royalty fees in an amount equal to 4% of the Restaurant's gross sales.

23.     Section 10.1 of the Franchise Agreement requires that the Defendants pay OC brand fund contributions in an amount equal to 2% of the Restaurant's gross sales.

24.     Section 4.5 of the Franchise Agreement further provides that unpaid obligations

under the Franchise Agreement are subject to interest at a rate of 18% per annum, administrative fees for late payments, and other charges.

25.     Section 4.5 of the Franchise Agreement further requires the Defendants to reimburse OC for any and all costs incurred by OC in the collection of any past-due payments, including attorneys' fees and costs.

26.     The Franchise Agreement, the Assumption Agreement, and the Owners Agreement make each individual Defendant liable for all obligations, including amounts due, under the Franchise Agreement.

27.     Section 28.1 of the Franchise Agreement contains a choice of law provision indicating that the agreement will be governed by the laws of the State of Colorado.

### The Development Agreement

28.     The Development Agreement provides that the Defendants had certain rights and responsibilities to develop five "Old Chicago®" branded restaurants in the development area as defined in the agreement, within certain timeframes, and to pay certain fees as set forth therein.

29.     Section 5.3 of the Development Agreement further requires the Defendants to pay royalty fees pursuant to any franchise agreement, including the Franchise Agreement, as well as development fees.

30.     The Development Agreement further provides that in the event of a default by the Defendants, the Defendants are responsible for payment of all of OC's costs and expenses arising from such default, including attorneys' fees.

31.     The only restaurant opened under the Development Agreement to date is the Restaurant.

32.     As of the date of this Complaint, the Defendants have not opened restaurants at any of the other four locations set forth in the Development Agreement, despite the expiration of the time to do so.

33.     Section 11.8 of the Development Agreement contains a choice of law provision indicating that the agreement will be governed by "the laws of the State where the Development Area is located," which is Utah.

**Confidential Information**

34.     In entering into the Franchise Agreement, the Defendants acknowledged that they would be receiving and would have access to OC's confidential and proprietary information, including specialized and valuable training, knowledge, know-how, techniques, data, trade secrets, and other confidential information, including "highly confidential secret recipes," in addition to information regarding the operational, sales, promotional, and marketing methods and techniques of the Old Chicago® restaurant system (collectively, "OC's Confidential Information").  The Defendants further acknowledged that their access to OC's Confidential Information was a primary reason that they entered into the agreements.

35.     The Defendants agreed to not divulge or use OC's Confidential Information for their own benefit, outside the scope of the Franchise Agreement, or for the benefit of any other person or entity.

**Covenants Not to Compete or Solicit**

36.     Each of the Defendants agreed to paragraphs 14.1, 14.2, 14.3, 14.4, 14.5 and 14.6 of the Franchise Agreement, as well as the non-compete provisions set forth in the Owners Agreement, and the non-compete provisions of the Development Agreement in Article 8,

paragraphs 8.1, 8.2, and 8.3 (hereinafter collectively, the "Non-Compete Provisions"), said provisions being each incorporated into this Complaint by reference.

37. Among other things, the Non-Compete Provisions prohibit the Defendants from engaging in competitive activities with the Restaurant, including owning, operating, lending to, advising, being employed by, or having any financial interest in a business, other than another Old Chicago® branded restaurant, that looks like, copies, imitates, or operates in a manner that resembles or is similar to an Old Chicago® branded restaurant.

38. The Non-Compete Provisions further prohibit the Defendants from employing or seeking to employ the Restaurant's employees or former employees in a competitive business.

39. The Franchise Agreement, Development Agreement, and Owners Agreement provide that violations of Non-Compete Provisions may result in irreparable injury to OC for which no adequate remedy at law may be available and further provide that OC is entitled to seek and obtain injunctive relief in the event of a violation.

40. The Non-Compete Provisions are the result of and are part of a contract for the sale of a business within the meaning of section 8-2-113(3)(c) of the Colorado Revised Statutes.

**Rebranding of Restaurant**

41. In or about April of 2022, Defendants WD, Tom Willis, Andy Daniels, and Thad Willis (collectively, "the New Franchisee Defendants") unilaterally caused the Restaurant to be rebranded as "Ruby's," which is a substantially similar business and provides a substantially similar dining experience, atmosphere, and menu items as an "Old Chicago®: branded restaurant.

42. In or about April of 2022, the Defendants ceased making payments of royalty fees and brand fund contributions under the Franchise Agreement ("the FA Fees").

43. In operating the "Ruby's" restaurant, the New Franchisee Defendants are using OC's Confidential Information.

44. Upon information and belief, the New Franchisee Defendants continued to employ employees of the Restaurant at their "Ruby's" restaurant after the rebranding.

45. The operation of the "Ruby's" restaurant by the New Franchisee Defendants has caused and is causing immediate and irreparable damage to OC as a competitive business.

46. OC has not terminated the Franchise Agreement, Development Agreement, or First or Second Owners Agreements, and said agreements have not expired under their own terms.

## FIRST CLAIM FOR RELIEF
### (Breach of Franchise Agreement)

47. The allegations and averments of Paragraphs 1–46 of this Complaint are incorporated herein by reference.

48. The Franchise Agreement is a valid and enforceable contractual agreement.

49. OC has fulfilled its obligations under the Franchise Agreement.

50. OC has not released any Defendant, including the Former Franchisee Defendants, from such Defendant's obligations under the Franchise Agreement.

51. The Defendants are in default and breach of the Franchise Agreement by virtue of their conduct set forth herein, and specifically the following:

    a. The Defendants' failure to timely pay to OC the FA Fees as follows:

        i. Royalty fees of 4% of the Restaurant's gross sales (after 5% sales reduction and $500/month in employee meals) from May of 2022 through March of 2023 in the estimated amount of no less than $112,320.00, plus additional monthly royalty fees and other

9

amounts to be shown at trial;

ii.    Brand fund contributions of 2% of the Restaurant's gross sales (after 5% sales reduction and $500/month in employee meals) from May of 2022 through March of 2023 in the estimated amount of no less than $56,160.00, plus additional monthly brand fund contributions and other amounts to be shown at trial.

b.    The Defendants' violations of the Non-Compete Provisions found in the Franchise Agreement by virtue of their rebranding of the Restaurant and operation of Ruby's as a competitive business; and

c.    The Defendants' use or misuse of OC's Confidential Information for their own benefit and/or the benefit of another person or entity.

52.    OC is accordingly entitled the following relief:

a.    A judgment against the Defendants, jointly and severally, in an amount to be shown at trial, which shall include (i) $168,480.00 in unpaid FA Fees from the period of May of 2022 through March of 2023, plus ongoing monthly FA Fees, ongoing and future attorneys' fees, costs, interest, and other charges under the Franchise Agreement; and (ii) damages resulting from the Defendants' violation of the Non-Compete Provisions and use or misuse of OC's Confidential Information in an amount to be shown at trial;

b.    A declaratory judgment that the Defendants are subject to, and obligated to comply with, the Non-Compete Provisions of the Franchise Agreement; and

c.    An order for preliminary and permanent injunctive relief prohibiting the Defendants from (i) continued operation of Ruby's or any other competitive business in

compliance with the Franchise Agreement; and (ii) use and disclosure of OC's Confidential Information.

## SECOND CLAIM FOR RELIEF
### (Breach of Development Agreement)

53.     The allegations and averments in paragraphs 1–52 herein are incorporated herein by reference.

54.     The Development Agreement is a valid and enforceable contractual agreement.

55.     OC has fulfilled its obligations under the Development Agreement.

56.     OC has not released any Defendant, including the Former Franchisee Defendants, from such Defendant's obligations under the Development Agreement.

57.     The Defendants are in default and breach of the Development Agreement by virtue of their conduct set forth herein, and specifically the following:

a.     The Defendants' failure to develop four "Old Chicago®" branded restaurants, in addition to the Restaurant, in the defined development area within the required timeframe; and

b.     The Defendants' violations of the Non-Compete Provisions found in the Development Agreement by virtue of their rebranding of the Restaurant and operation of Ruby's as a competitive business.

58.     OC is accordingly entitled the following relief:

a.     A judgment against the Defendants, jointly and severally, in an amount to be shown at trial, which shall include damages resulting from the Defendants' breach of their development obligations and violations of the Non-Compete Provisions found in the Development Agreement;

11

b.      A declaratory judgment that the Defendants are subject to, and obligated to comply with, the Non-Compete Provisions of the Development Agreement; and

c.      An order for preliminary and permanent injunctive relief prohibiting the Defendants from continued operation of Ruby's or any other competitive business in compliance with the Development Agreement.

### THIRD CLAIM FOR RELIEF
### (Breach of Owners Agreement – Individual Defendants)

59.     The allegations and averments in paragraphs 1-58 are incorporated herein by reference.

60.     The First and Second Owners Agreements are valid and enforceable contractual agreements.

61.     OC has fulfilled its obligations under the First and Second Owners Agreements.

62.     Defendants Cecil O'Brate, Tom Wills, Andy Daniels, and Thad Willis ("the Individual Defendants") are in default and breach of the guarantee and Non-Compete Provisions of the First and/or Second Owners Agreements by virtue of their conduct set forth herein.

63.     OC is therefore entitled to all remedies asserted above against the Individual Defendants for their breach of the First and Second Owners Agreements.

### FOURTH CLAIM FOR RELIEF
### (Misappropriation of Trade Secrets Under the Defend Trade Secrets Act, 18 U.S.C. § 1836)

64.     The allegations and averments in paragraphs 1-63 are incorporated herein by reference.

65.     OC's Confidential Information, and each portion of it, constitutes a "trade secret" within the meaning of the Defend Trade Secrets Act (18 U.S.C. 1839(3)).

12

66.     OC's Confidential Information derives independent economic value from not being generally known to, or readily ascertainable to, the general public or any persons who are not authorized users of it.

67.     OC has taken reasonable measures to keep its Confidential Information secret, including implementing contractual non-disclosure provisions for persons who have access to the Confidential Information, such as those included in the agreements referenced herein.

68.     The Defendants acquired OC's Confidential Information through improper means, in that they:

       a.      Are using OC's Confidential Information without paying the contracted-for royalties;

       b.      Misrepresented that they would operate an Old Chicago® branded restaurant in order to gain access to OC's Confidential Information; and/or

       c.      Have breached their duty to maintain the secrecy of OC's Confidential Information by using it for the benefit of another person and/or entity.

69.     The Defendants know or have reason to know that they acquired OC's Confidential Information through improper means.

70.     The Defendants' misappropriation of OC's Confidential Information was willful, malicious, and made in bad faith.

71.     Accordingly, OC is entitled to the following relief:

       a.      An order for preliminary and permanent injunctive relief prohibiting the Defendants from using or disclosing OC's Confidential Information;

       b.      Damages for OC's actual loss and the Defendants' unjust enrichment, in an

amount to be proven at trial but believed to be no less than $ 150,000.00 or (at the election of OC)
the imposition of a reasonable royalty for the Defendants' use of OC's Confidential Information
during the period of time in which it did not pay royalties under the Franchise Agreement, in an
amount to be proven at trial but believed to be no less than $ $168,480.00 from the period of May
of 2022 through March of 2023, plus such additional amounts as may be shown;

c.     Exemplary damages in an amount equal to twice the damages awarded in
subpart (b) above; and

d.     An award of OC's reasonable attorneys' fees.

WHEREFORE, OC requests relief and remedy against the Defendants as follows:

1.     A money judgment against the Defendants, jointly and severally, in an amount to
be shown at trial, which shall include (i) $168,480.00 in unpaid FA Fees from the period of May
of 2022 through March of 2023, plus ongoing monthly FA Fees, attorneys' fees, costs, interest,
and other charges; and (ii) damages resulting from the Defendants' breach of their development
obligations, violation of the Non-Compete Provisions, and use or misuse of OC's Confidential
Information;

2.     A money judgment against the Defendants, jointly and severally, for damages under
the Defend Trade Secrets Act, including exemplary damages and an award of OC's reasonable
attorneys' fees;

3.     A declaratory judgment that the Defendants are subject to, and obligated to comply
with, the Non-Compete Provisions of the agreements;

4.     An order for preliminary and permanent injunctive relief prohibiting the
Defendants from continued operation of Ruby's or any other competitive business in compliance

14

with the agreements and from further use or disclosure of OC's Confidential Information; and

5.      Such additional relief as may be appropriate.

DATED this 6th day of April, 2023.

**McKAY, BURTON & THURMAN**

_____/s/  David L. Bird_____
David L. Bird
Attorneys for Plaintiff

# Exhibit 1

**EXHIBIT B**



**FRANCHISE AGREEMENT**

**OLD CHICAGO FRANCHISING LLC**
8001 Arista Place Suite #500
Broomfield, CO 80021
Telephone:  (303) 664-4000

Name of Franchisee:

TAC VENTURES, LLC



{00078600 DOC. }
[2017 FA v1F]

# OLD CHICAGO FRANCHISING LLC
## FRANCHISE AGREEMENT

### TABLE OF CONTENTS

**Article**                                                                         **Page**

| Article | | Page |
|---|---|---|
| ARTICLE 1 | GRANT | 1 |
| ARTICLE 2 | SITE SELECTION, PLANS AND CONSTRUCTION | 3 |
| ARTICLE 3 | TERM AND RENEWAL | 5 |
| ARTICLE 4 | FEES | 6 |
| ARTICLE 5 | FRANCHISEE'S OBLIGATIONS | 8 |
| ARTICLE 6 | TRAINING | 9 |
| ARTICLE 7 | FRANCHISOR'S OTHER OBLIGATIONS | 11 |
| ARTICLE 8 | RESTAURANT STANDARDS AND OPERATIONS | 11 |
| ARTICLE 9 | FOODS, PRODUCTS AND SERVICES | 17 |
| ARTICLE 10 | ADVERTISING AND RELATED FEES | 18 |
| ARTICLE 11 | MARKS | 21 |
| ARTICLE 12 | TECHNOLOGY | 22 |
| ARTICLE 13 | MANUAL; OTHER CONFIDENTIAL INFORMATION | 23 |
| ARTICLE 14 | COVENANTS NOT TO COMPETE OR SOLICIT | 25 |
| ARTICLE 15 | BOOKS AND FINANCIAL RECORDS | 26 |
| ARTICLE 16 | INSURANCE | 27 |
| ARTICLE 17 | TRANSFER | 29 |
| ARTICLE 18 | FRANCHISOR'S RIGHT OF FIRST REFUSAL | 32 |
| ARTICLE 19 | INDEMNIFICATION | 33 |
| ARTICLE 20 | RELATIONSHIP OF PARTIES | 34 |
| ARTICLE 21 | TERMINATION | 35 |
| ARTICLE 22 | POST-TERMINATION OBLIGATIONS | 38 |
| ARTICLE 23 | FRANCHISOR'S OPTION TO PURCHASE | 39 |
| ARTICLE 24 | GENERAL PROVISIONS | 40 |
| ARTICLE 25 | ARBITRATION | 42 |
| ARTICLE 26 | FRANCHISEE'S LEGAL COUNSEL | 45 |
| ARTICLE 27 | ACKNOWLEDGMENTS | 45 |
| ARTICLE 28 | GOVERNING LAW; STATE MODIFICATIONS | 46 |
| ARTICLE 29 | DEFINITIONS | 46 |

ATTACHMENTS:

ATTACHMENT A -   FRANCHISE DATA SHEET
ATTACHMENT B -   OWNERS AGREEMENT
ATTACHMENT C -   STATEMENT OF OWNERSHIP



## OLD CHICAGO FRANCHISING LLC
## FRANCHISE AGREEMENT

This Franchise Agreement ("Agreement") is made by and between Old Chicago Franchising, LLC, a Delaware limited liability company ("Franchisor") and the franchisee identified on the signature page of this Agreement ("Franchisee") as of the date specified as the "Effective Date" on the signature page. In consideration of the following mutual promises, the parties agree as follows:

### WITNESSETH:

WHEREAS, as the result of the expenditure of time, skill, effort and money, Rock Bottom Restaurants, Inc., the Franchisor's corporate parent ("Parent"), has developed a distinctive system ("Restaurant System") identified by certain trade names, service marks, trademarks, logos, emblems and indicia of origin ("Marks") that governs the establishment and operation of restaurants ("Restaurants") that feature Chicago-style deep dish pizza, calzones, pasta, burgers, salads and related food items and a wide selection of imported, domestic and micro-brewed beers in a casual dining atmosphere and that operate under the "Old Chicago®" name and in association with the Marks; and

WHEREAS, the distinguishing characteristics of the Restaurant System include distinctive exterior and interior design, decor, color scheme and furnishings; special recipes and menu items; a prescribed beverage selection and tap system; uniform standards, specifications, and procedures for operations; quality and uniformity of foods, products and services; procedures for inventory, management and financial control; training and assistance; and advertising and promotional programs, all of which the Parent may change, improve and further develop from time to time; and

WHEREAS, the Parent has awarded the Franchisor a license to use and sublicense the use of the Restaurant System and the Marks and to franchise the operation of Old Chicago® Restaurants; and

WHEREAS, the Franchisee has entered into a Development Agreement with the Franchisor and, pursuant to that Development Agreement, the Franchisee has applied for a Franchise to operate an Old Chicago® restaurant ("Old Chicago Restaurant" or "Restaurant") and the Franchisor has approved the Franchisee's application; and

WHEREAS, the Franchisee understands and acknowledges the importance of the Franchisor's high standards of quality, cleanliness, appearance and service and the necessity of operating a franchised Old Chicago Restaurant in conformity with the Franchisor's standards and specifications, and the Restaurant System;

NOW, THEREFORE, the parties, in consideration of the mutual undertakings and commitments set forth herein, the receipt and sufficiency of which are hereby acknowledged, agree as follows:

### ARTICLE 1
### GRANT

1.1     Grant of Franchise.    Subject to the terms and conditions of this Agreement, the Franchisor hereby grants to the Franchisee the right and license, and the Franchisee accepts the right and obligation, to operate a franchised Old Chicago Restaurant under the Marks and in accordance with the Restaurant System and the provisions of this Agreement at the Licensed Location specified in Attachment A-1 to this Agreement. At all times, the Franchisee acknowledges and agrees that the Marks are and will remain the sole property of the Parent.



{00078600.DOC. }
[2017 FA v1F]

B-1

1.2.     Franchise Limits.  This Agreement does not grant the Franchisee the right or license to operate the Restaurant from any location except the Licensed Location or to use the Restaurant System or the Marks to offer or sell any Foods, Products or Services through any channel of distribution, except at the Restaurant.

1.3.     Protected Area.  Upon the Franchisor's review and evaluation of the location for the Restaurant and the Franchisee's acquisition of the Licensed Location in accordance with this Agreement, the Franchisor will assign to the Franchisee a primary area of operation ("Protected Area") described in Attachment A-1 to this Agreement.  The Protected Area may be further described in a map attached as an exhibit to this Agreement and signed by the Franchisor and the Franchisee.  Except as provided in this Agreement, and subject to the Franchisee's full compliance with this Agreement and any other agreement between the parties or any of their Affiliates, neither the Franchisor, the Parent nor any of their Affiliates will establish, or authorize any person or Entity to establish an Old Chicago Restaurant, other than the Franchisee's Restaurant, in the Protected Area during the term of this Agreement.

1.4.     Exceptions to Protected Area.  The Franchisee acknowledges that the Franchisor and its Affiliates operate restaurants under the Marks and under other names and marks, and further acknowledges that the rights granted in this Agreement pertain only to the operation of an Old Chicago Restaurant at the Licensed Location.  Accordingly, the Franchisee agrees that the Franchisor and its Affiliates may, or may authorize a third party to:  (a) advertise and promote the Restaurant System in the Protected Area and fill customer orders by marketing ancillary products, gift cards and other merchandise via the Internet to customers who reside or work in the Protected Area; (b) establish and operate in any Reserved Venue an Old Chicago Restaurant or a food service facility of any other type that offers the same products and services as an Old Chicago Restaurant; (c) offer and sell any foods, products and services under any names and marks other than the Marks anywhere, including in the Protected Area; (d) establish and operate an Old Chicago Restaurant anywhere outside of the Protected Area regardless of proximity to the Protected Area or the Restaurant; (e) purchase, be purchased by, merge or combine with any other business, including a business that competes directly with the Franchisee's Restaurant, wherever located; and (f) implement multi-area marketing programs (including over the Internet and national accounts) which may allow the Franchisor or others to solicit or sell to customers anywhere, even in the Protected Area.  The Franchisor reserves the right to issue mandatory policies to coordinate such multi-area marketing programs.

1.5.     Reserved Venue Option.  The Franchisor may conduct, or authorize any other person or Entity to conduct a business, including an Old Chicago Restaurant, at a Reserved Venue in the Protected Area.  The Franchisee may be afforded an opportunity to conduct business in a Reserved Venue if the Franchisee meets the criteria and qualifications that the Franchisor and/or the Facilities Operator deem necessary.  The Franchisor may require the Franchisee to provide such information as may be necessary, in the judgment of the Franchisor or the Facilities Operator, to determine whether the Franchisee meets such criteria and possesses the requisite qualifications.  If offered to the Franchisee, the Franchisee will have the right to accept such offer within 60 days after receipt of written notification of the opportunity.  If the Franchisee fails to notify the Franchisor in writing of the Franchisee's intent to accept the offer within the 60-day period, the Franchisor may conduct such business itself, or authorize any other person or Entity to do so.

1.6.     Relocation.  The Franchisee will not relocate the Restaurant without the prior written consent of the Franchisor.  The Franchisee will request the Franchisor's approval to relocate the Restaurant to another location in the Protected Area in writing.  If the Franchisor grants the Franchisee the right to relocate the Restaurant, the Franchisee will comply with the Franchisor's site selection, construction and other procedures and criteria, and the then-current standards and specifications applicable to new franchisees at the time of the relocation.  The Franchisor has the right to impose such



{00078600 DOC. }
[2017 FA v1F]

B-2

additional conditions upon its approval of Franchisee's relocation of the Restaurant as it determines in its discretion, including, but not limited to, the payment by Franchisee to the Franchisor a Relocation Fee in the amount of $5,000 to reimburse the Franchisor for its costs and expenses associated with the relocation, including legal and accounting fees. The Franchisor will be under no obligation to adjust the boundaries of the Protected Area, or to grant the Franchisee additional territory in the Protected Area, if the Franchisee relocates its Restaurant.

     1.7.   Owner's Agreement and Assumption of Obligations. To induce us to enter into this Agreement, all persons with a direct or indirect ownership interest in the Restaurant, and their spouses, must sign and deliver to us the Owner's Agreement in the form attached to this Agreement as <u>Attachment B</u>. If the Franchisee is an entity, each individual owner (i.e., each natural person holding a direct or indirect ownership interest in the Franchisee) and their spouses must sign the Owner's Agreement in the form attached to this Agreement as <u>Attachment B</u>. Any future persons and their spouses must sign and deliver revised versions of <u>Attachment B</u> as a condition of, and in order to reflect any permitted changes in ownership in connection with any permitted transfer of ownership under this Agreement.

     <u>Attachment C</u> to this Agreement completely and accurately describes all of the Franchisee's owners and their interests in the Franchisee as of the Effective Date. The Franchisee and its owners agree to sign and deliver to the Franchisor revised versions of <u>Attachment C</u> periodically to reflect any permitted changes in the information that <u>Attachment C</u> now contains.

# ARTICLE 2
## SITE SELECTION, PLANS AND CONSTRUCTION

     2.1.   <u>Site Acquisition</u>. The Franchisee will be responsible for all costs and expenses for locating, presenting for the Franchisor's prior review, securing and developing a site for the Restaurant within the Protected Area, and for constructing and equipping the Restaurant at the Licensed Location. The Franchisee acknowledges that the location, selection, procurement and development of the site for the Restaurant is the Franchisee's responsibility; that in discharging such responsibility the Franchisee must consult with real estate and other professionals of the Franchisee's choosing; and that the Franchisor's evaluation of a prospective site and the rendering of any assistance in the review of a site does not constitute a representation, promise, warranty or guaranty, express or implied, by the Franchisor that an Old Chicago Restaurant operated at that site will be profitable or financially successful.

     2.2.   <u>Site Selection Guidelines</u>. Prior to making a binding commitment to secure a site for the Restaurant by lease or purchase, the Franchisee will locate a site that satisfies the site selection guidelines provided to the Franchisee by the Franchisor, obtain the financial information, approvals and commitments required by the Franchisor, and submit to the Franchisor, in the form the Franchisor specifies, the information and materials as the Franchisor may require regarding the proposed site for the Restaurant (collectively, "<u>Site Information</u>"). The Franchisee will not purchase or lease a proposed site until the Franchisee has provided the Site Information to the Franchisor, the Franchisor has reviewed the Site Information, and the Franchisor has provided the Franchisee with a no-objection letter for the proposed site. The review of any Site Information, any visits by the Franchisor to a proposed site, and/or the issuance of a no-objection letter by the Franchisor will not constitute an approval of the site by the Franchisor or a warranty or representation by the Franchisor or any other party that the site for the Licensed Location chosen by the Franchisee will be a financial or operational success. The issuance of a no-objection letter by the Franchisor will mean only that it has received and reviewed the Site Information provided by the Franchisee, and will not be deemed to be an approval of the site by the Franchisor.

     2.3.   <u>Site Release</u>. Except as set forth in Section 2.2 of this Agreement, the Franchisor will have no duty or obligation to assist the Franchisee in the selection of a site for the Licensed Location, or



to provide any assistance to the Franchisee in the purchase or lease of the Licensed Location. The Franchisor has informed the Franchisee that it does not have any experience or expertise in selecting real estate sites in the geographic area where the Franchisee's Restaurant will be located and, therefore, the Franchisor will not have any obligation, duty or liability to the Franchisee as a result of the site selected by the Franchisee and/or the purchase or lease of the Licensed Location. The Franchisee hereby releases the Franchisor and its Affiliates and their respective agents and employees, in their corporate and individual capacities, from any and all Claims by the Franchisee arising from, in connection with, or as a result of the Franchisee's purchase or lease of the site selected by the Franchisee for the Licensed Location.

2.4.    Timing for Site Acquisition.  Within 60 days after the Franchisor has evaluated the site for the Restaurant and issued the no-objection letter, the Franchisee will, at the Franchisee's expense, acquire the Licensed Location by purchase or lease.

2.5.    Lease for Licensed Location.  If the Franchisee leases the Licensed Location, the Franchisee will submit a copy of the proposed Lease to the Franchisor prior to the Lease's execution, and furnish to the Franchisor a copy of the executed Lease within 10 days after execution. The terms of the Lease must, at a minimum: (a) give the Franchisor the right to enter the premises during regular business hours to conduct inspections, monitor the use of the Marks and cure defaults under the Lease or this Agreement, (b) prohibit the Franchisee from subleasing or assigning all or any of its occupancy rights or the leased premises without the Franchisor's prior written consent; (c) give the Franchisor the right (but not the duty) to assume the Lease for the remaining term of the Lease if, prior to the expiration of the Lease, the Franchisee is evicted by the landlord or if this Agreement expires or is terminated by either the Franchisor or the Franchisee for any reason; however, in all the aforementioned situations, franchisee shall have the right of first refusal to keep said leased premises; and (d) provide that the Franchisee and the landlord will not amend the Lease in any manner that would materially affect the Franchisee's obligations under this Agreement without the Franchisor's prior written consent. Any lease signed may require the Franchisee's owners and their spouses to sign a personal guaranty. The Franchisee will have the Lease reviewed by its legal counsel, and the Franchisee and the Franchisee's landlord will execute a copy of the Lease Addendum attached to the Franchise Disclosure Document as Exhibit H. The Franchisor's review of the Lease will not be for the purpose of approving the legal aspects, economics or rental terms of the Lease. Accordingly, the Franchisor will have no responsibility to the Franchisee regarding the economics, legality or enforceability of the Lease.

2.6.    Prototypical Restaurant Plans and Specifications.  If the site for the Restaurant will be newly constructed by the Franchisee, the Franchisor will loan to the Franchisee the Franchisor's prototypical restaurant plans and specifications for an Old Chicago Restaurant. If the Licensed Location for the Franchisee's Restaurant will be located in an existing building or end-cap space, the Franchisor will provide to the Franchisee a conceptual space and site plan design for the site of the Restaurant. The Franchisee must independently obtain, at its expense, the architectural, engineering and design services it deems necessary for the construction or remodeling of the Restaurant from a licensed architectural design firm. The Franchisee, at its expense and in cooperation with the architect, engineering and/or design firm it has employed, will adapt the Restaurant plans and specifications for construction or remodeling of the Restaurant provided by the Franchisor to the extent necessary to be consistent with local building codes and will submit such plans to the Franchisor for review. If the Franchisor determines, in its sole discretion, that the architect, the architectural design firm and/or the Restaurant plans do not meet the Franchisor's architectural and design standards and specifications for an Old Chicago Restaurant or are not consistent with the best interests of the Restaurant System, the Franchisor will, within 30 days after receiving such plans, provide the Franchisee with a reasonably detailed list of the changes necessary to make the plans acceptable. The Franchisee acknowledges that the Franchisor's review of such plans does not constitute a representation, warranty or guaranty, express or implied, by the Franchisor that such plans



are free of architectural or design errors or that they comply with all applicable legal requirements (including the requirements of the Americans With Disabilities Act) and the Franchisor will have no liability to the Franchisee or any other party with respect thereto.

2.7. <u>Construction or Remodeling</u>. Prior to beginning construction or remodeling of the Restaurant at the Licensed Location, the Franchisee will obtain all zoning approvals, clearances, permits, licenses and certifications required for the lawful construction or remodeling of the Licensed Location. The Franchisee will provide the Franchisor with periodic reports regarding the progress of the construction or remodeling as may be requested by the Franchisor. If the Franchisor identifies instances where the Franchisee's construction or remodeling is inconsistent with, or does not meet, the Franchisor's standards, the Franchisor will notify the Franchisee in writing of such deficiencies, and the Franchisee will correct such deficiencies prior to opening. The Franchisee will notify the Franchisor of the scheduled date for completion of construction or remodeling no later than 30 days prior to such date. Within a reasonable time after the date of completion of construction or remodeling, the Franchisor will, at its option, conduct an inspection of the completed Restaurant. The Franchisee acknowledges and agrees that the Franchisee will not open the Restaurant for business without the prior written authorization of the Franchisor.

2.8. <u>Opening of Restaurant</u>. The Franchisee will open and commence business at the Restaurant within 270 days after the Effective Date of this Agreement unless the Development Agreement or another written agreement between the parties specifies a different Required Opening Date. Prior to opening, the Franchisee will complete all exterior and interior preparations for the Restaurant pursuant to the standards and specifications approved by the Franchisor, and will comply with all other pre-opening obligations of the Franchisee to the Franchisor's satisfaction. The Franchisor will have the right to prohibit the Franchisee from opening the Restaurant for business until the Franchisee complies with these obligations.

**ARTICLE 3**
**TERM AND RENEWAL**

3.1. <u>Term</u>. The term of this Agreement will commence on the Effective Date and will expire 10 years after the Effective Date. If the Franchisee leases the Licensed Location, then the Franchisee will use its best efforts to negotiate a Lease term that coincides with the term of this Agreement, and the term of this Agreement and the term of the Lease for the Licensed Location will commence on the same date. If the term of the Lease for the Licensed Location (excluding any renewal terms) is for a term that is longer than the term of this Agreement, then the term of this Agreement will be automatically extended to coincide with the initial term of the Franchisee's Lease for the Licensed Location; provided, however, that in no event will the term of this Agreement exceed 20 years (excluding any renewal terms). If the Franchisee, or any of the Franchisee's Owners, owns, either directly or indirectly, the Licensed Location, including the business premises, the real estate or the building, then the term of this Agreement will be for 15 years.

3.2. <u>Option to Reacquire</u>. The Franchisee may, at its option, reacquire the Franchise for the Restaurant for an additional term of 10 years, subject to any or all of the following conditions: (a) the Franchisee will give the Franchisor written notice of the Franchisee's intention to reacquire the Franchise not less than seven months nor more than 12 months prior to the end of the term of this Agreement; (b) the Franchisee will repair or replace, at the Franchisee's expense, all FF&E required for the operation of the Restaurant as the Franchisor may require and will obtain, at the Franchisee's expense, any new or additional FF&E that may be required by the Franchisor for the Franchisee to offer and sell new menu items from the Restaurant or to provide the Restaurant's services by alternative means, such as carry-out, catering, or other manner specified by the Franchisor, and will otherwise modernize the Restaurant



premises and the FF&E required for the operation of the Restaurant, as required by the Franchisor to reflect then-current standards and image of the Restaurant System; (c) the Franchisee is not in default of any provision of this Agreement or any other agreement between the parties to this Agreement and any of their Affiliates and the Franchisee has timely complied with all the terms and conditions of such agreements during their terms; (d) the Franchisee has satisfied all monetary obligations owed by the Franchisee to the Franchisor and their Affiliates under this Agreement and under any other agreement between the parties to this Agreement and any of their Affiliates and has timely met those obligations throughout the terms of the related agreements; (e) the Franchisee has the right to remain in possession of the Licensed Location or obtains the Franchisor's approval of a new site for the operation of the Restaurant for the duration of the renewal term of the Franchise; (f) the Franchisee and its Owners have executed a general release, in a form satisfactory to the Franchisor, of any and all Claims against the Franchisor, its Affiliates and each of their respective officers, directors, agents, representatives, independent contractors and employees, in their corporate and individual capacities, including Claims arising under this Agreement and federal, state and local laws, rules and regulations; (g) the Franchisee will execute the Franchisor's then-current form of franchise agreement and ancillary documents (including, but not limited to, an Owners Agreement or other guaranty) for a term of 10 years, the provisions of which may substantially differ from the terms of this Agreement including, without limitation, a higher percentage Royalty Fee, Brand Fund Contribution and other advertising contribution and expenditure requirements, except that the Franchisee will pay to the Franchisor, in lieu of an Initial Franchise Fee, a Reacquisition Fee of 50% of Franchisor's then current Initial Franchise Fee or, if Franchisor is not then offering franchises for sale, then $20,000; and (h) the Franchisee will comply with the Franchisor's then-current qualification and training requirements.

## ARTICLE 4
### FEES

4.1.    Initial Franchise Fee.   Unless the Franchisee is signing this Agreement under a Development Agreement the Franchisor, in which case the payment schedule would be determined by the provisions of such Development Agreement, upon execution hereof, the Franchisee will pay to the Franchisor a nonrefundable Initial Franchise Fee of $40,000, which will be paid in full when the Franchisee executes this Agreement.  The Initial Franchise Fee will be deemed fully earned when paid and is payment for all of the pre-opening assistance that Franchisor provides to allow Franchise to open the Restaurant, and it also offsets some of Franchisor's franchisee recruitment expenses.

4.2.    Royalty Fee.   During the term of this Agreement, the Franchisee will pay to the Franchisor a continuing Royalty Fee in an amount equal to 4% of the Restaurant's Gross Sales.  The Royalty Fee is an ongoing payment that allows Franchisee to use the Marks and the intellectual property of the Restaurant System and that pays for Franchisor's ongoing support and assistance.

4.3.    Payment of Royalty Fees; Royalty Reports.  The Royalty Fee and any other fees required by this Agreement to be calculated and paid on the basis of Gross Sales will be payable on the 15th day following the end of each Sales Period with respect to the Gross Sales for the preceding Sales Period, and must be paid by the Franchisee to the Franchisor by electronic funds transfer ("EFT") from the Franchisee's designated bank account on the date due.  Each Royalty Fee payment will be preceded or accompanied by a report ("Royalty Report") that itemizes the Gross Sales for the related Sales Period and by any other reports the Franchisor may require.  The Franchisee will also provide the Franchisor with detailed sales information, including the calculated Gross Sales for the preceding Week generated by the Franchisee's Restaurant.  This information will be captured from the point-of-sales system on Monday morning of each Week for the preceding Week by electronic data communication, facsimile transmission or such other method as the Franchisor may direct or permit.



4.4.    Electronic Funds Transfer.  The Franchisee will establish and maintain an EFT account and the Franchisor may withdraw funds from the Franchisee's designated bank account by EFT in the amount of the Royalty Fees, Brand Fund Contributions payable pursuant to Section 10.1, and any other fees, payments or amounts due to the Franchisor or its Affiliates.  Withdrawals may be made on the first business day after the Royalty Fee, Brand Fund Contribution or other payment is due or on any succeeding business day, and if applicable, the amount of the withdrawal will be based on the Gross Sales for the applicable Sales Period, as evidenced by the Royalty Report.  If the Franchisor has not received the relevant Royalty Report, the amount of the withdrawal will be based on the most recent Royalty Report provided to the Franchisor by the Franchisee as required by Section 4.3.  When the Franchisor subsequently receives the Royalty Report for the subject Sales Period, the amount of the payment for the subject Sales Period will be adjusted based upon the actual Gross Sales generated during the applicable Sales Period.  For any other monetary obligation not paid when due, the Franchisor will have the right to withdraw such amounts on the fifth or later business day after such amount becomes past due.  The Franchisee will, upon execution of this Agreement or any time thereafter at the Franchisor's request, execute such documents or forms as the Franchisor determines are necessary for the Franchisor to process EFT payments from the Franchisee's designated bank account for payments due hereunder.  The Franchisee will be responsible for any EFT transfer fees or service charges imposed by its bank.  The Franchisee will at all times throughout the term of this Agreement maintain a balance in the bank account sufficient to cover the EFT payments made from the account.  The Franchisee will not be entitled to withhold payments due the Franchisor under this Agreement on grounds of alleged nonperformance by the Franchisor.

4.5.    Interest and Fees on Amounts due to the Franchisor.  All unpaid obligations under this Agreement will bear interest from the date due until paid at the lesser of (a) 18% per annum, or (b) the maximum rate allowed by applicable law.  If interest in excess of the maximum rate allowed by applicable law will be deemed charged, required or permitted, any such excess will be applied as a payment and reduction of any other amounts which may be due and owing hereunder.  If any check, draft, electronic transfer or otherwise, is unpaid because of insufficient funds or otherwise, the Franchisee shall pay the Franchisor a fee of $50 per occurrence.  The Franchisee will also pay the Franchisor an administrative fee of $100 for each delinquent payment within 10 days after the delinquent payment was due.  If any payment is made to the Franchisor by credit card for any fee required, the Franchisor may charge a service charge of up to 4% of the total charge.  The Franchisee will, immediately upon receipt of an invoice from the Franchisor, reimburse the Franchisor for any and all costs incurred by the Franchisor in the collection of any past-due payments, including attorneys' fees and costs.

4.6.    Application of Franchisee Payments.  All payments by Franchisee pursuant to this Article 4 shall be applied in such order and to such obligations of Franchisee as Franchisor in its sole discretion may designate from time to time.  Franchisee agrees that they may not designate an order of application of any payments different from that designated by Franchisor and expressly acknowledges and agrees that Franchisor may accept payments made pursuant to different instructions from Franchisee without any obligation to follow such instructions, even if such a payment is made by its terms conditional on such instructions being followed.  This subparagraph may be waived only by written agreement signed by Franchisor, which written agreement must be separate from the check or other document constituting payment.

4.7.    Security Interest in Restaurant.  As security for the performance of the Franchisee's obligations under this Agreement, including payments owed to the Franchisor, the Franchisee grants the Franchisor a security interest in all of the assets of the Restaurant, including but not limited to inventory, fixtures, furniture, equipment, accounts, supplies, contracts, and proceeds and products of all those assets.  The Franchisee agrees that the Franchisor may file a UCC-1 to perfect the security interest granted.  If the Franchisee defaults in any of the Franchisee's obligations under this Agreement, the Franchisor may



exercise all rights of a secured creditor granted to the Franchisor by law, in addition to the Franchisor's other rights under this Agreement and at law. The Franchisee will not grant a security interest in the Restaurant or in any of the Restaurant Assets to any party other than the Franchisor without the Franchisor's prior written consent. In connection with any request for the Franchisor's consent, the secured party will be required to enter into an agreement with the Franchisor that ensures orderly transition of management control of the Restaurant in the event of default by the Franchisee under any documents related to the security interest.

## ARTICLE 5
## FRANCHISEE'S OBLIGATIONS

5.1.    <u>Franchisee's Efforts</u>.  The Franchisee and each of the Owners covenants and agrees that they will make all commercially reasonable efforts to operate the Restaurant so as to achieve optimum sales.  Each Owner will execute this Agreement as one of the Owners, and will be individually, jointly and severally, bound by all obligations of the Franchisee and the Owners.

5.2.    <u>Operating Principal</u>.  The "<u>Operating Principal</u>" designated by the Franchisee when the Franchisee signed the Development Agreement will, during the entire time he or she acts as such, meet the following qualifications:  (a) the Operating Principal must, at the Franchisee's option, either serve as the General Manager or, subject to the approval of the Franchisor, the Franchisee must designate another individual to act as the General Manager; (b) except as may otherwise be provided in this Agreement, the Operating Principal's Ownership Interest in the Franchisee must remain free of any pledge, mortgage, hypothecation, lien, charge, encumbrance, voting agreement, proxy, security interest or purchase right or options; (c) the Operating Principal will execute this Agreement as one of the Owners, and will be individually, jointly and severally, bound by all obligations of the Franchisee and the Owners; (d) the Operating Principal will devote his/her full time and best efforts to the supervision, management and operations of the Franchisee's Restaurant; and (e) if, during the term of this Agreement, the Operating Principal is not able to continue to serve in the capacity of Operating Principal or no longer qualifies to act as Operating Principal, the Franchisee will promptly notify the Franchisor and designate a duly qualified replacement Operating Principal within 30 days after the Operating Principal ceases to serve or be so qualified.  The replacement Operating Principal must complete the approval process and training required by the Franchisor and be approved by the Franchisor in writing before assuming his/her duties.

5.3.    <u>Management Team</u>.  The Franchisee will designate and retain at all times a general manager ("<u>General Manager</u>"), a kitchen manager ("<u>Kitchen Manager</u>") two or more assistant managers ("<u>Assistant Managers</u>") and such other personnel as the Franchisor deems reasonably necessary for the operation and management of the Restaurant.  The General Manager and the Assistant Managers will be responsible for the daily operation of the Restaurant.  The Kitchen Manager will be responsible for the daily operation of the kitchen of the Restaurant.  The General Manager, Kitchen Manager and Assistant Managers will hereinafter be collectively referred to as the "<u>Management Team</u>."  A designated member of the Franchisee's Management Team will be responsible for the training of the Franchisee's bartenders, wait staff and other floor personnel ("<u>Training Manager</u>").  The Management Team members will, during the entire period they are employed by the Franchisee: (a) satisfy Franchisor's educational and business experience criteria, as set forth in the Manual or otherwise in writing by the Franchisor; (b) be full-time employees who will devote their full time and best efforts to their respective duties; and (c) satisfy the Franchisor's initial and on-going training requirements.  If, during the term of this Agreement, a member of the Management Team is not able to continue to perform his/her required duties or no longer qualifies to hold such position, the Franchisee will promptly notify the Franchisor and designate a duly qualified replacement within 30 days after the affected individual ceases to serve.



5.4.    Compensation for Hiring Former Employee.  The Franchisee and the Owners understand that compliance by all franchisees operating under the Restaurant System with the Franchisor's training, development and operational requirements is an essential and material element of the Restaurant System and that all operators of Old Chicago Restaurants consequently expend substantial time, effort and expense in training their management personnel.  Accordingly, the Franchisee and the Owners agree that if the Franchisee or any of the Owners, during the term of this Agreement, designate or employ in a managerial position any individual who is at the time, or has been within the preceding 180 days, employed in a managerial position by the Franchisor or any of its Affiliates, or by any other franchisee, then the former employer of such individual will be entitled to be compensated for the costs and expenses, of whatever nature or kind, incurred by such employer in connection with the training of such employee. The employing Franchisee or Owner will pay an amount equal to the compensation (including salary, bonuses and benefits) of such employee for the 24-month period (or such shorter time, if applicable) immediately prior to the termination of his or her employment with the former employer.  This amount will be paid by the Franchisee or the applicable Owner prior to such individual's assuming his or her new position, unless the Franchisee or the applicable Owner and the former employer otherwise agree in writing.

## ARTICLE 6
## TRAINING

6.1.    Training.  The Franchisee agrees that it is necessary for the efficient operation of the Restaurant that the Operating Principal (or, if applicable, the Operations Officer, as defined in the Development Agreement), the Management Team and other Restaurant personnel receive such training as the Franchisor may require.  For the purposes of this Article, all references to the Operating Principal will mean the Operations Officer if designated as such by the Operating Principal in accordance with the Development Agreement.  Not later than thirteen weeks prior to the date the Restaurant is scheduled to open, the Franchisee's Operating Principal, General Manager, Kitchen Manager, and two Assistant Managers (a total of five individuals, which will include a designated Training Manager) will attend and complete, to the Franchisor's satisfaction, those elements of the Franchisor's Manager In Training Program ("MITP") applicable to such positions.  MITP may last up to seven weeks.  If this Agreement is for the Franchisee's second Restaurant, the Franchisee's General Manager, Kitchen Manager and two Assistant Managers (a total of four individuals) will attend the MITP.  For each of Franchisee's Restaurants after the second, Franchisee shall, at Franchisee's expense, conduct MITP for the General Manager, Kitchen Manager, and Assistant Managers in a Restaurant of Franchisee that has been approved by Franchisor as a "Certified Training Restaurant."  Franchisor will require the Restaurant designated by the Franchisee as its Certified Training Restaurant passes Franchisor's brand standards audit as a condition for approval.  Franchisee's Training Manager and MITP instructors must participate in a two week training program and be certified by Franchisor before Franchisee may conduct MITP.  After Franchisee has developed its second Restaurant, Franchisee shall also be responsible, at its expense, for conducting MITP for any replacement Operating Principal, General Manager, Kitchen Manager or Assistant Manager in Franchisee's Certified Training Restaurant; otherwise, such replacement managers must attend MITP conducted by Franchisor at Franchisee's expense.  Except as otherwise provided in this Agreement or the Development Agreement, training of such persons will be conducted by the Franchisor at a Certified Training Restaurant or another location designated by the Franchisor, and the Franchisor will provide instructors for the MITP for such persons at no additional cost to the Franchisee, subject to the payment by the Franchisee of its expenses and the expenses of its personnel as provided below. Franchisee shall designate a qualified replacement Operating Principal, General Manager, Kitchen Manager, Assistant Manager or Training Manager within 30 days after the affected individual ceases to serve in that capacity.  Any replacement or successor Operating Principal, General Manager, Kitchen Manager or Training Manager must complete applicable portions of the MITP within 13 weeks of such individual's start date, said training to begin within 30 days after such start date.  The Franchisor reserves

the right to charge a reasonable fee for any training provided by the Franchisor to any replacement or successor Operating Principal, General Manager, Kitchen Manager or Training Manager, if the Franchisee is not approved by the Franchisor to provide such training in accordance with the Development Agreement. The Franchisee will be responsible for any and all expenses incurred by the Franchisee or the Franchisee's personnel in connection with any MITP, including Travel Expenses, Salaries and Benefits, and the cost of the printed training materials provided by the Franchisor to the Franchisee and the Franchisee's personnel during training. Payments to the Franchisor for printed training materials will be due and payable by the Franchisee within 10 days after receipt of an invoice from the Franchisor indicating the amount owed.

6.2. <u>Completion of Training</u>. The Franchisor will determine, in its sole discretion, whether the members of the Franchisee's Management Team have satisfactorily completed the MITP. If the MITP is not satisfactorily completed by all of the members of the Management Team, or if the Franchisor, in its reasonable business judgment based upon observation of any such person's performance, determines that the person cannot satisfactorily complete the required training, the Franchisee will designate a replacement who must satisfactorily complete the required training at least 13 weeks prior to the Required Opening Date.

6.3. <u>Additional Training</u>. The Operating Principal, General Manager, Kitchen Manager, Assistant Managers, Training Manager, and such other Restaurant personnel as the Franchisor may designate, will attend such additional training programs and seminars as the Franchisor may offer from time to time. For all such programs and seminars, the Franchisor will provide the instructors and training materials. However, the Franchisor reserves the right to impose a fee for such additional training programs and seminars. The Franchisee will be responsible for any and all expenses incurred by the Franchisee and its Restaurant personnel in connection with such additional training, including Travel Expenses, Salaries and Benefits. Payments to the Franchisor for additional training will be due and payable by the Franchisee within 10 days after receipt of an invoice from the Franchisor indicating the amount owed.

6.4. <u>New Restaurant Opening Team</u>. A New Restaurant Opening Team ("NRO Team") will assist with the implementation of the Restaurant System and provide on-site pre-opening and opening training, supervision and assistance at the Restaurant. The duration of on-site assistance, personnel and number of members of the NRO Team will be solely determined by the Franchisor; provided however that if the Restaurant is the first Old Chicago Restaurant opened by Franchisee, the NRO Team will provide at least four weeks of assistance. The NRO Team will include a NRO Manager, a Back-of-the-House ("BOH") Lead, a BOH kitchen training team, consisting of four to six people, a Front-of-the-House ("FOH") Lead and a FOH training team, consisting of four to six people. If Franchisee (and/or its Affiliates, collectively) owns three or more Old Chicago Restaurants, Franchisee must supply its own NRO Team members.

6.5. <u>NRO Team Expenses</u>. All Travel Expenses, Salaries and Benefits for the members of the NRO Team, as required and determined by the Franchisor, will be paid by the Franchisee. If the Franchisor schedules the Franchisee's opening and the Restaurant is not ready to open as scheduled, the Franchisee will be responsible for the costs to change travel arrangements for the entire NRO Team and all related expenses. Invoices for the expenses applicable to the NRO Team will be sent on a Monthly basis to the Franchisee by the Franchisor after the opening of the Restaurant. The Franchisee will pay each such invoice in full within 10 days after receipt of the invoice. These fees are uniformly imposed and non-refundable. In the event the Franchisee is not able to supply its NRO Team members, the Franchisor may provide team members to fill the remaining positions on the NRO Team, at the Franchisee's expense. Franchisee must designate a charity to which Franchisee must donate any monies received at any pre-opening or mock dining bar or restaurant session.



6.6.   <u>Additional Assistance</u>.   For any additional pre-opening, opening or other training or assistance the Franchisee requests, and any similar assistance that the Franchisor provides to the Franchisee, the Franchisee will pay to the Franchisor the then-current per diem fee being charged to franchisees generally for trained representative assistance, and reimburse the Franchisor for any related expenses incurred by the Franchisor to provide such training or assistance including, if applicable, Travel Expenses.   Payments to the Franchisor for such additional assistance will be due and payable by the Franchisee within 10 days after receipt of an invoice from the Franchisor indicating the amount owed.

6.7.   <u>On-Site Remedial Training</u>.   Upon the reasonable request of the Franchisee or as the Franchisor deems appropriate, the Franchisor will, subject to the availability of personnel, provide the Franchisee with additional trained representatives who will provide on-site remedial training to the Franchisee's Restaurant personnel.   The Franchisee will pay the per diem fee then being charged to franchisees under the Restaurant System for the services of such trained representatives, plus their Travel Expenses.   Payments to the Franchisor for such on-site remedial training will be due and payable by the Franchisee within 10 days after receipt of an invoice from the Franchisor indicating the amount owed.

## ARTICLE 7
## FRANCHISOR'S OTHER OBLIGATIONS

In addition to the training and other assistance provided pursuant to Article 6 the Franchisor will also provide the following services and assistance to the Franchisee during the term of this Agreement: (1) periodic visits to the Restaurant, as determined by the Franchisor, to inspect the premises of the Restaurant and evaluate the Restaurant's Foods, Products and Services; (2) copies of advertising and promotional materials and information that the Franchisor develops from time to time for use by operators of Old Chicago Restaurants in local marketing and advertising, including formats for classified directory advertising for which the Franchisor will have the right to charge the Franchisee a fee; (3) updates to the list of Approved and Designated Suppliers and the criteria for the Franchisor's approval of new Approved Suppliers; and (4) updates to the Manual.

## ARTICLE 8
## RESTAURANT STANDARDS AND OPERATIONS

8.1.   <u>Compliance with Standards</u>.   The Franchisor has developed and will continue to develop uniform standards of quality, cleanliness and service applicable to all Old Chicago Restaurants, including the Franchisee's Restaurant, to protect and maintain for the benefit of the Franchisor and all of its franchisees the distinction, valuable goodwill and uniformity represented and symbolized by the Marks and the Restaurant System.   The Franchisee agrees to maintain the uniformity and quality standards required by the Franchisor for all Foods, Products and Services associated with the Marks and the Restaurant System, and agrees to the terms and conditions contained in this Article to assure the public that all Old Chicago Restaurants will be uniform in nature and will sell and dispense quality Foods, Products and Services.   The Franchisee understands the importance of maintaining uniformity among all of the Old Chicago Restaurants and the importance of complying with all of the Franchisor's standards and specifications relating to the operation of the Restaurant and agrees to comply with those standards and specifications.   The Franchisee will use the Marks and the Restaurant System in strict compliance with the moral and ethical standards, quality standards, health standards, operating procedures, specifications, requirements and instructions required by the Franchisor.

8.2.   <u>Maintenance of Restaurant</u>.   The Franchisee will maintain the Restaurant in a high degree of sanitation, repair and condition, and in connection therewith will make such additions, alterations, repairs and replacements to the Restaurant as may be required for sanitation purposes (but no others



{00078600.DOC. }
[2017 FA v1F]

B-11

without the Franchisor's prior written consent), including such periodic repainting or replacement of worn or obsolete FF&E as the Franchisor may require, at the Franchisee's cost and expense. The Franchisee will also obtain, at its expense, any new or additional FF&E that may be reasonably required by the Franchisor for the Franchisee to comply with the then-current Restaurant System, to offer and sell new menu items from the Restaurant or to provide the Restaurant's services by alternative means, such as through carry-out, catering, or any other manner specified by the Franchisor. Except as may be expressly provided in the Manual or otherwise in writing by the Franchisor, no alterations or improvements or changes of any kind in the design or the premises of the Restaurant or the FF&E will be made in or about the Restaurant without the prior written approval of the Franchisor.

8.3. <u>Remodeling of Restaurant</u>. The Franchisee will, upon the request of the Franchisor and at Franchisee's sole expense, make other improvements to remodel and/or modernize the premises of the Restaurant and the FF&E to comply with the Franchisor's then-current standards and specifications. The Franchisee agrees that it will make such capital improvements or modifications to the Restaurant if so requested by the Franchisor every five years during the term of this Agreement.

8.4. <u>Compliance with Manual</u>. To ensure that the highest degree of quality and service is maintained, the Franchisee will operate the Restaurant in strict conformity with such methods, standards and specifications of the Franchisor set forth in the Manual and as may from time to time otherwise be prescribed by the Franchisor in writing. The Franchisee acknowledges that its compliance with the Manual is vitally important to the Franchisor and the Restaurant System's franchisees and is necessary to protect the Franchisor's reputation and the goodwill of the Marks and to maintain the uniform quality of operation through the Restaurant System. However, the Manual is not designed to control the day-to-day operation of the Franchisee's Restaurant.

8.5. <u>Foods, Products and Services Offered</u>. The Franchisee will sell or offer for sale all Foods, Products and Services required by the Franchisor and only in the manner and style prescribed by the Franchisor, including dine-in, carry-out and catering, as expressly authorized by the Franchisor in writing in the Manual or otherwise, and execute such documents or instruments as the Franchisor may deem necessary to facilitate the providing of these services. The Franchisee will sell and offer for sale only the Foods, Products and Services that have been expressly approved for sale in writing by the Franchisor; and will discontinue selling and offering for sale any Foods, Products or Services, or providing such Foods, Products or Services in any manner or through any method of distribution which the Franchisor may, in its sole discretion, disapprove in writing at any time. The Franchisee will have discretion regarding the prices it charges customers for menu items, products, merchandise or services subject to its participation in Restaurant System wide promotions. However, Franchisor reserves the right to establish minimum and maximum resale prices subject to applicable law. The Franchisee will maintain in sufficient supply and to use and sell at all times only such food and beverage items, ingredients, products, materials, supplies and paper goods that conform to the Franchisor's standards and specifications (including products specified by name or brand).

8.6. <u>Sample Testing</u>. The Franchisor or its agents will have the right, at any reasonable time, to remove a reasonable number of samples of beer, beverages, food or non-food items from the Franchisee's inventory, or from the Restaurant, without payment therefor, in amounts necessary for testing by the Franchisor or an independent laboratory to determine whether the samples meet the Franchisor's then-current standards and specifications. In addition to any other remedies it may have under this Agreement, the Franchisor may require that the Franchisee bear the cost of the testing if the supplier of the item has not previously been approved by the Franchisor or if the sample fails to conform to the Franchisor's standards or specifications.



8.7.    Furniture, Fixtures and Equipment.  The Franchisee will purchase or lease and install, at the Franchisee's expense, all FF&E as the Franchisor may direct from time to time in the Manual or otherwise in writing; and refrain from installing or permitting to be installed on or about the Restaurant premises, without the Franchisor's prior written consent, any FF&E or other items not previously approved as meeting the Franchisor's standards and specifications.

8.8.    Approved Signs.  All exterior and interior signs at the Licensed Location ("Signs") must comply with the standard sign plans and specifications established by the Franchisor and provided to the Franchisee.  The Franchisee will, at its expense, prepare or cause the preparation of complete and detailed plans and specifications for the Signs and will submit them to the Franchisor for written approval.  The Franchisor will have the absolute right to inspect, examine, videotape and photograph the Signs during the term of this Agreement.  The Franchisee will be responsible for any and all installation costs, sign costs, architectural fees, engineering costs, construction costs, permits, licenses, repairs, maintenance, utilities, insurance, taxes, assessments and levies in connection with the construction, erection, maintenance or use of the Signs.  The Franchisee will comply with all federal, state and local laws, regulations, building codes and ordinances relating to the construction, erection, maintenance and use of the Signs.  The Franchisee may not alter, remove, change, modify, or redesign the Signs unless approved by the Franchisor in writing.  The Franchisor will have the right to redesign the specifications for the Signs without the approval or consent of the Franchisee.  Within 90 days after receipt of written notice from the Franchisor, the Franchisee will, at its expense, either modify or replace the Signs so that the Signs displayed at the Licensed Location will comply with the new specifications.  The Franchisee will not be required to modify or replace the Signs more than once every five years.

8.9.    Inspections.  The Franchisee will grant the Franchisor and its agents the right to enter upon the Restaurant premises at any time for the purpose of conducting inspections; cooperate with the Franchisor's representatives in such inspections by rendering such assistance as they may reasonably request; and, upon notice from the Franchisor or its agents and without limiting Franchisor's other rights under this Agreement, take such steps as may be necessary to correct immediately any deficiencies detected during any such inspection.  Should the Franchisee, for any reason, fail to correct such deficiencies within the time period determined by the Franchisor, such failure shall be a default under this Agreement, and the Franchisor will have the right and authority (without, however, any obligation to do so) to correct such deficiencies and charge the Franchisee a fee for the Franchisor's expenses in so acting, payable by the Franchisee immediately upon demand.

8.10.   Staffing; Dress Code.  The Franchisee will maintain a competent, conscientious, trained staff and take such steps as are necessary to ensure that its employees preserve good customer relations and comply with the dress code prescribed in the Manual.

8.11.   Independent Shopping Services.  The Franchisor will have the right to hire independent shopping or other customer feedback services to (a) visit the Franchisee's Restaurant, (b) interview the customers of the Franchisee's Restaurant electronically, by telephone, or in person, (c) summarize customer information from comment cards and other evaluation methods or devices, and/or (d) communicate with customers of the Franchisee's Restaurant by e-mail or in writing for the purpose of evaluating: (1) the operations of the Franchisee's Restaurant, (2) the quality of the Foods, Products and Services provided to customers by the Franchisee's Restaurant, (3) whether the Franchisee is in compliance with the operational and quality standards specified in the Manual.  The Franchisor will determine the frequency, nature and extent of the evaluation services that will be provided and the form of the reports the evaluation service will provide to the Franchisor.  The fees charged to evaluate the Franchisee's Restaurant will be paid by the Franchisor or from the Brand Fund.  The Franchisor will provide the Franchisee with copies of all evaluation reports prepared for the Franchisee's Restaurant.



8.12.   <u>Music</u>.  The Franchisee will play in the Restaurant such recorded or programmed music as the Franchisor may from time to time require in the Manual or otherwise in writing and obtain such copyright licenses as may be necessary to authorize the playing of such recorded music.

8.13.   <u>Marks; Franchisee's Name</u>.  The Franchisee will operate the Restaurant so that it is clearly identified and advertised as an Old Chicago Restaurant.  The style and form of the name "Old Chicago®" and the other Marks used in any advertising, marketing, public relations or promotional program must have the prior written approval of the Franchisor.  The Franchisee will use the name "Old Chicago®," the approved logos and all graphics commonly associated with the Restaurant System and the Marks on all materials in the manner prescribed by the Franchisor.  The Franchisee will require all advertising and promotional materials, signs, decorations, paper goods (including menus and all forms and stationery used in the Restaurant), and other items that may be designated by the Franchisor will bear the Marks in the form, color, location and manner prescribed by the Franchisor.  The Franchisee will not use any of the words "Old Chicago®," the Marks or any derivative thereof or any of the words used in any of the other Marks in the name of any Entity formed by the Franchisee or any affiliate of the Franchisee.  The Franchisee will at all times hold itself out to the public as an independent contractor operating its Restaurant pursuant to the Agreement with the Franchisor.  The Franchisee will file for a certificate of assumed name in the manner required by applicable state law to notify the public that the Franchisee is operating its Restaurant as an independent contractor.

8.14.   <u>Complaints; Notices</u>.  The Franchisee will process and handle all government agency, consumer and employee complaints, allegations and claims connected with or relating to the Restaurant, and will promptly notify the Franchisor by telephone and in writing of all such matters including:  (a) food related illnesses, (b) safety or health violations, (c) claims exceeding $1,000, (d) dram shop violations, (e) liquor license violations, and (f) any other material notifications, complaints, allegations or claims against or losses suffered by the Franchisee or the Restaurant.  The Franchisee will deliver to the Franchisor, immediately upon receipt by the Franchisee or delivery at the Licensed Location, an exact copy of all (a) notices of default received from the landlord of the Licensed Location or any mortgagee, trustee under any deed of trust, contract for deed holder, lessor, or any other party, (b) notifications or other correspondence relating to any legal proceeding relating in any way to the Franchisee's Restaurant or to the Licensed Location, and (c) inspection reports or any other notices, warnings or citations from any governmental authority, including any health and safety, taxing and/or licensing authorities.  The Franchisee will provide all additional information requested by the Franchisor relating to any of these matters.  The Franchisee will maintain for the Franchisor's review any inspection reports affecting the Restaurant or equipment located in the Restaurant during the term of this Agreement and for 30 days after the expiration or earlier termination this Agreement. If any of Franchisee's customers contact Franchisor with a complaint or issue, Franchisor may in its sole discretion remedy such complaint or issue in which case Franchisee must reimburse Franchisor for any such remedy deemed appropriate in Franchisor's sole discretion.

Upon the occurrence of a Crisis Management Event, Franchisee shall immediately inform Franchisor, as instructed in the Manual, by telephone and email (or other electronic messaging medium authorized by Franchisor for this purpose).  Franchisee shall cooperate fully with Franchisor with respect to Franchisor's response to the Crisis Management Event. "<u>Crisis Management Event</u>" means any event that occurs at or about the Restaurant that has or may cause harm or injury to customers or employees, such as food contamination, food spoilage/poisoning, food tampering/sabotage, contagious diseases, natural disasters, terrorist acts, shootings, or any other circumstance which may damage the System, Marks, or image or reputation of Restaurants or Franchisor or its Affiliates. In the event of the occurrence of a Crisis Management Event, Franchisor may also establish emergency procedures pursuant to which Franchisor may require Franchisee to, among other things, temporarily close the Restaurant to the public,

in which event Franchisor shall not be liable to Franchisee for any losses or costs, including consequential damages or loss profits occasioned thereby.

8.15.   Identifiers.   Franchisee acknowledges that all telephone numbers, facsimile numbers, social media websites, Internet addresses and e-mail addresses (collectively "Identifiers") used in the operation of Franchisee's Restaurant constitute Franchisor's assets, and upon termination or expiration of this Franchise Agreement, Franchisor will take such action within five (5) days to cancel or assign to Franchisor or Franchisor's designee as determined by Franchisor, all of Franchisee's right, title and interest in and to such Identifiers and will notify the telephone company and all listing agencies of the termination or expiration of Franchisee's right to use any Identifiers, and any regular, classified or other telephone directory listing associated with the Identifiers and to authorize a transfer of the same to, or at Franchisor's direction.   Franchisee agrees to take all action required cancel all assumed name or equivalent registrations related to Franchisee's use of the Marks.   Franchisee acknowledges that, Franchisor has the sole rights to, and interest in, all Identifiers used by Franchisee to promote Franchisee's Restaurant and/or associated with the Marks.   Franchisee irrevocably appoints Franchisor, with full power of substitution, as Franchisee's true and lawful attorney-in-fact, which appointment is coupled with an interest, to execute such directions and authorizations as may be necessary or prudent to accomplish the foregoing. Franchisee further appoints Franchisor to direct the telephone company, postal service, registrar, Internet Service Provider, listing agency, website operator, or any other third party to transfer such Identifiers to Franchisor or Franchisee's designee.  The telephone company, postal service, registrar, Internet Service Provider, listing agency, website operator, or any other third party may accept such direction by Franchisor pursuant to this Franchise Agreement as conclusive evidence of Franchisor's rights to the Identifiers and Franchisor's authority to direct their transfer.

8.16.   Payment of Taxes.   The Franchisee will promptly pay when due all Taxes levied or assessed, and all accounts and other indebtedness of every kind incurred by the Franchisee in the conduct of the Restaurant. The Franchisee will be solely liable for the payment of all Taxes and will indemnify the Franchisor for the full amount of all such Taxes imposed on the Franchisor, and for any liability (including penalties, interest and expenses) arising from or concerning the payment of Taxes, whether the Taxes were correctly or legally asserted or not.  Each payment made to the Franchisor hereunder will be made free and clear and without deduction for any Taxes.  If any Taxes are, directly or indirectly, imposed on the Franchisor with respect to any payments to the Franchisor required under this Agreement, unless the Taxes are credited against the income tax otherwise payable by the Franchisor, the Franchisee will pay an amount to the Franchisor equal to the Taxes so imposed within 10 days after receiving an invoice from the Franchisor indicating the amount owed.

8.17.   No Tax Sale or Seizure.   In the event of any bona fide dispute as to the Franchisee's liability for Taxes assessed or other indebtedness, the Franchisee may contest the validity or the amount of the tax or indebtedness in accordance with the procedures of the taxing authority or applicable law. However, in no event will the Franchisee permit a tax sale or seizure by levy of execution or similar writ or warrant or attachment by a creditor, to occur against the premises of the Restaurant or any improvements thereon.

8.18.   Compliance with Laws.   The Franchisee will be solely responsible for and authority over the operation of its Restaurant, and will control, supervise and manage all the employees, agents and independent contractors who work for or with the Franchisee.  The Franchisor will not have any right, obligation or responsibility to hire, fire, discipline, control, supervise or manage the Franchisee's employees, agents or independent contractors.  The Franchisee will inform all of its employees that they are solely employees of the Franchisee and not the Franchisor and the Franchisee will describe the independent relationship of the Franchisor and the Franchisee to the Franchisee's employees. Within seven (7) days of Franchisor's request, Franchisee and each of its employees will sign an employment



relationship acknowledgement form stating that Franchisee alone is the employee's employer and that Franchisee alone operates the Restaurant. Franchisee will use its legal name on all documents for use with employees and contractors, including but not limited to, employment applications, time cards, pay checks, and employment and independent contractor agreements and will not use the Marks on these documents.

The Franchisee will comply with all applicable federal, state, city, local and municipal laws, statutes, ordinances, rules and regulations pertaining to the operation of the Franchisee's Restaurant including, but not limited to: (a) health and food service licensing laws; (b) health and safety regulations and laws; (c) environmental laws; (d) employment laws (including all wage and hour, compensation and benefit laws; employment taxes; workers' compensation laws; workplace safety laws; discrimination laws; sexual harassment laws; and disability and discrimination laws); (e) credit card and debit card laws applicable to consumers, including all Privacy Laws (defined below), and (f) tax laws (including those relating to individual and corporate income taxes, sales and use taxes, franchise taxes, gross receipts taxes, employee withholding taxes, F.I.C.A. taxes, inventory taxes, personal property taxes, real estate taxes and federal, state and local income tax laws). The Franchisee will, at its expense, be solely and exclusively responsible for determining the licenses and permits required by law for the Franchisee's Restaurant, for obtaining and qualifying for all licenses and permits, and for compliance with all applicable laws by its employees, agents and independent contractors.

The Franchisee agrees to comply with all applicable laws pertaining to the privacy of customer, employee, and transactional information ("Privacy Laws"). The Franchisee also agrees to comply with the Franchisor's standards and policies pertaining to Privacy Laws. If there is a conflict between the Franchisor's standards and policies pertaining to Privacy Laws and actual applicable law, the Franchisee will: (a) comply with the requirements of applicable law; (b) immediately give the Franchisor written notice of said conflict; and (c) promptly and fully cooperate with the Franchisor and the Franchisor's counsel in determining the most effective way, if any, to meet the Franchisor's standards and policies pertaining to Privacy Laws within the bounds of applicable law. The Franchisee agrees not to publish, disseminate, implement, revise, or rescind a data privacy policy without the Franchisor's prior written consent as to said policy.

8.19.    Alcoholic Beverages.  The Franchisee will comply with: (a) all liquor licensing laws; (b) all federal, state, city, local and municipal licensing, insurance and other laws, regulations and requirements applicable to the sale of alcoholic beverages by the Franchisee at the Restaurant; and (c) the liquor liability insurance requirements set forth in this Agreement.

8.20.    Conferences.  The Franchisee's Operating Principal and/or the other persons designated by the Franchisor will attend each "National Partners Conference" held by the Franchisor.  In addition, the Franchisee's General Manager and/or the other persons designated by the Franchisor will attend each "General Managers Conference" held by the Franchisor for Old Chicago Restaurant operators. The date and location of all National Partners Conferences and General Manager Conferences (collectively, "Conferences") conducted by the Franchisor will be at the sole discretion of the Franchisor.  The Franchisee will pay the Salaries and Benefits, the Travel Expenses and all other expenses incurred by the persons attending the Conferences on the Franchisee's behalf.  The Franchisor reserves the right to charge registration fees for the Conferences held by the Franchisor.  The Franchisee must send at least one person to each Conference held by the Franchisor provided that the Franchisor may exclude the Franchisee from attending any  Conference if the Franchisee is then in default of the Agreement or has received two more notices of default of this Agreement in the preceding 12 months.

8.21.    Credit Cards; Gift Certificates and Cards.  The Franchisee muse use any credit card vendors and honor all credit, debit, charge and cash cards required by the Franchisor in the Manual or otherwise in writing.  The term "credit card vendors" includes, among other things, companies that



provide services for electronic payment, such as near field communication vendors (for example, "Apple Pay and Google Wallet"). The Franchisee agrees to comply with the then-current Payment Card Industry Data Security Standards as those standards may be revised and modified by the PCI Security Standards Council, LLC (see www.pcisecuritystandards.org), or any successor organization or standards that the Franchisor may reasonably specify. Among other things, the Franchisee agrees to implement the enhancements, security requirements, and other standards that the PCI Security Standards Council (or its successor) requires of a merchant that accepts payment by credit and/or debit cards. The Franchisee will not create or issue any gift certificates or gift card programs, and will participate in and sell the gift certificates and gift cards that are approved, required or issued by the Franchisor for all Old Chicago Restaurants. The Franchisee will not issue coupons or discounts of any type, except as approved by the Franchisor in the Manual or otherwise in writing.

8.22.   <u>Quality Assurance Programs; Customer Loyalty Programs</u>. The Franchisee will, at its expense, fully participate in all quality assurance programs and customer loyalty programs established, approved or required by the Franchisor in the Manual or otherwise in writing for all Old Chicago Restaurants including, but not limited to, the World Beer Tour™. The Franchisee's participation in any such quality assurance programs and customer loyalty programs will be in compliance with the standards, policies and procedures established by the Franchisor.

## ARTICLE 9
## FOODS, PRODUCTS AND SERVICES

9.1.   <u>Limitations on Foods, Products and Services</u>. The Franchisee will sell only those Foods, Products and Services, and will sell all Foods, Products and Services, specified in the Manual or otherwise in writing by the Franchisor. The Franchisee will maintain sufficient inventories to realize the full potential of the Restaurant and will conform to all customer service standards prescribed by the Franchisor in writing. The Franchisee will only sell the Foods, Products and Services on a retail basis at the Licensed Location, and will not offer or sell the Foods, Products and Services: (a) on a wholesale or retail basis at any other location; (b) by means of the Internet, catalogue or mail order sales, or telemarketing; and (c) by any other method of distribution. The Franchisee will have discretion regarding the prices it charges customers for menu items, merchandise or services.

9.2.   <u>Delivery</u>. The Franchisee will not deliver, whether for a fee or not, any foods, food products, beverages, merchandise or other items offered for sale by the Franchisee's Restaurant.

9.3.   <u>Approved Suppliers</u>. The Franchisee will purchase certain Foods, Products and Services which will be used or sold by the Franchisee at its Restaurant only from Approved Suppliers. The Franchisee will have the right to purchase such Foods, Products and Services from other suppliers provided they conform to the Franchisor's standards and specifications and provided that the Franchisor determines that the supplier's business reputation, quality standards, delivery performance, credit rating, and other criteria are satisfactory. Franchisee must comply with the designated supply chain management system ("<u>Supply Chain Management System</u>") to manage product quality and product inventory, and must use an approved supplier for these services. If the Franchisee desires to purchase any Foods, Products or Services from suppliers other than Approved Suppliers, then the Franchisee must, at its expense, submit samples, specifications, and product information requested by the Franchisor for review and testing to determine whether these Foods, Products and Services comply with the Franchisor's standards and specifications. The Franchisor will also have the right to inspect the facilities of the proposed supplier, and the Franchisee will reimburse the Franchisor for the costs and expenses incurred to conduct the inspection. The Franchisor will complete all product testing within 30 days, and will notify the Franchisee of its determination within 45 days after the Franchisor receives the samples and other requested information from the Franchisee. The written approval of the Franchisor must be obtained



before any previously unapproved Foods, Products and Services are purchased, sold or used by the Franchisee.

9.4.     <u>Designated Suppliers</u>.  The Franchisee will purchase only from Designated Suppliers those Foods, Products and Services designated in writing by the Franchisor which are to be used or sold by the Restaurant and which the Franchisor determines must meet the standards of quality and uniformity required to protect the valuable goodwill and uniformity symbolized by and associated with the Marks and the Restaurant System.

9.5.     <u>Sources for Recipes and Proprietary Products</u>.  The Franchisee acknowledges that the Franchisor has and may continue to develop for use in the Restaurant System certain foods, beverages and products that are prepared from highly confidential secret recipes and that are trade secrets of the Franchisor.  Because of the importance of quality and uniformity of production and the significance of such foods, beverages and products in the Restaurant System, it is to the mutual benefit of the parties that the Franchisor closely controls the production and distribution of such foods, beverages and products. Accordingly, the Franchisee agrees that the Franchisee will use the Franchisor's secret recipes and other proprietary products to the Franchisor's specifications, and will purchase solely from the Franchisor or from Designated Suppliers all of the Franchisee's ingredients and supplies for such foods, beverages and products.   The Franchisee further agrees to purchase from Designated Suppliers for resale to the Franchisee's customers certain Old Chicago® brand promotional merchandise, such as T-shirts, sweatshirts and caps, as required by the Franchisor in amounts sufficient to satisfy the Franchisee's World Beer Tour® members' or other customers' demand.

9.6.     <u>Brand Name Products</u>.  The Franchisee will purchase and use in the operations of its Restaurant all of the brand name products specified in writing by the Franchisor.

9.7.     <u>Branding of Products</u>.  The Franchisee will not have the right to: (a) use or display the Marks on or in connection with any foods, products or services ("<u>Products</u>") that have not been approved by the Franchisor in writing; (b) acquire, develop, produce or manufacture any Products using the name "Old Chicago®" or any of the Marks, or direct any other person or Entity to do so; (c) acquire, develop, produce or manufacture any Products that have been developed, produced or manufactured by or for the Franchisor for use in conjunction with the Restaurant System and which is sold under any of the Marks, or direct any other person or Entity to do so; and (d) use, have access to, or have any rights to any proprietary formulas, ingredients, or recipes for any Products created by or at the direction of the Franchisor and sold under the name "Old Chicago®" or any of the Marks.

**ARTICLE 10**
**ADVERTISING AND RELATED FEES**

10.1.     <u>Brand Fund Contributions</u>.  The Franchisee will pay the Franchisor continuing "<u>Brand Fund Contributions</u>" equal to 2% of the Gross Sales of the Restaurant at the same time and in the same matter that the Franchisee pays its Royalty Fees.  Brand Fund Contributions will be deposited by the Franchisor into the "<u>Brand Fund</u>."  Every franchisee of the Franchisor will be required to contribute to the Brand Fund but all franchisees may not contribute on the same basis or amount.

10.2.     <u>Use of Brand Fund Contributions</u>.  The Franchisor will have the absolute and unilateral right to determine when, how and where the Brand Fund Contributions and other payments deposited into the Brand Fund will be spent.  The Franchisor assumes no fiduciary duty to the Franchisee or other direct or indirect liability or obligation to collect amounts due to the Brand Fund or to maintain, direct, or administer the Brand Fund.



The Brand Fund may be used, to among other things, to purchase and pay for product and market research, production development, production materials, ad slicks, brochures, radio and television commercial production costs, services provided by advertising agencies or media buyers, in-store advertising, menu development, design and production, mailing costs, signs, public relations, telemarketing, direct mail advertising, promotional programs, advertising market research, graphics and design costs, creation, maintenance and enhancement of a home page or Website, Internet costs, software development and upgrades, services provided by software developers or consultants, special event marketing costs, gift card and gift certificate program costs, independent shopping, customer feedback or other evaluation services, miscellaneous advertising costs, the costs incurred in administering the Brand Fund and such other costs and expenses as the Franchisor deems appropriate and in the best interests of all Old Chicago Restaurants and the Restaurant System. All administrative and other costs associated with or incurred in the administration of the Brand Fund including, but not limited to, marketing and administrative personnel Salaries and Benefits, including but not limited to the Salaries and Benefits of a marketing coordinator, Travel Expenses, long distance telephone charges, office rental, collection costs (including attorneys' fees paid in collecting past-due Brand Fund Contributions), postage and office supplies will be paid from the Brand Fund. The Franchisor will not be required to spend the Brand Fund Contributions in the Brand Fund in any particular geographic or DMA market and will not be required to spend the Brand Fund Contributions in the Franchisee's market area in proportion to the Brand Fund Contributions paid by the Franchisee. The Franchisor will not use Brand Fund Contributions for advertising that is principally a solicitation for the sale of franchises, but the Franchisor reserves the right to include a notation in any advertisement indicating "Franchises Available," or similar phrasing, or include information regarding acquiring a franchise on or as a part of materials and items produced by or for the Brand Fund. The Franchisor will not be required to spend the Brand Fund Contributions in the Brand Fund in the fiscal year in which the payments were made. All interest accrued by the Brand Fund will remain in the Brand Fund. The Franchisor will use the Brand Fund in a manner that provides marketing benefits to all Old Chicago Restaurants as determined in the Franchisor's sole discretion. However, the Franchisor reserves the right to allocate the funds in the Brand Fund to various permitted uses as it sees fit and does not guarantee that all Restaurants will receive equal benefits or identical coverage. If the Brand Fund operates at a deficit or requires additional funds at any time, the Franchisor may loan such funds to the Brand Fund or the Franchisor may borrow from another source in such amounts and on such terms including repayment terms, as the Franchisor deems necessary or advisable, in the Franchisor's sole discretion. The Brand Fund is not audited, however, a summary showing the income to the Brand Fund and the expenditures made from the Brand Fund during each fiscal year will be prepared by the Franchisor and be available 90 days after the Franchisor's fiscal year end for the preceding fiscal year. Copies of the summary will, upon written request, be provided to the Franchisee.

10.3.  <u>Reproduction of Marketing Materials</u>. The Franchisor will furnish the Franchisee one slick, master or other "suitable for reproduction" sample of all newspaper inserts, direct mail flyers, point-of-purchase promotional pieces, television and radio commercials, and other marketing and product identification materials that the Franchisor creates and approves for system-wide use. The Franchisee must pay to reproduce and use these materials in the Franchisee's local advertising campaigns.

10.4.  <u>Local Advertising; LRM Report</u>. Unless the Franchisor uniformly specifies a lesser amount, each Month the Franchisee will spend at least 1% of the preceding Month's Gross Sales of the Restaurant on local advertising and promotions in accordance with the Local Restaurant Marketing ("<u>LRM</u>") guidelines set forth in the Manual or otherwise in writing by the Franchisor. The Franchisee will receive dollar-for-dollar credit against this obligation for all contributions that the Franchisee makes to an Area Cooperative. Expenditures the Franchisee incurs for any of the following will not qualify as local advertising for purposes of this provision, unless approved in advance by the Franchisor in writing: (a) salaries, expenses or benefits of any employees of the Franchisee, including expenses for attendance at advertising meetings or activities; (b) in-store materials consisting of fixtures or equipment; or (c) seminar



and educational costs and expenses of the Franchisee's employees. Within 30 days after the end of each calendar year, the Franchisee will, in the prescribed form, furnish the Franchisor with an accurate accounting of the Franchisee's expenditures for approved local advertising and promotions (the "<u>LRM Report</u>"). Each LRM Report will show the amount the Franchisee spent on a Monthly basis for local advertising and promotions during the preceding year and how the Franchisee spent those funds. Upon the Franchisor's request, the Franchisee will also submit documents substantiating that the Franchisee incurred and paid particular expenditures for local advertising and promotions during the quarter each Month during the previous calendar quarter. If the Franchisee does not spend the required amount on Local Advertising in any given Month, the Franchisee shall pay the difference between the amount that the Franchisee actually paid for Local Advertising and the required amount for Local Advertising to the Franchisor which amount will be contributed to the Brand Fund, or if the Brand Fund does not then exist, to other marketing initiatives then conducted by the Franchisor.

10.5.    <u>Yellow Pages</u>. The Franchisee will pay its pro rata share of the cost of Yellow Pages and classified directory listings to be placed by the Franchisor on behalf of all Old Chicago Restaurants in the Restaurant's market. If the Franchisee operates the only Old Chicago Restaurant in the market, the Franchisee will be responsible for full payment of the Yellow Pages and classified directory advertisement. Expenditures by the Franchisee for directory listings may be applied to the local advertising obligations of the Franchisee contained in this Agreement.

10.6.    <u>Advertising Standards and Approval</u>. All advertising and promotion by the Franchisee will be conducted in a dignified manner and will conform to the standards and requirements set forth in the Manual or otherwise. The Franchisee will obtain the Franchisor's prior approval of all advertising and promotional plans and materials not prepared by the Franchisor which approval may be withheld in the Franchisor's sole discretion. The Franchisee will submit previously unapproved plans and materials to the Franchisor, and the Franchisor will approve or disapprove such plans and materials within 14 days after the Franchisor's receipt. The Franchisee will promptly discontinue the use of any advertising or promotional plans or materials, whether or not previously approved, upon notice from the Franchisor. If the Franchisee uses any marketing, advertising or promotional materials or campaigns that the Franchisor has not approved, the Franchisee will pay the Franchisor an "<u>Unauthorized Advertising Fee</u>" of $500 per occurrence which may be contributed to the Brand Fund in the Franchisor's sole discretion. The Franchisee agrees to participate in all system-wide promotions and advertising campaigns that the Franchisor creates. The Franchisor reserves the right to approve in advance of use by the Franchisee any graphic or electronic materials or commercials developed by the Franchisee that feature any of the Marks.

10.7.    <u>Grand Opening</u>. In addition to the expenditures set forth above, the Franchisee will plan and carry out a grand opening promotion relating to the opening of the Restaurant in accordance with the Manual, and will spend a minimum of $25,000 on the grand opening promotion for its Restaurant. The Franchisee will pay a non-refundable portion of this amount to the Franchisor or the Franchisor's affiliates for menus and opening promotional materials. Expenditures for grand opening advertising will be in addition to the other advertising obligations of the Franchisee contained in this Agreement.

10.8.    <u>Resolution of Disputes</u>. If in connection with an Area Cooperative's formation or functioning, its members are unable to reach agreement within 45 days regarding organization, administration, contribution waivers or exceptions, budget or other matters relating to the Area Cooperative, the issue will be referred to the Franchisor for resolution. The Franchisor's decision with respect to the issue's resolution will be binding on all members of the Area Cooperative. In addition, the Franchisor reserves the right to review each Area Cooperative's contribution rate on an annual basis and to disapprove a rate of less than 1% of Gross Sales.



## ARTICLE 11
## MARKS

11.1.   <u>Right to Use Marks</u>.  The Franchisor grants the Franchisee the right to use the Marks during the term of this Agreement in accordance with the Restaurant System and related standards and specifications.

11.2.   <u>Acknowledgments</u>.  The Franchisee expressly understands and acknowledges that:  (a) the Parent is the owner of all right, title and interest in and to the Marks and the goodwill associated with and symbolized by them; (b) neither the Franchisee nor the Owners will take any action that would prejudice or interfere with the validity of the Franchisor's or the Parent's rights with respect to the Marks; (c) nothing in this Agreement will give the Franchisee any right, title, or interest in or to any of the Marks or any of the Franchisor's or the Parent's service marks, trademarks, trade names, trade dress, logos, copyrights or proprietary materials, except the right to use the Marks and the Restaurant System in accordance with the terms and conditions of this Agreement for the operation of the Restaurant and only at or from the Licensed Location or in approved advertising related to the Restaurant; (d) any and all goodwill arising from the Franchisee's use of the Marks and the Restaurant System will inure solely and exclusively to the Franchisor's or the Parent's benefit, and upon expiration or termination of this Agreement and the Franchise herein granted, no monetary amount will be assigned as attributable to any goodwill associated with the Franchisee's use of the Marks; (e) the Franchisee will not contest the validity of or the Franchisor's or the Parent's interest in the Marks or assist others to contest the validity of or the Franchisor's or the Parent's interest in the Marks; and (f) any unauthorized use of the Marks will constitute an infringement of the Franchisor's or the Parent's rights in the Marks.  The Franchisee agrees that it will provide to the Franchisor or the Parent (as designated) all assignments, affidavits, documents, information and assistance the Franchisor determines is necessary to fully vest all such rights, title and interest in and to the Marks, including all such items as are reasonably requested by the Franchisor or the Parent to register, maintain and enforce such rights in the Marks.

11.3.   <u>New Marks</u>.  The Franchisor reserves the right to substitute different Marks for use in identifying the Restaurant System and the Restaurant if the current Marks no longer can be used, or if the Franchisor, in its sole discretion, determines that substitution of different Marks will be beneficial to the Restaurant System.   In such event, the Franchisor may require the Franchisee, at the Franchisee's expense, to discontinue or modify the Franchisee's use of any of the Marks or to use one or more additional or substitute Marks.  The Franchisor will have no obligation or liability to the Franchisee as a result of such substitution including, but not limited to, no obligation to reimburse the Franchisee for any promotion or advertising expenses associated with the modified or substituted Signs, materials and Marks.

11.4.   <u>Franchisee's Use of Marks</u>.  With respect to the Franchisee's licensed use of the Marks, the Franchisee further agrees that (a) unless otherwise authorized or required by the Franchisor, the Franchisee will operate and advertise the Restaurant only under the name "Old Chicago®" without prefix or suffix; (b) the Franchisee will not use the Marks as part of its corporate or other legal name; (c) the Franchisee will identify itself as the owner of the Restaurant, and a franchisee of the Franchisor, in conjunction with any use of the Marks, including uses on invoices, order forms, receipts and contracts, as well as the display of a notice in such content and form and at such conspicuous locations on the premises of the Restaurant or any Restaurant vehicle as the Franchisor may designate; (d) the Franchisee will not use the Marks to incur any obligation or indebtedness on behalf of the Franchisor or its Affiliates; (e) the Franchisee will not sell any products bearing the Marks or use the Marks to advertise, promote or sell any merchandise or services in any manner, including through the Internet or any other method that makes use of Electronic Commerce except in compliance with this Agreement and the Manual and, where required, with the Franchisor's prior written consent which may be withheld in Franchisor's sole discretion; and (f)



the Franchisee will comply with the Franchisor's instructions in filing and maintaining the requisite trade name or fictitious name registrations, and will execute any documents deemed necessary by the Franchisor or its counsel to obtain protection of the Marks or to maintain their continued validity and enforceability.

11.5.   Infringements.  The Franchisee will notify the Franchisor immediately by telephone, and thereafter in writing, of any alleged infringement of or challenge to the Franchisee's use of any Mark, of any Claim by any person of any rights in any Mark, and the Franchisee and the Owners will not communicate with any person other than the Franchisor or any designated Affiliate thereof, their counsel and the Franchisee's counsel in connection with any such infringement, challenge or Claim.   The Franchisor or an Affiliate will have complete discretion to take such action as it deems appropriate in connection with any matter involving the Marks, and the right to control exclusively, or to delegate control to any of its Affiliates of, any settlement, litigation or United States Patent and Trademark Office proceeding or other proceeding arising out of any such alleged infringement, challenge or Claim or otherwise relating to any Mark.  The Franchisee will, at its expense, execute any and all instruments and documents, render such assistance, and do such acts or things as may, in the opinion of the Franchisor, be necessary or advisable to protect and maintain the interests of the Franchisor or any Affiliate in any litigation or other proceeding or to otherwise protect and maintain the interests of the Franchisor or any other interested party in the Marks.  The Franchisor will indemnify the Franchisee against and reimburse the Franchisee for all Damages for which the Franchisee is held liable in any proceeding arising out of the Franchisee's use of any of the Marks (including settlement amounts), provided that the conduct of the Franchisee and the Owners with respect to such proceeding and use of the Marks is in full compliance with the terms of this Agreement.

11.6.   Franchisor's Rights.  The license of the Marks granted to the Franchisee is nonexclusive and the Franchisor and its Affiliates thus have and retain the following rights, among others, subject only to the limitations of Article 1:  (a) to grant other licenses for use of the Marks; (b) to develop and establish other systems using the Marks or other names or marks and to grant licenses thereto without providing any rights to the Franchisee; and (c) to engage, directly or indirectly, through its employees, representatives, licensees, assigns, agents and others, at wholesale, retail or otherwise, in (1) the production, distribution, license and sale of products and services, and (2) the use in connection with such production, distribution and sale, of the Marks and any and all trademarks, trade names, service marks, logos, insignia, slogans, emblems, symbols, designs and other identifying characteristics as may be developed or used from time to time by the Franchisor.

## ARTICLE 12
## TECHNOLOGY

12.1.   Computer System.   The Franchisee will, at its sole expense, lease or purchase the Computer System designated by the Franchisor.  The Franchisee acknowledges and agrees that changes to technology are dynamic and not predictable.  In order to provide for inevitable but unpredictable changes to technological needs and opportunities, the Franchisee agrees that the Franchisor will have the right to establish, in writing, reasonable new standards for the implementation of technology in the Computer System and the Franchisee agrees to comply with those reasonable new standards that the Franchisor establishes.  The Franchisee will be solely responsible for acquiring, installing, implementing, updating and maintaining the Computer System as required by the Franchisor in the Manual or otherwise and for any licensing or other fees, costs and expenses incurred that any provider or supplier may charge.  The Franchisee acknowledges that the Franchisor has the right to access, review and download for the Franchisor's own purposes any information stored on the Computer System and will ensure at all times that the Franchisor has access to and the ability to retrieve by electronic means any information stored on the Computer System including information concerning the Franchisee's Restaurant and Gross Sales.

The Franchisee acknowledges and agrees that it is solely responsible for protecting the Franchisee's Computer System from viruses, computer hackers, and other computer-related and technology-related problems, and the Franchisee hereby releases the Franchisor from any and all Claims it may have as a result of viruses, hackers, or other computer-related or technology-related problems.

12.2.  Proprietary Software.  When available, the Franchisee will enter into a software license agreement ("Software License Agreement") with the Franchisor in substantially the same form as the Software License Agreement attached to the Franchise Disclosure Document as Exhibit H for the license of certain proprietary computer software that may be provided by the Franchisor, at the Franchisee's cost, for the operation of the Restaurant.

12.3.  Electronic Commerce Policies and Procedures.  If the Franchisor decides to engage in Electronic Commerce, it will (a) establish uniform procedures, policies and protocols to govern electronic communications between the Franchisor and its customers and the use and dissemination of information that the Franchisor obtains with respect to its customers' identities, purchasing habits and other commercially relevant matters; (b) develop a secure site on the facility through which the Franchisor can accept credit card and other confidential information from its customers; (c) establish a central administration center through which customer orders are processed, customer complaints are handled, sales taxes (if any) are remitted, and records of sales transactions are created and maintained; and (d) establish a central fulfillment center through which all customer orders are filled.

12.4.  Internet Website.  The Franchisor has established and will maintain an Internet website ("Website") to advertise and promote Old Chicago Restaurants.  As provided for in Section 10.2, the Franchisor may use monies from the Brand Fund to pay for the costs of maintaining, upgrading and updating the Website.  All features of the Website, including the domain name, content, features, format, procedures and links to other websites, will be determined by the Franchisor, in its sole discretion.  The Franchisor will have the right to modify, enhance, suspend or temporarily or permanently discontinue the Website at any time, in its sole discretion.  The Franchisee will not have the right to establish a website or home page on the Internet to advertise or promote its Restaurant.  The Franchisee will not use any of the Marks or any other intellectual property of the Franchisor or its Affiliates on any wiki, blog, social media or related website or online community.  The Franchisor and its Affiliates will have the sole right to promote the Foods, Beverages, Merchandise and Services offered by Old Chicago Restaurants on the Internet, and to create the Website containing the Marks.  The Website will include a section that lists the address and contact information of each Restaurant in the Restaurant System, including the Franchisee's Restaurant.  All references to the Franchisee's Restaurant will be removed from the Website immediately upon the termination or expiration of this Agreement.

12.5.  Technology Fee.  In addition to any amounts that the Franchisee may be required to pay to third party providers, suppliers or vendors related to the Computer System, the Franchisee must pay the Franchisor, a "Technology Fee" of $350 per month on the same date and in the same manner that the Franchisee pays its Royalty to the Franchisor.  The Technology Fee covers costs incurred by the Franchisor for technology management and certain technologies used in the operating of the Restaurant.  The Franchisor reserves the right to modify or increase the monthly Technology Fee to account for changes, additions and modifications to required hardware and software and for licensing and maintenance costs.

### ARTICLE 13
### MANUAL; OTHER CONFIDENTIAL INFORMATION

13.1.  Compliance with Manual.  To protect the reputation and goodwill of the Franchisor and to maintain high standards of operation under the Marks, the Franchisee will operate and conduct business



at its Restaurant in accordance with the Manual, other written directives that the Franchisor may issue from time to time and any other manuals and materials created or approved for use in the operation of the Restaurant.

13.2.   <u>Confidentiality of Manual</u>.   The Franchisee and the Owners will at all times treat the Manual, any written directives of the Franchisor, and any other manuals and materials, and the information contained therein, as confidential and will maintain such information as trade secret and confidential in accordance with this Article.   The Franchisee and the Owners will use all reasonable efforts to maintain this information as secret and confidential, and the Franchisee and the Owners will divulge and make such materials available only to such of the Franchisee's employees as must have access to it in order to operate the Restaurant, or to such other persons authorized by the Franchisor in writing.   The Franchisee and the Owners will not at any time copy, duplicate, record or otherwise reproduce these materials, in whole or in part, or otherwise make the same available to any person other than those authorized above.   The Manual, written directives, other manuals and materials and any other confidential communications provided or approved by the Franchisor will at all times remain the sole property of the Franchisor, will at all times be kept in a secure place on the Restaurant premises, and will be returned to the Franchisor immediately upon request or upon termination or expiration of the Franchise.

13.3.   <u>Modifications to Manual</u>.   The Franchisor may from time to time revise the contents of the Manual and the contents of any other manuals and materials created or approved for use in the operation of the Restaurant.   The Franchisee expressly agrees to comply with each new or changed standard.   The Franchisee will at all times ensure that the Manual is kept current and up to date.   In the event of any dispute as to the contents of the Manual, the terms of the master copy of the Manual maintained by the Franchisor at the Franchisor's corporate office will control.   The Franchisor will charge the Franchisee its cost for any replacement Manual requested by the Franchisee.

13.4.   <u>Confidential Information</u>.   Neither the Franchisee nor any of the Owners will, during the term of this Agreement or thereafter, communicate, divulge or use for the benefit of any other person, or Entity and, following the expiration or termination of this Agreement, will not use for their own benefit, any confidential information, knowledge or know-how concerning the methods of operation of the Restaurant that may be communicated to the Franchisee or the Owners or of which they may be apprised in connection with the operation of the Restaurant.   The Franchisee and the Owners will divulge such confidential information only to such of the Franchisee's employees as must have access to it in order to operate the Restaurant.   Any and all information, knowledge, know-how, techniques and any materials used in or related to the Restaurant System that the Franchisor provides to the Franchisee in connection with this Agreement, including the Manual, plans and specifications, marketing information and strategies and site evaluation, selection guidelines and techniques, recipes, and other information communicated in writing and through other means, including electronic media (e.g., CD Rom, computer disk or video, and audio tape) will be deemed confidential for purposes of this Agreement.   Neither the Franchisee nor the Owners will at any time, without the Franchisor's prior written consent, copy, duplicate, record or otherwise reproduce such materials or information, in whole or in part, nor otherwise make the same available to any unauthorized person.   The covenants in this Article will survive the expiration, termination or transfer of this Agreement or any interest herein and will be perpetually binding upon the Franchisee and each of the Owners.

13.5.   <u>Confidentiality Agreements</u>.   The Franchisee's Management Team (and, if Franchisee is an entity, any of Franchisee's officer that does not own equity in the franchise entity) must sign Franchisor's System Protection Agreement, the current-form of which is attached to the Franchise Disclosure Document.   In addition all of the Franchisee's employees who have access to the Manual or any other confidential information must sign agreements in a form satisfactory to the Franchisor agreeing



to maintain the confidentiality, during the course of their employment and thereafter, of all information copyrighted or designated by the Franchisor as confidential information (unless such persons have already signed a System Protection Agreement). The Franchisee will be responsible for the enforcement of these agreements and for the legal fees, costs and expenses associated with such enforcement.

13.6.   New Developments.  If the Franchisee or the Owners develop any new concept, product, recipe, service, process, enhancement or improvement in the operation or promotion of the Restaurant and/or the Restaurant System ("New Developments"), the Franchisee will promptly notify the Franchisor of such New Development, will provide to the Franchisor all necessary information, without compensation, regarding the New Development, and will execute any documents required by the Franchisor relating to the New Development.  The Franchisee and the Owners acknowledge that any such New Developments will be the property of the Franchisor, and that the Franchisor may use or disclose information relating to the New Developments to employees, agents and Affiliates of the Franchisor and to other franchisees, as it determines to be appropriate.

**ARTICLE 14**
**COVENANTS NOT TO COMPETE OR SOLICIT**

14.1.   Consideration.  The Franchisee and the Owners specifically acknowledge that, pursuant to this Agreement, the Franchisee and the Owners will receive valuable training, trade secrets and confidential information, including information regarding the operational, sales, promotional and marketing methods and techniques of the Franchisor and the Restaurant System, all of which are beyond the present skills and experience of the Franchisee, the Owners, the Franchisee's Management Team and employees. The Franchisee and the Owners acknowledge that such specialized training, trade secrets and confidential information provide a competitive advantage and will be valuable to them in the development and operation of the Restaurant, and that gaining access to such specialized training, trade secrets and confidential information is, therefore, a primary reason that they are entering into this Agreement.

14.2.   In-Term Covenant.  In consideration for such specialized training, trade secrets, confidential information and related rights, the Franchisee and the Owners agree that during the term of this Agreement, neither the Franchisee nor any of the Owners will, either directly or indirectly, for themselves or through, on behalf of or in conjunction with any person or Entity:  (a) divert, or attempt to divert, any business or customer of the Restaurant to any Competitive Business, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks and the Restaurant System; or (b) own, maintain, operate, engage in, or have any financial or beneficial interest in (including any interest in corporations, partnerships, trusts, unincorporated associations, joint ventures or other Entities), advise, assist or make loans to any Competitive Business.

14.3.   Post-Term Covenant.  Commencing upon the expiration or termination of this Agreement, the Transfer of all of the Franchisee's interest in this Agreement or when an individual or Entity ceases to be an Owner and continuing for two years thereafter, neither the Franchisee, nor any of the Owners will, directly or indirectly, for themselves, or through, on behalf of, or in conjunction with any person or Entity:  (a) divert, solicit, or attempt to divert or solicit, any business or customer of the Restaurant to any Competitive Business, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks and the Restaurant System; (b) employ, or seek to employ, any person who is at that time, or has been within the preceding 180 days, employed by the Franchisor or by any other franchisee of the Franchisor, or otherwise directly or indirectly induce such person to leave that person's employment, except as may be permitted by this Agreement or under any other existing agreement between the Franchisor and the Franchisee; or (c) own, maintain, operate, engage in, or have any financial or beneficial interest in



(including any interest in corporations, partnerships, trusts, unincorporated associations or joint ventures), advise, assist or make loans to any Competitive Business which is, or is intended to be, located within a 10-mile radius of the Licensed Location or any Old Chicago Restaurant or food service facility at a Reserved Venue in existence, under construction or where the premises have been purchased, leased or otherwise acquired at any given time during such two-year period. The covenants in this Article will not apply to the ownership of less than 3% of the Ownership Interests of any publicly-held corporation.

14.4.   Severability.  The parties acknowledge and agree that each of the preceding covenants contains reasonable limitations as to time, geographical area, and scope of activity to be restrained and does not impose a greater restraint than is necessary to protect the goodwill or other business interests of the Franchisor.  The parties agree that each of the covenants herein will be construed as independent of any other covenant or provision of this Agreement.  If all or any portion of a covenant in this Article is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which the Franchisor is a party, the Franchisee and the Owners expressly agree to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Article. The Franchisee and the Owners understand and acknowledge that the Franchisor will have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Article without their consent, effective immediately upon notice to the Franchisee; and the Franchisee and the Owners agree that they will comply forthwith with any covenant as so modified, which will be fully enforceable notwithstanding anything to the contrary in this Agreement.  The Franchisee and the Owners expressly agree that the existence of any Claims they may have against the Franchisor, whether or not arising from this Agreement, will not constitute a defense to the enforcement by the Franchisor of the covenants in this Article.

14.5.   Right to Injunctive Relief.  The Franchisee and the Owners acknowledge that a violation of the terms of this Article would result in irreparable injury to the Franchisor for which no adequate remedy at law may be available, and the Franchisee and the Owners accordingly consent to the issuance of an injunction prohibiting any conduct by the Franchisee or the Owners in violation of the terms of this Article.  The Franchisee and the Owners agree to pay all court costs and attorneys' fees incurred by the Franchisor in connection with the enforcement of this Article, including payment of all costs and expenses for obtaining specific performance of, or an injunction against violation of, the requirements of this Article.

14.6.   Noncompetition Agreements.   The Franchisee's Management Team must sign a noncompetition agreement prepared by local counsel retained by the Franchisee in a form that is satisfactory to the Franchisor.   The Franchisee will be responsible for the enforcement of the noncompetition agreements signed by the Franchisee's Management Team and the legal fees, costs and expenses associated with such enforcement.

**ARTICLE 15**
**BOOKS AND FINANCIAL RECORDS**

15.1.   Financial Records.  The Franchisee will maintain during the term of this Agreement, and will keep and preserve for at least five years from the dates of their preparation, full, complete and accurate Financial Records for the Restaurant.  The Franchisee will present its Financial Records in the form and manner that the Franchisor prescribes from time to time in the Manual or otherwise in writing. The Franchisee will adopt and follow a fiscal year that ends on December 31, or on the Sunday closest to December 31.  The Franchisee will use the chart of accounts that the Franchisor specifies and will prepare its Financial Statements in accordance with generally accepted accounting principles.



15.2.   Reporting Obligations.  In addition to the other reporting obligations set forth in this Agreement, the Franchisee will comply with the following:  (a) the Franchisee will submit to the Franchisor, in the form prescribed by the Franchisor, a balance sheet and profit and loss statement with explanatory footnotes for each Sales Period (which may be unaudited) within 30 days after the end of each Sales Period; (b) the Financial Statements will be signed by the Franchisee's treasurer or chief financial officer attesting that it is true, complete and correct; (c) the Franchisee will provide to the Franchisor the Financial Statements for the Restaurant within 90 days after the end of each fiscal year; (d) the Franchisor reserves the right, in the Franchisor's sole discretion, to require that the Franchisee provide the Franchisor with Financial Statements which include a "review level" opinion prepared in accordance with generally accepted accounting principles and issued by an independent certified public accountant; and (e) the Franchisee will submit to the Franchisor, for review or auditing, such Financial Records as the Franchisor may designate, in the form and at the times and places required by the Franchisor in writing. If the Franchisee fails to submit any required report when due, the Franchisor will charge, and the Franchisee will pay $100 per occurrence and $100 per week until the Franchisee submits the required report.  Such amounts may be contributed to the Brand Fund.  The Franchisor may require, at its option, that certain reports that the Franchisee is required to submit be certified as accurate and complete by the Franchisee, its Owners or its chief financial officer, and that certain reports be submitted using the formats and communication media that the Franchisor specifies.

15.3.   Franchisor's Audit Rights.  The Franchisor or a third party appointed by the Franchisor, which may include an independent public accounting firm, will have the right at all reasonable times to review, audit, examine and copy any or all the Financial Records of the Franchisee as the Franchisor may require.  The Franchisee will make such Financial Records for the Restaurant available to the Franchisor or its designees immediately upon request.  If any required payments to the Franchisor are delinquent, or if an inspection or audit reveals that such payments have been understated in any report to the Franchisor, then the Franchisee will immediately pay to the Franchisor the amount overdue or understated in any report to the Franchisor, then the Franchisee will immediately pay to the Franchisor the amount overdue or understated upon demand with interest determined in accordance with the provisions of this Agreement.  If an inspection or audit discloses an understatement of Gross Sales in any Royalty Report of 2% or more or the Franchisee fails to provide required reports, the Franchisee will reimburse the Franchisor for all costs and expenses connected with the inspection or audit (including accounting and legal fees), in addition to any other remedies the Franchisor may have at law or in equity.

15.4.   Obligation to Correct Payment Mistakes.  The Franchisee understands and agrees that the receipt or acceptance by the Franchisor of any of the statements furnished or Royalties, Brand Fund Contributions or other payments made to the Franchisor (or the cashing of any Royalty checks, or processing of electronic fund transfers) will not preclude the Franchisor from questioning the correctness thereof at any time and, in the event that any inconsistencies or mistakes are discovered in such statements or payments, they will immediately be rectified by the Franchisee and the appropriate payment will be made by the Franchisee.

15.5.   Appointment of Franchisor as Attorney-In-Fact.  The Franchisee hereby appoints the Franchisor its true and lawful attorney-in-fact with full power and authority, for the sole purpose of obtaining any and all returns and reports filed by the Franchisee with any state or federal taxing authority. This power of attorney will survive the expiration or termination of this Agreement.

**ARTICLE 16**
**INSURANCE**

16.1.   Insurance Required.  Upon execution of this Agreement, the Franchisee will procure and will maintain in full force and effect at all times during the term of the Franchise at the Franchisee's



{00078600.DOC. }
[2017 FA v1F]

expense, insurance policies protecting the Franchisee, the Franchisor and their respective Affiliates, successors and assigns and each such Entity's officers, directors, agents, representatives, independent contractors and employees against any Claim with respect to personal injury, death or property damage, or any loss, liability or expense whatsoever arising or occurring upon or in connection with the Restaurant.

16.2.    Required Coverages.  All insurance policies for the Restaurant will be written by licensed and qualified carriers with A. M. Best Insurance Guide Ratings of A/VIII or better and otherwise reasonably acceptable to the Franchisor and will include, at a minimum (except as additional coverages and higher policy limits may be specified by the Franchisor from time to time), in accordance with standards and specifications set forth in writing, the following: (a) comprehensive commercial general liability insurance, providing coverage on an occurrence form basis, with limits of not less than $1,000,000 each occurrence for bodily injury and property damage combined, $2,000,000 annual general aggregate, and $2,000,000 products and completed operations annual aggregate; (b) "all risk" insurance covering fire and extended coverage, vandalism and malicious mischief, sprinkler leakage and all other perils of direct physical loss or damage under the ISO "Special Causes of Loss" form, for the full replacement value of all the Franchisee's property or equipment of any nature located at, on, in, or about the Restaurant, or in any way used in the operation of the Restaurant, including all contents, awnings, signs, and glass with deductibles acceptable to the Franchisor; (c) "umbrella" policy providing per occurrence coverage limits of not less than $5,000,000; (d) workers' compensation insurance, if required by applicable law, in amounts specified by applicable law; (e) employee practices liability insurance with minimum per occurrence coverage of at least $1,000,000; (f) business interruption insurance to cover the Franchisee's loss of revenue and ongoing expenses and to cover any amounts owing to the Franchisor under this Agreement (including, in the case of a casualty loss, the Royalty Fees, Brand Fund Contributions and other fees and payments the Franchisor would have received had the casualty loss not occurred) or any other agreement between the Franchisee and the Franchisor or its Affiliates, in the amount specified by the Franchisor in the Manual or otherwise in writing for a minimum period of time as designated by the Franchisor; (g) trade name restoration, loss of business income and incident response insurance for food poisoning or food-borne illness incidents at the Restaurant or any Old Chicago Restaurant with coverage limits of at least $500,000 per location/incident for at least 18 months; (h) automobile liability coverage, including coverage of owned, non-owned and hired vehicles with coverage in amounts not less than $1,000,000 with combined single limit per occurrence for bodily injury and property damage; (i) any additional insurance which may be required by the Franchisor, with limits not less than the amounts specified by the Franchisor; and (j) any insurance which may be required by statute or rule of the state or locality in which the Restaurant is located.

16.3.    Deductibles.  The Franchisee may, with the prior written consent of the Franchisor, elect to have deductibles in connection with the coverage required under this Article.  Such policies will also include a waiver of subrogation in favor of the Franchisor and its Affiliates and each of their officers, directors, employees, representatives, independent contractors and agents.

16.4.    Liability Coverage.  All liability insurance policy or policies will:  (a) include premises and operations liability coverage, products and completed operations liability coverage, and broad form property damage coverage including completed operations; (b) include blanket contractual liability coverage including, to the maximum extent possible, coverage for the Franchisee's indemnification obligations under this Agreement; (c) include personal and advertising injury coverage, and liquor liability coverage with a limit of not less than $1,000,000, or such higher amount as the Franchisor may require depending upon the state in which the Restaurant is located; (d) provide that the insurance company has the duty to defend all parties insured under the policy; (e) provide that defense costs are paid in addition to, and not in depletion of, any of the policy limits; and (f) cover liabilities arising out of or



incurred in connection with the Franchisee's use, operation, occupancy, leasing or ownership of the Old Chicago Restaurant.

16.5.   Builder's Risks Insurance.   In connection with any construction, renovation, refurbishment or remodeling of the Restaurant, the Franchisee will maintain builder's risks insurance and performance and completion bonds in forms and amounts, and written by a carrier or carriers, satisfactory to the Franchisor.

16.6.   Franchisor's Insurance; Indemnification.   The Franchisee's obligation to obtain and maintain the insurance policy or policies in the amounts specified in this Article will not be limited in any way by reason of any insurance which may be maintained by the Franchisor, nor will the Franchisee's performance of that obligation relieve it of liability under the indemnity provisions set forth in this Agreement.

16.7.   Negligence of Franchisee.   All general liability and property damage policies will contain a provision that the Franchisor and its directors, officers, employees, representatives, independent contractors and agents, as named insureds, will be entitled to recover under such policies on any loss occasioned to the Franchisor or its agents or employees by reason of the negligence of the Franchisee or its agents or employees.

16.8.   Certificates of Insurance.   Upon execution of this Agreement, and thereafter in accordance with this Article and not less than 30 days prior to the expiration of any such policy, the Franchisee will deliver to the Franchisor certificates of insurance evidencing the existence and continuation of proper coverage with limits not less than those required hereunder.   In addition, if requested by the Franchisor, the Franchisee will deliver to the Franchisor a copy of each required insurance policy.   All insurance policies required hereunder, with the exception of workers' compensation and employment liability policies, will name the Franchisor, its Affiliates, and their respective directors, officers, employees, representatives, independent contractors and agents, as additional insureds, and will expressly provide that any interest of same therein will not be affected by any breach by the Franchisee of any policy provisions.   Further, each such insurance policy will expressly provide that no less than 30 days prior written notice will be given to the Franchisor if the insurer proposes a material alteration to or cancellation of the policy.

16.9.   Franchisee's Failure to Procure.   If the Franchisee, for any reason, fails to procure or maintain the insurance required by this Article, the Franchisor will have the right and authority (but no obligation) to procure such insurance and to charge the premiums to the Franchisee, which charges, together with a 20% administrative fee for the Franchisor's expenses in so acting, will be payable by the Franchisee immediately upon notice.   The foregoing remedies will be in addition to any other remedies the Franchisor may have at law or in equity.

## ARTICLE 17
## TRANSFER

17.1.   Franchisor's Right to Transfer.   The Franchisor will have the right to Transfer this Agreement and all or any part of its rights or obligations herein to any person or Entity without the Franchisee's consent.   Without limitation, the Franchisee agrees that the Franchisor may sell its Ownership Interests, its assets and/or its rights in the Marks or the Restaurant System to a third party; may offer its securities privately or publicly; may merge, spin-off, acquire other Entities or be acquired by another Entity; and may undertake a refinancing, recapitalization, leveraged buyout or other economic or financial restructuring.   With regard to any or all of the above sales, assignments and dispositions, the Franchisee expressly and specifically waives any Claims against the Franchisor and its Affiliates arising



from or related to the Transfer of this Agreement, the Marks or the Restaurant System, or any rights of the Franchisor therein, from the Franchisor or its Affiliates to any other party. Nothing contained in this Agreement will require the Franchisor to continue offering any services or products, whether or not bearing the Marks, to the Franchisee after the Franchisor assigns its rights in this Agreement to a third party.

17.2.    <u>Transfer by Franchisee or Owners</u>.   The Franchisee and the Owners understand and acknowledge that the rights and duties set forth in this Agreement are personal to the Franchisee and the Owners, and that the Franchisor has granted rights under this Agreement in reliance on the business skill, financial capacity and personal character of the Franchisee and the Owners.   Accordingly, neither the Franchisee nor any Owner, nor any successor or assign of the Franchisee or any Owner, will Transfer any direct or indirect interest in this Agreement, in the Restaurant Assets or any direct or indirect interest that will affect any change in the Ownership Interests in the Franchisee or in the ownership or other interest in the Restaurant Assets without the prior written consent of the Franchisor.   Any such purported assignment or transfer, by operation of law or otherwise, made in violation of this Agreement will be null and void.

17.3.    <u>Conditions for Approval of Transfer</u>.   If the Franchisee wishes to Transfer all or part of its interest in the Restaurant Assets or in this Agreement, or if the Franchisee or an Owner wishes to Transfer any Ownership Interest in the Franchisee, the Franchisee, the Owner and/or the proposed transferee will notify the Franchisor in writing at least 30 days prior to the proposed Transfer, and obtain the Franchisor's written approval before completing the Transfer.   The Franchisor may, in its sole and absolute discretion, require any or all of the following as conditions of its approval:  (a) all of the accrued monetary obligations of the Franchisee and its Affiliates and all other outstanding obligations to the Franchisor and its Affiliates arising under this Agreement or any other agreement have been satisfied and the Franchisee has satisfied all trade accounts and other debts, of whatever nature or kind; (b) the Franchisee and its Affiliates are not in default of any provision of this Agreement or any other agreement between the Franchisee or an Affiliate and the Franchisee or an Affiliate, and the Franchisee has substantially and timely complied with all the terms and conditions of such agreements during the terms thereof; (c) the Franchisee and its Owners have executed a general release, in a form satisfactory to the Franchisor, of any and all Claims against the Franchisor, its Affiliates and each of their respective officers, directors, agents, representatives, independent contractors and employees, in their corporate and individual capacities, including Claims arising under this Agreement and federal, state and local laws, rules and regulations; (d) the transferee has demonstrated to the Franchisor's satisfaction that it meets the criteria considered by the Franchisor when reviewing a prospective franchisee's application for a Franchise including, but not limited to:   (1) the Franchisor's educational, managerial and business standards; (2) the transferee's good moral character, business reputation and credit rating; (3) the transferee's aptitude and ability to operate the Restaurant; (4) the transferee's financial resources and capital for operation of the Restaurant; and (5) the geographic proximity and number of other Old Chicago Restaurants owned or operated by the transferee, if any; (e) the transferee is not nor does it have an interest in, nor otherwise have any association with, a Competitive Business, or a distributor, wholesaler or manufacturer of alcoholic beverages, including beer; (f) the transferee must execute, for a term ending on the expiration date of this Agreement, the standard form of franchise agreement then being offered to new franchisees by the Franchisor and other ancillary agreements, including Franchisor's then-current Owners Agreement or other guaranty, as the Franchisor may require for the Restaurant, which agreements will supersede this Agreement and its ancillary documents in all respects and the terms of which agreements may differ from the terms of this Agreement including, without limitation, a higher percentage Royalty Fee, Brand Fund Contribution and local advertising contribution or expenditure requirement; provided, however, that the transferee will not be required to pay any Initial Franchise Fee; (g) if the transferee is an Entity, the transferee's Owners will execute the required agreements as the transferee's Owners and guarantee the transferee's performance of all such obligations, covenants and agreements; (h) the transferee, at its expense, will renovate, modernize and otherwise upgrade the

Restaurant, the FF&E and, if applicable, any Restaurant vehicles to conform to then-current standards and specifications of the Restaurant System, and will complete the upgrading and other requirements within the time period reasonably specified by the Franchisor; (i) at the transferee's expense (including then-current training fees, Travel Expenses, Salaries and Benefits), the transferee, the transferee's Management Team and any other applicable Restaurant personnel will complete any training programs then in effect for franchisees of Old Chicago Restaurants upon such terms and conditions as the Franchisor may require; (j) the Franchisee will pay a Transfer Fee of 25% of the Franchisor's then current Initial Franchise Fee or, if the Franchisor is not then offering franchises for sale then, $10,000 to reimburse the Franchisor for its costs and expenses associated with the Transfer, including legal and accounting fees, and including a $1,000 non-refundable deposit at time Franchisee requests approval of the transfer; (k) the Franchise shall reimburse Franchisor for any broker or placement fee that Franchisor may incur with respect to the transfer; and (l) if applicable, the Franchisor has waived its right of first refusal in accordance with the provisions of Article 18 of this Agreement. Upon the effective date of any Transfer, the transferor will remain liable for all of the obligations to the Franchisor in connection with the Restaurant incurred prior to the effective date of the transfer and will execute any and all instruments reasonably requested by the Franchisor to evidence such liability.

17.4.    Transfer for Convenience of Ownership. If the proposed Transfer is to an Entity formed solely for the convenience of the ownership of the Franchisee, the Franchisor's consent may be conditioned upon fulfillment of the applicable requirements set forth above in Section 17.3, as determined by the Franchisor, provided that the Franchisee will not be required to pay the Transfer Fee to the Franchisor but will be required to reimburse the Franchisor for any costs (including but not limited to accounting or legal fees) that the Franchisor incurs in approving such Transfer. In that event, the Franchisee must be the Owner of all of the Ownership Interests of the Entity and if the Franchisee is more than one individual, each individual will have the same proportionate Ownership Interest in the Entity as he or she had in the Franchisee prior to the Transfer. If a Transfer will not affect a change in the Controlling Interest in the Franchisee, the Owners may Transfer their respective Ownership Interests in the Franchisee by and among themselves with the Franchisor's prior written consent, which will not be unreasonably withheld but which may be conditioned on compliance with the applicable requirements of Section 17.3, as determined by the Franchisor.

17.5.    Death or Disability of Franchisee or Owner. Upon the death or Permanent Disability of an individual Franchisee or an individual Owner of a Controlling Interest in the Franchisee, a representative of the Franchisee will notify the Franchisor of such death or Permanent Disability within 15 days after its occurrence. In that event, this Agreement and the Ownership Interests may be Transferred to any designated person or beneficiary ("Beneficiary"); provided, however, the Transfer to the Beneficiary will be subject to the applicable provisions of Section 17.3, as determined by the Franchisor, and will not be valid or effective until the Franchisor has received the properly executed legal documents which its attorneys deem necessary to document the Transfer of this Agreement or the Ownership Interests. The Beneficiary must agree to be unconditionally bound by the terms and conditions of this Agreement, and if applicable, must successfully complete the appropriate training program. There will be no charge to the Beneficiary for attending the training program; however, the Salary and Benefits and the Travel Expenses of the Beneficiary will be paid by the Beneficiary.

17.6.    No Waiver. The Franchisor's consent to a Transfer of any interest described herein will not constitute a waiver of any Claims that the Franchisor may have against the transferring party, nor will it be deemed a waiver of the Franchisor's right to demand exact compliance with any of the terms of this Agreement by the transferor or the transferee.

17.7.    Transfer of Ownership Interests. Ownership Interests in the Franchisee may be offered to the public only with the prior written consent of the Franchisor, which consent will not be unreasonably



withheld.  As a condition of its approval of such offering, the Franchisor may, in its sole discretion, require that immediately after such offering (whether registered or exempt) the Owners retain a Controlling Interest in the Franchisee. All materials required for such offering by federal or state law will be submitted to the Franchisor for a review limited solely to the subject of the relationship between the Franchisee and the Franchisor prior to being filed with any governmental agency.  Any materials (including any private placement memorandum) to be used in any exempt offering or private placement will be submitted to the Franchisor for such review prior to their use.  No offering will imply (by use of the Marks or otherwise) that the Franchisor is participating in an underwriting, issuance or offering of securities of the Franchisee, the Franchisor, or any Affiliate of the Franchisor. The Franchisor may, at its option, require the Franchisee's offering materials to contain a written statement prescribed by the Franchisor concerning the limitations described herein.  The Franchisee, its Owners, and the other participants in the offering must fully indemnify the Franchisor and its Affiliates, and each of their respective officers, directors, agents, representatives, independent contractors and employees in connection with the offering.  For each proposed offering, the Franchisee will pay to the Franchisor a nonrefundable fee of $7,500.  The Franchisee will give the Franchisor written notice at least 30 days prior to the date of commencement of any offering or other transaction covered by this provision.

17.8.  <u>Notification of Certain Transfers</u>.  If any Owner holding an Ownership Interest in the Franchisee, the Transfer of which is not subject to the preceding provisions of this Article, proposes to Transfer such Ownership Interest, then the Franchisee will promptly notify the Franchisor of such proposed Transfer in writing and will provide such information relative thereto as the Franchisor may request. The transferee may not be, have an interest in or any association with, a Competitive Business.

## ARTICLE 18
## FRANCHISOR'S RIGHT OF FIRST REFUSAL

18.1.  <u>Terms of Right of First Refusal</u>.  If the Franchisee wishes to Transfer all or part of its interest in the Restaurant Assets or this Agreement or if the Franchisee or an Owner wishes to Transfer a Controlling Interest in the Franchisee (including any Transfers that, whether individually or in the aggregate, would effect a change in Controlling Interest) pursuant to any bona fide offer received from a third party to purchase such interest, the proposed seller will promptly notify the Franchisor in writing of such offer, and will provide such information and documentation relating to the offer as the Franchisor may require. The Franchisor will have the fully-assignable right and option, exercisable within 30 days after the Franchisor's receipt of such written notification and copies of all documentation requested by the Franchisor describing the terms of such offer, to send written notice to the seller that the Franchisor intends to purchase the seller's interest on the same terms and conditions offered by the third party.  In the event that the Franchisor elects to purchase the seller's interest, closing on such purchase must occur within the later of 60 days after the date of notice to the seller of the election to purchase by the Franchisor, 60 days after the date the Franchisor receives and obtains all necessary permits and approvals, or such other date as the parties agree upon in writing.  Any material change in the terms of any offer or any change in the identity of the proposed purchaser prior to closing will constitute a new offer subject to the same right of first refusal by the Franchisor as in the case of an initial offer.  If the Franchisor fails or refuses to exercise its option and the Restaurant is not subsequently sold to the proposed purchaser for any reason, the Franchisor shall continue to have, upon the same conditions, a first option to purchase the Restaurant upon the terms and conditions of any subsequent offer.  The Franchisor's failure to exercise the option afforded by this provision will not constitute a waiver of any other provision of this Agreement, including all of the requirements of Section 17.3 with respect to a proposed Transfer.

18.2.  <u>Cash Payments</u>.  In the event an offer from a third party provides for payment of consideration other than cash or involves certain intangible benefits, the Franchisor may elect to purchase the interest proposed to be sold for the reasonable cash equivalent.  If the parties cannot agree within a



reasonable time on the reasonable cash equivalent of the non-cash part of the offer, then such amount will be determined by two appraisers, with each party selecting one appraiser, and the average of their determinations will be binding. In the event of such appraisal, each party will bear its own legal and other costs and divide the appraisal fees equally. In the event that the Franchisor exercises its right of first refusal, it will have the right to set off against the purchase price (a) all fees for any such independent appraiser due from the Franchisee, and (b) all amounts due from the Franchisee or any of its Affiliates.

**ARTICLE 19**
**INDEMNIFICATION**

19.1.    <u>Indemnification Obligations</u>.  The Franchisee and each of the Owners will, at all times, indemnify and hold harmless to the fullest extent permitted by law the Franchisor, its Affiliates, successors and assigns and their respective officers, directors, agents, representatives, independent contractors and employees ("<u>Indemnitees</u>") from all Damages incurred in connection with any Claim, or any settlement thereof (whether or not a formal proceeding or action has been instituted) which arises out of or is based upon any of the following:  (a) the infringement, alleged infringement, or any other violation or alleged violation by the Franchisee or any of the Owners of any patent, mark or copyright or other proprietary right owned or controlled by third parties (except as such may occur with respect to any right to use the Marks, any copyrights or other proprietary information granted hereunder); (b) the violation, breach or asserted violation or breach by the Franchisee or any of the Owners of any federal, state or local law, regulation, ruling, standard or directive or any industry standard; (c) libel, slander or any other form of defamation of the Franchisor, the Restaurant System or any franchisee operating under the Restaurant System, by the Franchisee or by any of the Owners; (d) the violation or breach by the Franchisee or by any of the Owners of any warranty, representation, agreement or obligation in this Agreement or in any other agreement between the Franchisee and its Affiliates, and the Franchisor or its Affiliates; (e) any claim arising out of Franchisee's employment or contractual relationship with its employees or independent contractors, including any allegation that the Franchisee's employees are employees of the Franchisor or that Franchisor is a joint employer of Franchisee's employees for any purpose including applicable labor or employment law; and (f) acts, errors, or omissions of the Franchisee, any of the Franchisee's Affiliates and any of the Owners and the officers, directors, agents, representatives, independent contractors and employees of the Franchisee and its Affiliates in connection with the establishment and operation of the Restaurant, including any acts, errors or omissions of any of the foregoing in the operation of any motor vehicle.  The parties understand and agree that the Franchisor cannot and does not exercise control over the manner of operation of the Restaurant or any motor vehicles used by, or on behalf of, the Franchisee or any employee, agent or independent contractor of the Franchisee and that the safe and lawful operation of the Restaurant or any motor vehicle is therefore the Franchisee's sole responsibility.

19.2.    <u>Notification Obligations</u>.  The Franchisee and each of the Owners agree to give the Franchisor immediate notice of any Claim relating to the Restaurant, the Restaurant System or the Marks.  At the expense and risk of the Franchisee and each of the Owners, the Franchisor may elect to assume (but under no circumstance is obligated to undertake) or associate counsel of its own choosing with respect to the defense and/or settlement of any such Claim.  Such an undertaking by the Franchisor will, in no manner or form, diminish the obligation of the Franchisee and each of the Owners to indemnify the Indemnitees and to hold them harmless for all Damages incurred hereunder.

19.3.    <u>Remedial Actions</u>.  In order to protect persons or property, or its reputation or goodwill, or the reputation or goodwill of others, the Franchisor may, at any time and without notice, as it, in its judgment deems appropriate, consent or agree to settlements or take such other remedial or corrective action as it deems expedient with respect to the action, suit, proceeding, claim, demand, inquiry or investigation if, in the Franchisor's sole judgment, there are grounds to believe that: (a) any of the acts or



circumstances enumerated in Section 19.1(a) through (e) have occurred; or (b) any act, error, or omission as described in Section 19.1(f) may result directly or indirectly in damage, injury, or harm to any person or any property.

19.4.    Payment of Damages.  All Damages incurred under this Article will be chargeable to and paid by the Franchisee or any of the Owners pursuant to its obligations of indemnity under this Article, regardless of any actions, activity or defense undertaken by the Franchisor or the subsequent success or failure of such actions, activity, or defense.  Damages shall include any legal or accounting fees that the Franchisor incurs as a result of any breach or termination of this Agreement and the Franchisee must reimburse the Franchisor for any expenses incurred enforcing its rights under the Agreement.

19.5.    Indemnification of Indemnitees.  The Indemnitees do not assume any liability whatsoever for acts, errors, or omissions of any third party with whom the Franchisee, any of the Owners, the Franchisee's Affiliates or any of the officers, directors, agents, representatives, independent contractors and employees of the Franchisee or its Affiliates may contract, regardless of the purpose.  The Franchisee and each of the Owners will hold harmless and indemnify the Indemnitees for all losses and expenses that may arise out of any acts, errors or omissions of the Franchisee, the Owners, the Franchisee's Affiliates, the officers, directors, agents, representatives, independent contractors and employees of the Franchisee and its Affiliates and any such other third parties, without limitation and without regard to the cause or causes thereof or the negligence (whether such negligence be sole, joint or concurrent, active or passive) or strict liability of the Franchisor or any other party or parties arising in connection therewith.

19.6.    Mitigation.  Under no circumstances will the Indemnitees be required or obligated to seek recovery from third parties or otherwise mitigate their losses in order to maintain a claim against the Franchisee or any of the Owners.  The Franchisee and each of the Owners agree that the failure to pursue such recovery or mitigate loss will in no way reduce the amounts recoverable from the Franchisee or any of the Owners by the Indemnitees.

19.7.    Survival of Indemnification Obligations.  The Franchisee and the Owners expressly agree that the terms of this Article will survive the termination, expiration or transfer of this Agreement or any interest herein.

## ARTICLE 20
## RELATIONSHIP OF PARTIES

20.1.    Good Faith and Fair Dealing.  If, and only if, applicable law implies a covenant of good faith and fair dealing in this Agreement, the parties agree that the covenant shall not imply any rights or obligations that are inconsistent with a fair construction of the terms of this Agreement.  Additionally, if applicable law shall imply the covenant, the Franchisee agrees that: (i) this Agreement (and the relationship of the parties that is inherent in this Agreement) grants the Franchisor the discretion to make decisions, take actions and/or refrain from taking actions not inconsistent with its explicit rights and obligations under this Agreement that may affect favorably or adversely the Franchisee's interests; (ii) the Franchisor will use its judgment in exercising the discretion based on its assessment of its own interests and balancing those interests against the interests of the Franchisor's franchisees generally, and specifically without considering the Franchisee's individual interests or the individual interests of any other particular franchisee; (iii) the Franchisor will have no liability to the Franchisee for the exercise of the Franchisor's discretion in this manner, so long as the discretion is not exercised in bad faith; and (iv) in the absence of bad faith, no trier of fact in any arbitration or litigation shall substitute its judgment for the Franchisor's judgment so exercised.



20.2.   <u>No Fiduciary Relationship</u>.  The parties acknowledge and agree that this Agreement does not create a fiduciary relationship between them, that the Franchisee will be an independent contractor, and that nothing in this Agreement is intended to constitute either party an agent, legal representative, affiliate, joint venturer, partner, employee, joint employer or servant of the other for any purpose.

20.3.   <u>Independent Contractor</u>.  During the term of this Agreement, the Franchisee will hold itself out to the public as an independent contractor conducting its Restaurant operations pursuant to the rights granted by the Franchisor in this Agreement.  The Franchisee agrees to take such action as will be necessary to that end including, without limitation, exhibiting a notice of that fact in a conspicuous place on the Restaurant premises, on any Restaurant vehicle, on all letterhead, business cards and forms, and as further described in the Manual, the content and form of which the Franchisor reserves the right to specify in writing.

20.4.   <u>No Assumption of Liabilities</u>.  The Franchisee understands and agrees that nothing in this Agreement authorizes the Franchisee or any of the Owners to make any contract, agreement, warranty or representation on the Franchisor's behalf, or to incur any debt or other obligation in the Franchisor's name, and that the Franchisor will in no event assume liability for, or be deemed liable under this Agreement as a result of, any such action, or for any act or omission of the Franchisee or any of the Owners or any Claim or judgment arising therefrom.

**ARTICLE 21**
**TERMINATION**

21.1.   <u>Immediate Termination upon Receipt of Notice</u>.  The Franchisee acknowledges and agrees that each of the Franchisee's obligations described in this Agreement is a material and essential obligation of the Franchisee; that nonperformance of such obligations will adversely and substantially affect the Franchisor and the Restaurant System; and that the exercise by the Franchisor of the rights and remedies set forth herein is appropriate and reasonable.  The Franchisee will be in default under this Agreement, and unless precluded by applicable law, the Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording the Franchisee any opportunity to cure the default, effective immediately upon the Franchisee's receipt of notice of termination upon the occurrence of any of the following events:

(a)   <u>Bankruptcy, Insolvency or Receivership</u>.  The Franchisee or the Operating Principal: (i) becomes insolvent or makes a general assignment for the benefit of creditors; (ii) files a voluntary petition under any chapter of the U.S. Bankruptcy Code or under any similar law or statute of the United States or any state, or admits in writing its inability to pay its debts when due; (iii) is adjudicated bankrupt or insolvent in proceedings filed against the Franchisee or Operating Principal under any chapter of the U.S. Bankruptcy Code or under any similar law or statute of the United States or any state; (iv) has filed against it a bill in equity or other proceeding for the appointment of a receiver of the Franchisee or other custodian for the Franchisee's business or Restaurant Assets; (v) is subject to the appointment of a receiver or other custodian (permanent or temporary) for any part of the Restaurant Assets or property; or (vi) has instituted against them proceedings for a composition with creditors under any state or federal law.

(b)   <u>Final Judgment, Foreclosure or Forced Sale of Restaurant or Property</u>.  The Franchisee or an Owner: (i) has an unsatisfied or of record final judgment for an amount in excess of $10,000 for 30 days or longer (unless supersedeas bond is filed) and execution is levied against the Franchisee's business or property; or (ii) has instituted against it a suit to foreclose any lien or mortgage against the Restaurant premises or equipment which is not dismissed within 30 days; or



(iii)  suffers the sale of the real or personal property of the Franchisee's Restaurant by any sheriff, marshal or constable;

      (c)    <u>Dissolution</u>.  The Franchisee is and Entity and it is dissolved.

      (d)    <u>Material Misstatement or Fraud</u>.  The Franchisee or any Owner delivers to the Franchisor any required Financial Record or other financial or personal information that the Franchisee or Owner knows is materially false, misleading, incomplete or inaccurate with the intention that Franchisor rely on such information or that the Franchisee operates the Restaurant or conducts its business under this Agreement in an unfair, fraudulent or corrupt way.

      (e)    <u>Sale at Unauthorized Location</u>.  The Franchisee operates the Restaurant or sells any Foods, Products or Services authorized by the Franchisor for sale at the Restaurant at any location except the Licensed Location.

      (f)    <u>Construction, Permitting and Opening</u>.  The Franchisee: (i) fails to acquire possession of a Licensed Location for the Restaurant within the time and in the manner specified in this Agreement; (ii) fails to construct or remodel the Restaurant and/or obtain and install the FF&E in accordance with the standards and specifications provided to the Franchisee, as adapted with the Franchisor's approval; (iii) fails to obtain all licenses (including all licenses necessary for the sale of alcoholic beverages) required to operate the Restaurant as an Old Chicago Restaurant; of (iv) fails to open the Restaurant for business as an Old Chicago Restaurant by the Required Opening Date.

      (g)    <u>Abandonment</u>.  The Franchisee at any time ceases to operate or otherwise abandons the Restaurant, or loses the right to possession of the Licensed Location, or otherwise forfeits the right to do or transact business in the jurisdiction where the Restaurant is located. This provision will not apply in cases of Force Majeure (acts of God, strikes, lockouts or other industrial disturbances, war, riot, epidemic, fire or other catastrophe or other forces beyond the Franchisee's control) if through no fault of the Franchisee, the premises of the Restaurant are damaged or destroyed and if the Franchisee applies within 30 days after such event for the Franchisor's approval to relocate or reconstruct the Restaurant premises and the Franchisee diligently pursues such reconstruction or relocation.

      (h)    <u>Criminal Acts</u>.  The Franchisee or any of the Owners is convicted of, or has entered a plea of nolo contendere (no contest) to, a felony, a crime involving moral turpitude, or any other crime or offense related to the Restaurant business that the Franchisor believes is likely to have an adverse effect on the Restaurant System, the Marks, the goodwill associated with them, or the Franchisor's interests in them, including any violation of any alcoholic beverages control laws.

      (i)    <u>Health and Safety</u>.  A threat or danger to public health or safety results from the construction, maintenance or operation of the Restaurant or the conduct of the Restaurant is so contrary to this Agreement, the Restaurant System, the Manual or public health, safety or sanitation codes and regulations as to constitute an imminent danger to the public health (for example, failing to strictly comply with food storage, handling and preparation laws).

      (j)    <u>Confidentiality and Non-competition Covenants</u>.  The Franchisee or any Owner violates the covenants contained in Section 13.4 or Article 14 of this Agreement or similar covenants contained in the Owners Agreement or similar agreement.



(k)     Unauthorized Transfer.  The Franchisee or any of the Owners purport to Transfer any rights or obligations under this Agreement or any Ownership Interest in the Franchisee or the Restaurant Assets to any third party contrary to the terms of Article 17.

(l)     Failure to Maintain Insurance.  The Franchisee fails to procure and maintain the insurance coverage required by Article 16 and the Franchisee fails to cure such default within seven days following notice from the Franchisor.

(m)     Misuse of Marks.  The Franchisee misuses or makes any unauthorized use of the Marks or otherwise materially impairs the goodwill associated with them or the Franchisor's rights in them and such use is not cured within 24 hours of the Franchisee's receipt of notice from the Franchisor.

(n)     Multiple Defaults.  The Franchisee or any of the Owners is given three (3) or more written notices of default in the performance of any obligation under or of any violation of the terms of this Agreement within any twelve (12) month period, whether or not such defaults are of the same or different nature and whether or not such defaults have been cured by the Franchisee.

(o)     Cross Default.  The Franchisee or any of its Affiliates defaults under or fails or refuses to comply with any terms and conditions of any franchise agreement, area development agreement, lease, license or other material agreement between the Franchisor or its Affiliates and the Franchisee or its Affiliates related to the ownership or operation of any Restaurant licensed to Franchisee or its Affiliate, and the Franchisee or it Affiliate does not timely cure such default. This provision shall not apply to a breach or default of a Development Agreement.

(p)     Failure to Pay or Report.  The Franchisee or any of its Affiliates fails, refuses, or neglects promptly to pay any monies owing to the Franchisor or its Affiliates when due under this Agreement or any other agreement, or to submit the financial or other information required by the Franchisor under this Agreement and does not cure such default within 10 days following notice being sent by the Franchisor (or such other applicable cure period contained in such other agreement or required by law).

21.2.   Defaults with Cure Rights; Cure Period.  Except for defaults by the Franchisee which by the terms of Section 21.1 do not have a cure period or which can be corrected by the Franchisee within a different cure period, the Franchisor may terminate this Agreement by giving written notice of default stating the nature of such default to the Franchisee at least 30 days prior to the effective date of termination for such default.  The Franchisee may avoid termination by immediately initiating a remedy to cure such default and curing it to the Franchisor's satisfaction and by promptly providing proof of the cure to the Franchisor within the 30-day period.  Franchisee must also reimburse Franchisor's costs and expenses arising from such default, including reasonable accountant fees, attorney fees, and hourly charges of administrative employees.  If any such default is not cured, as determined by the Franchisor, within the specified time or such longer period as applicable law may require, this Agreement will terminate effective upon the Franchisee's receipt of written notice of termination from the Franchisor. Defaults that are susceptible of cure include, but are not limited to, the following events:  (a) if the Franchisee fails to comply with any of the requirements imposed by this Agreement, as it may from time to time be amended or supplemented by the Franchisor through the Manual or otherwise in writing, or fails to carry out the terms of this Agreement; (b) if the Franchisee fails to maintain or observe any of the standards, specifications or procedures prescribed by the Franchisor in this Agreement, the Manual or otherwise in writing except as described in Section 21.1;  and (c) if the Franchisee or any of its Affiliates



fails, refuses, or neglects promptly to pay any monies owing to any Approved Suppliers or Designated Suppliers when due.

21.3.   Termination by Franchisee.   Franchisee may terminate this Agreement due to a material default by Franchisor of its obligations hereunder, which default is not cured by Franchisor within 30 days after Franchisor's receipt of prompt written notice by Franchisee to Franchisor detailing the alleged default with specificity; provided, that if the default is such that it cannot be reasonably cured within such 30 day period, Franchisor shall not be deemed in default for so long as it commences to cure such default within 30 days and diligently continues to prosecute such cure to completion.

## ARTICLE 22
## POST-TERMINATION OBLIGATIONS

22.1.   Termination of Rights.   Upon termination or expiration of this Agreement, all rights granted hereunder to the Franchisee will immediately terminate.  The Franchisee will immediately cease to operate the Restaurant under the Restaurant System and in association with the Marks, and will not afterwards, directly or indirectly, represent to the public or hold itself out as a present or former franchisee of the Franchisor.  Upon expiration or termination of the Agreement the Franchisee shall follow all procedures established by the Franchisor to ensure that such expiration or termination causes the least possible disruption to the Restaurant System including those procedures set forth in the Manual.

22.2.   Expiration of Franchise Agreement.   Upon expiration of this Agreement, the Franchisee shall not remove any furniture, fixtures, signs, equipment, other property, or leasehold improvements within sixty (60) days prior to the date specified for expiration.  The Franchisor shall, upon written notice of its intention to purchase said property at least thirty (30) days prior to such date of expiration, have the option to purchase the Franchisee's furniture, fixtures, signs, equipment, other property, and leasehold improvements or any portion thereof in accordance with Article 23.

22.3.   Cessation of Use of Marks.   Upon the termination or expiration of this Agreement, the Franchisee will immediately and permanently cease to use, in any manner whatsoever, any confidential methods, recipes, computer software, procedures and techniques associated with the Restaurant System, and the name "Old Chicago®" and all other Marks and distinctive forms, slogans, signs, symbols and devices associated with the Restaurant System.  In particular, the Franchisee will cease to use all signs, advertising materials, displays, stationery, forms and any other articles which display any of the Marks.

22.4.   Cancellation of Assumed Name.   Upon the termination or expiration of this Agreement, the Franchisee will take such action as may be necessary to cancel any assumed name or equivalent registration that contains the mark "Old Chicago®" or any other service mark or trademark of the Franchisor or its Affiliates, and the Franchisee will furnish the Franchisor with evidence satisfactory to the Franchisor of compliance with this obligation within five days after termination or expiration of this Agreement.

22.5.   Payment of Sums Owed.   Upon the termination or expiration of this Agreement, the Franchisee and the Owners will promptly pay all sums owing to the Franchisor and its Affiliates.  Such sums will include all Damages incurred by the Franchisor as a result of any default by the Franchisee and in connection with obtaining any remedy available to the Franchisor for any violation of this Agreement by Franchisee.

22.6.   Return of Manual.  Upon the termination or expiration of this Agreement, the Franchisee will immediately deliver to the Franchisor all manuals, records, files, instructions, correspondence and



other written materials related to operating the Restaurant, any computer software licensed by the Franchisor and associated computer files and customer files generated and/or maintained by such software, all agreements, invoices, and any and all other materials relating to the operation of the Restaurant in the Franchisee's possession or control, and all copies thereof (all of which are acknowledged to be the Franchisor's property), and the Franchisee will retain no copy or record of any of the foregoing, except the Franchisee's copy of this Agreement and of any correspondence between the parties and any other documents that the Franchisee needs for compliance with applicable law.

22.7.    <u>Advertising Materials</u>.    Upon the termination or expiration of this Agreement, the Franchisee will immediately furnish to the Franchisor an itemized list of all advertising and sales promotion materials bearing the Marks or any of the Franchisor's distinctive markings, designs, labels or other commercial symbols, whether located on the Restaurant premises or under Franchisee's control at any other location.  The Franchisor will have the right to inspect these materials.  The Franchisor will have the option, exercisable within 30 days after such inspection, to purchase any or all of the materials at the Franchisee's cost, or to require the Franchisee to destroy or properly dispose of such materials. Materials not purchased by the Franchisor will not be used by the Franchisee or any other party for any purpose unless authorized in writing by the Franchisor.

22.8.    <u>Restaurant Premises</u>.    If, upon the termination or expiration of this Agreement, the Franchisee operates the Restaurant under a Lease for the Licensed Location with a third party or, with respect to any lease for the FF&E used in the operation of the Restaurant (collectively, "<u>Leases</u>"), the Franchisee will, at the Franchisor's option, assign to the Franchisor any interest which Franchisee has in the Lease.  The Franchisor may exercise such option, at or within 30 days after either Franchisee's receipt of notice of termination or (subject to any existing right to renew) expiration of this Agreement.  The time for closing on the assignment of the Leases will be a date no later than 10 days after the Franchisor's exercise of its option thereunder.  In the event the Franchisor does not elect to exercise its option to acquire the Lease for the Licensed Location or the Franchisor does not elect to acquire the Restaurant premises pursuant to Section 23.1, then the Franchisee will within 10 days thereafter make such modifications or alterations to the Licensed Location as are necessary to distinguish the appearance of the Restaurant from that of other Old Chicago Restaurants operating under the Restaurant System, and will make such specific additional changes as the Franchisor may request.  If the Franchisee fails or refuses to comply with the requirements of this provision, the Franchisor will have the right to enter upon the premises of the Restaurant, without being guilty of trespass or any other crime or tort, to make or cause to be made such changes to the Licensed Location as may be required, at the expense of the Franchisee, which the Franchisee will pay upon demand.

## ARTICLE 23
## FRANCHISOR'S OPTION TO PURCHASE

23.1.    <u>Option to Purchase Assets</u>.  Subject to the Franchisor's option to assume the Lease for the Licensed Location and any FF&E leases under Section 22.8 and any applicable state law, the Franchisor will have the option, to be exercised within 30 days after Franchisee's receipt of notice of termination of this Agreement, to purchase from the Franchisee any or all of the Restaurant Assets, at the Franchisee's cost or fair market value, whichever is less.  The Franchisor will purchase the Restaurant Assets only, and will be assuming no liabilities whatsoever, unless otherwise agreed to in writing by the parties.  If the parties cannot agree on the fair market value within 30 days of the Franchisor's exercise of its option, fair market value will be determined by two appraisers, with each party selecting one appraiser, and the average of their determinations will be binding.  In the event of such appraisal, each party will bear its own legal and other costs and will split the appraisal fees equally.  If the Franchisor elects to exercise any option to purchase herein provided, it will have the right to set off all amounts due from the Franchisee to the Franchisor or any of its Affiliates (including any costs for the appraisal) and any costs incurred in



connection with any escrow arrangement (including legal fees) against any payment therefor and will pay the remaining amount in cash.

23.2.  Terms of Options.  With respect to the options described in Section 23.1, the Franchisee will deliver to the Franchisor in a form satisfactory to the Franchisor, such warranties, deeds, releases of lien, bills of sale, assignments and such other documents and instruments which the Franchisor deems necessary in order to perfect the Franchisor's title and possession in and to the Restaurant Assets being purchased or assigned and to meet the requirements of all tax and government authorities.  If at the time of closing, the Franchisee has not obtained all of these certificates and other documents, the Franchisor may, in its sole discretion, place the purchase price or rent in escrow pending issuance of any required certificates or documents.  The time for closing of the purchase and sale of the Restaurant Assets will be a date not later than 60 days after the purchase price is determined by the parties or the determination of the appraisers, or the date the Franchisor receives and obtains all necessary permits and approvals, whichever is later, unless the parties mutually agree to designate another date.  Closing will take place at the Franchisor's corporate offices or at such other location as the parties may agree.

23.3.  Assignment of Franchisor's Option.  The Franchisor will be entitled to assign any and all of its options in this Article to any other party without the prior consent of the Franchisee.

### ARTICLE 24
### GENERAL PROVISIONS

24.1.  Notices.  Any and all notices required or permitted under this Agreement will be in writing and will be by personal service or sent by prepaid certified mail to the respective parties at the following addresses, unless and until a different address has been designated in writing to the other party:

Notices to Franchisor:  Old Chicago Franchising, LLC
8001 Arista Place Suite #500
Broomfield, CO 80021
Attention:  President
Telephone:  (303) 664-4000
Facsimile:  (303) 942-7414

Notices to Franchisee:  The address set forth in Attachment A

For the purposes of this Agreement, personal service will include service by a recognized overnight delivery service (such as Federal Express, Airborne Express or UPS) which requires a written receipt of delivery from the addressee.

24.2.  Entire Agreement.  This Agreement, the documents referred to herein, and the attachments hereto, constitute the entire, full and complete agreement between the Franchisor, the Franchisee and the Owners concerning the subject matter hereof and supersede all prior related agreements between the Franchisor and the Franchisee or the Owners.  Nothing in this or any other related agreement, however, is intended to disclaim the representations we made in the Franchise Disclosure Document that we furnished to you.  Except for those permitted to be made unilaterally by the Franchisor hereunder, no amendment, change or variance from this Agreement will be binding on either party unless mutually agreed to by the parties and executed by their authorized officers or agents in writing.

24.3.  No Waiver.  No delay, waiver, omission or forbearance on the part of the Franchisor to exercise any right, option, duty or power arising out of any breach or default by the Franchisee or the


{00078600.DOC.}
[2017 FA v1F]

B-40

Owners under this Agreement will constitute a waiver by the Franchisor to enforce any such right, option, duty or power against the Franchisee or the Owners, or as to a subsequent breach or default by the Franchisee or the Owners. Acceptance by the Franchisor of any payments due to it hereunder subsequent to the time at which such payments are due will not be deemed to be a waiver by the Franchisor of any preceding breach by the Franchisee or the Owners of any terms, provisions, covenants or conditions of this Agreement.

24.4.  Written Approvals.  Whenever this Agreement requires the prior approval or consent of the Franchisor, the Franchisee will make a timely written request to the Franchisor, and such approval or consent will be obtained in writing.

24.5.  No Warranties.  The Franchisor makes no warranties or guaranties upon which the Franchisee may rely and assumes no liability or obligation to the Franchisee or any third party to which it would not otherwise be subject, by providing any waiver, approval, advice, consent or suggestion to the Franchisee in connection with this Agreement, or by reason of any neglect, delay or denial of any request therefor.

24.6.  Force Majeure.  If a Force Majeure event occurs, then the Franchisee will continue to be obligated to pay to the Franchisor any and all amounts that it duly became obligated to pay in accordance with the terms of this Agreement prior to the occurrence of any Force Majeure event, and the Indemnitees will continue to be indemnified and held harmless by the Franchisee in accordance with Article 19. Except as provided in Section 16.2(f), none of the parties will be held liable for a failure to comply with any terms and conditions of this Agreement when such failure is caused by an event of Force Majeure. Upon the occurrence of any event of the type referred to herein, the party affected thereby will give prompt notice thereof to the other parties, together with a description of the event, the duration for which the party expects its ability to comply with the provisions of the Agreement to be affected thereby and a plan for resuming operation under the Agreement, which the party will promptly undertake and maintain with due diligence. Such affected party will be liable for failure to give timely notice only to the extent of damage actually caused.

24.7.  Cumulative Remedies.  No right or remedy conferred upon or reserved by the Franchisor, the Franchisee, or the Owners by this Agreement is intended and it will not be deemed to be exclusive of any other right or remedy provided or permitted herein, by law or at equity, but each right or remedy will be cumulative of every other right or remedy.

24.8.  Counterparts.  This Agreement may be executed in multiple counterparts, each of which when so executed will be an original, and all of which will constitute one and the same instrument.

24.9.  Captions.  The captions used in connection with the articles of this Agreement are inserted only for purpose of reference. Such captions will not be deemed to govern, limit, modify or in any other manner affect the scope, meaning or intent of the provisions of this Agreement or any part thereof nor will such captions otherwise be given any legal effect.

24.10.  Survival of Obligations.  Any obligation of the Franchisee or the Owners that contemplates performance of such obligation after termination or expiration of this Agreement or the transfer of any interest of the Franchisee or the Owners therein will be deemed to survive such termination, expiration or transfer, including the provisions of this Article.

24.11.  Severability.  All provisions of this Agreement are severable and this Agreement will be interpreted and enforced as if all completely invalid or unenforceable provisions were not contained herein and partially valid and enforceable provisions will be enforced to the extent valid and enforceable.



If any applicable law or rule of any jurisdiction requires (i)  a greater prior notice of the termination of this Agreement than is required in Article 21, or (ii) the taking of some other action not required hereunder, or (iii) that any provision of this Agreement or any specification, standard or operating procedure prescribed by the Franchisor be declared invalid or unenforceable under applicable law, then such invalid or unenforceable provision, specification, standard or operating procedure will be modified to the least extent necessary to be valid and enforceable.  Such modifications to this Agreement will be effective only in such jurisdiction.

24.12.  <u>Joint and Several Obligations</u>.  All references in this Agreement to the masculine, neuter or singular will be construed to include the masculine, feminine, neuter or plural, where applicable. Without limiting the obligations individually undertaken by the Owners under this Agreement, all acknowledgments, promises, covenants, agreements and obligations made or undertaken by the Franchisee in this Agreement will be deemed, jointly and severally, undertaken by all of the Owners.

24.13.  <u>Cumulative Remedies</u>.  All rights and remedies of the parties to this Agreement will be cumulative and not alternative, in addition to and not exclusive of any other rights or remedies which are provided for herein or which may be available at law or in equity in case of any breach, failure or default or threatened breach, failure or default of any term, provision or condition of this Agreement or any other agreement between the Franchisee, and the Franchisor or their respective Affiliates.  The rights and remedies of the parties to this Agreement will be continuing and will not be exhausted by any one or more exercises thereof, and may be exercised at any time or from time to time as often as may be expedient; and any option or election to enforce any such right or remedy may be exercised or taken at any time and from time to time.  The expiration, earlier termination or exercise of the Franchisor's rights pursuant to Article 21 will not discharge or release Franchisee or any of the Owners from any liability or obligation then accrued, or any liability or obligation continuing beyond, or arising out of, the expiration, the earlier termination or the exercise of such rights under this Agreement.

24.14.  <u>Further Assurances</u>.  Each of the parties will, upon reasonable request of the other, sign any additional documents necessary or advisable, to fully implement the terms and conditions of this Agreement.

24.15.  <u>Successors and Assigns</u>.  Except as expressly provided to the contrary, nothing in this Agreement is intended, nor will be deemed, to confer upon any person or Entity other than the Franchisee, the Franchisor, and their respective permitted successors and assigns, any rights or remedies under or as a result of this Agreement.

**ARTICLE 25**
**<u>DISPUTE RESOLUTION</u>**

25.1.  <u>Disputes Subject to Arbitration</u>.  Except as expressly provided to the contrary in Section 25.6 of this Agreement, all disputes and controversies between the Franchisee and the Franchisor, including allegations of fraud, misrepresentation and violation of any state or federal laws, rules or regulations, arising under, as a result of, or in connection with this Agreement, the Licensed Location or the Franchisee's Restaurant are subject to and will be resolved exclusively by arbitration conducted in accordance with and governed by the Federal Arbitration Act.  The Franchisor and the Franchisee agree that the arbitration provisions of this Article 25 shall apply during the term of this Agreement and following the termination, expiration, or non-renewal of this Agreement. The Franchisor and the Franchisee will fully perform their obligations under this Agreement during the entire arbitration process.

25.2.  <u>Notice of Dispute</u>.  The party alleging the dispute must provide the other party with written notice setting forth the alleged dispute in detail.  The party who receives written notice alleging



the dispute will have 30 days after receipt of the written notice to correct, settle or compromise the dispute specified in the written notice. If the written notice alleges that the Franchisee is delinquent in the payment of any fees or other payments payable to the Franchisor, the Franchisee will have 10 days to make full payment (including interest as provided for herein) to the Franchisor.

25.3.  Demand for Arbitration.  If the dispute alleged by either party has not been corrected, settled or compromised within the time period provided for in Section 25.2, then either party may demand arbitration in accordance with the Rules of Practice and Procedure of Judicial Arbitration & Mediation Services, Inc. ("JAMS"), and initiate the procedures necessary to appoint an Arbitrator. If JAMS or any successor is no longer in existence at the time the arbitration is commenced, Franchisor and Franchisee will agree on another arbitration organization to conduct the arbitration proceeding. If the amount involved is more than $300,000, either party will have the right to demand that arbitration be conducted by three Arbitrators, one of which must be a retired judge.

25.4.  Venue and Jurisdiction.  All disputes arising under this Agreement including any arbitration hearings and matters which are to be heard in state or federal court as described in Section 25.6 will take place exclusively in Broomfield, Colorado, and will be held no later than 90 days after the Arbitrators have been selected. The Franchisor, the Franchisee and its Owners do hereby agree and submit to personal jurisdiction to arbitration and the state and federal courts located in the State of Colorado and do hereby waive any rights to contest venue and jurisdiction in the State of Colorado and to allege that venue and jurisdiction are invalid.

25.5.  Powers of Arbitrators.  The authority of the Arbitrator(s) will be limited to making a finding, judgment, decision and award relating to the interpretation of or adherence to the written provisions of this Agreement.  The Federal Rules of Evidence ("Rules") will apply to all arbitration hearings and the introduction of all evidence, testimony, records, affidavits, documents and memoranda in any arbitration hearing must comply in all respects with the Rules and legal precedents interpreting the Rules. Each party will bear its own costs in the arbitration, including its own portion of the Arbitrator(s)' fees; provided, however, that the Arbitrator(s) may include attorney fees and costs in any award. Both parties will have the absolute right to cross-examine any person who testified against them or in favor of the other party. The Arbitrator(s) will have no authority to add to, delete or modify in any manner the terms and provisions of this Agreement.  All findings, judgments, decisions and awards of the Arbitrator(s) will be limited to the dispute set forth in the written demand for arbitration, and the Arbitrators will have no authority to decide any other issues. The Arbitrator(s) will not have the right or authority to award punitive damages to either the Franchisor or the Franchisee and the Owners.  All findings, judgments, decisions and awards by the Arbitrators will be in writing, will be made within 60 days after the arbitration hearing has been completed, and will be final and binding on the Franchisor and the Franchisee.  The written decision of the Arbitrator(s) will be deemed to be an order, judgment and decree and may be entered as such in any court of competent jurisdiction by either party.  The arbitration and the parties' agreement therefor shall be deemed to be self-executing, and if either party fails to appear at any properly noticed arbitration proceeding, an award may be entered against such party despite said failure to appear.  All issues relating to arbitrability or the enforcement of the agreement to arbitrate contained herein shall be governed by the Federal Arbitration Act (9 U.S.C. § 1 et seq.), notwithstanding any provision of this Agreement specifying the state law under which this Agreement shall be governed and construed.

25.6.  Disputes Not Subject to Arbitration.  The following disputes between the Franchisor and the Franchisee will not be subject to arbitration:  (a) the Franchisee's use of the Marks or the Restaurant System; (b) the obligations of the Franchisee upon termination or expiration of this Agreement; (c) the Franchisee's violation of the provisions of this Agreement relating to confidentiality and the covenants not to compete or solicit; and (d) any matter to enforce an Arbitrator's action.



25.7.   <u>No Collateral Estoppel or Class Actions</u>.  All arbitration findings, conclusions, orders and awards made by the Arbitrators will be final and binding on the Franchisor and the Franchisee; however, such arbitration findings, conclusions, orders and awards may not be used to collaterally estop either the Franchisee or the Franchisor from raising any like or similar issue or defense in any subsequent arbitration, litigation, court hearing or other proceeding involving third parties, including other franchisees.  No person or Entity except the Franchisor, the Franchisee, and the Owners will have the right to join in or participate in any arbitration proceeding arising under this Agreement, and therefore, the Arbitrators will not be authorized to permit class actions or to permit any other person or Entity to be involved in or be named as a party to any arbitration proceeding brought by either party under this Agreement.

THE FRANCHISEE WAIVES ANY RIGHT TO PROCEED AGAINST THE FRANCHISOR (AND THE FRANCHISOR'S AFFILIATES, STOCKHOLDERS, MEMBERS, MANAGERS, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, SUCCESSORS AND ASSIGNS) BY WAY OF CLASS ACTION, CLASS ARBITRATION, OR BY WAY OF A MULTI-PLAINTIFF, CONSOLIDATED OR COLLECTIVE ACTION.

25.8.   <u>Injunctive Relief</u>.  Either party will have the right to petition a court of competent jurisdiction for the entry of temporary and permanent injunctions and orders of specific performance enforcing the provisions of this Agreement for any action relating to:  (a) the use of the Marks and/or the Restaurant System; (b) the obligations upon termination or expiration of this Agreement; and (c) any breaches of the provisions of this Agreement by either the Franchisor or the Franchisee relating to confidential information and the interpretation, construction or enforcement of the covenants not to compete or solicit contained in Article 14.

25.9.   <u>Waiver of Claims</u>.  The Franchisee and the Owners waive, to the fullest extent permitted by applicable law, any right to or claim of any punitive, exemplary, incidental, indirect, special, consequential or other damages (including, without limitation, loss of profits) against the Franchisor, its Affiliates, and their respective officers, directors, agents, representatives, independent contractors, servants and employees, in their corporate and individual capacities, arising out of any cause whatsoever (whether such cause is based in contract, negligence, strict liability, other tort or otherwise) and agree that in the event of a dispute, the Franchisee and the Owners will be limited to the recovery of any actual damages sustained by it or them.

25.10.   <u>Limitation Periods</u>.  The Franchisor, the Franchisee and the Owners agree that no form of proceeding will be maintained by any party to enforce any liability or obligation of the other party, whether arising from this Agreement or otherwise, unless brought before the expiration of the earlier of: (a) one year after the date of discovery of the facts resulting in such liability or obligation, or (b) two years after the date of the first act or omission giving rise to the alleged liability or obligation, except that where applicable state or federal law mandate or make possible by notice or otherwise a shorter period, such shorter period will apply.

25.11.   <u>Confidentiality</u>.   All evidence, testimony, records, documents, findings, decisions, judgments and awards pertaining to any arbitration hearing between the Franchisor and the Franchisee will be secret and confidential in all respects.  The Franchisor and the Franchisee will not disclose the decision or award of the Arbitrators and will not disclose any evidence, testimony, records, documents, findings, orders, or other matters from the arbitration hearing to any person or Entity except as required by law.  Nothing herein will prevent either party from disclosing or using any information presented in any arbitration proceeding in any subsequent court hearing brought pursuant to this Agreement.



25.12.  <u>JURY TRIAL WAIVER</u>.  THE PARTIES HEREBY AGREE TO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR EQUITY, REGARDLESS OF WHICH PARTY BRINGS SUIT.  THIS WAIVER SHALL APPLY TO ANY MATTER WHATSOEVER BETWEEN THE PARTIES HERETO WHICH ARISES OUT OF OR IS RELATED IN ANY WAY TO THIS AGREEMENT, THE PERFORMANCE OF EITHER PARTY, AND/OR THE FRANCHISEE'S PURCHASE FROM THE FRANCHISOR OR ITS AFFILIATES AND/OR ANY GOODS OR SERVICES OBTAINED FROM THE FRANCHISOR OR ITS AFFILIATES.

25.13  <u>Survival</u>.  Franchisor and Franchisee agree that the provisions of this Article 25 shall apply during the term of this Agreement and following the termination, expiration, or non-renewal of this Agreement.

## ARTICLE 26
## FRANCHISEE'S LEGAL COUNSEL

The Franchisee acknowledges that this Agreement constitutes a legal document that grants certain rights to and imposes certain obligations upon the Franchisee.  The Franchisee has been advised by the Franchisor to retain an attorney or advisor prior to the execution of this Agreement to review the Franchisor's Franchise Disclosure Document, to review this Agreement in detail, to review all legal documents, including the Lease, all purchase agreements and architectural and construction contracts, to review the economics, operations and other business aspects of the Restaurant, to determine compliance with applicable laws, to advise the Franchisee on economic risks, liabilities, obligations and rights under this Agreement, and to advise the Franchisee on tax issues, financing matters, applicable state and federal laws, liquor laws, health and safety laws, environmental laws, employee issues, insurance, structure of the business, and other legal and business matters.

## ARTICLE 27
## ACKNOWLEDGMENTS

27.1.  <u>No Warranties or Guaranties</u>.  The Franchisee acknowledges that it has conducted an independent investigation of the business venture contemplated by this Agreement and recognizes that the success of this business venture involves substantial business risks and will largely depend upon the ability of the Franchisee.  The Franchisor expressly disclaims making, and the Franchisee acknowledges that it has not received or relied on, any warranty or guaranty, express or implied, as to the potential volume, profits or success of the business venture contemplated by this Agreement.

27.2.  <u>Other Franchisees</u>.  The Franchisee acknowledges that other franchisees have or will be granted Franchises at different times, different locations, under different economic conditions and in different situations, and further acknowledges that the economics and terms and conditions of such other Franchises may vary substantially in form and in substance from those contained in this Agreement.

27.3.  <u>Review of Agreement</u>.  The Franchisee acknowledges that the Franchisee has received, read and understands this Agreement and that the Franchisor has afforded the Franchisee sufficient time and opportunity to consult with advisors selected by the Franchisee about the potential benefits and risks of entering into this Agreement.

27.4.  <u>Receipt of Agreement; Disclosure Document</u>.  The Franchisee acknowledges that it received a complete copy of this Agreement and all related Attachments and agreements at least seven days prior to the date on which this Agreement was executed.  The Franchisee further acknowledges that



it has received and carefully read a copy of the Franchisor's Franchise Disclosure Document at least 14 days prior to the date on which this Agreement was executed.

## ARTICLE 28
## GOVERNING LAW

28.1.   Governing Law; Severability.   Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. §1051 et seq.), this Agreement and the relationship between the Franchisor and the Franchisee will be governed by the laws of the State of Colorado. In the event of any conflict of law, the laws of Colorado will prevail, without regard to the application of Colorado conflict of law rules. If, however, any provision of this Agreement would not be enforceable under the laws of Colorado, and if Franchisee's Restaurant is located outside of Colorado and such provision would be enforceable under the laws of the state in which Franchisee's Restaurant is located, then such provision will be interpreted and construed under the laws of that state. Nothing in this Section 28.1 is intended by the parties to subject this Agreement to any franchise or similar law, rule, or regulation of the State of Colorado to which it would not otherwise be subject. The provisions of this Agreement which conflict with or are inconsistent with applicable governing law will be superseded and/or modified by such applicable law only to the extent such provisions are inconsistent. All other provisions of this Agreement will be enforceable as originally made and entered into upon the execution of this Agreement by the Franchisee and the Franchisor.

## ARTICLE 29
## DEFINITIONS

For purposes of this Agreement, the following terms will have the following meanings:

29.1.   Abandon.   "Abandon" will mean the conduct of the Franchisee indicating the willingness, desire or intent of the Franchisee to discontinue operating its Old Chicago Restaurant in accordance with the quality standards, uniformity requirements and the Restaurant System as described in this Agreement and the Manual including, but not limited to, the failure of the Franchisee to operate the Restaurant during the business hours specified in the Manual for two or more consecutive days without the prior written approval of the Franchisor or the failure to remain open for business during the specified business hours.

29.2.   Affiliate.   "Affiliate" will mean any individual or Entity that controls, is controlled by, or is under common control with the Franchisor or the Franchisee, as applicable.

29.3.   Approved Supplier.   "Approved Supplier" will mean a supplier, vendor or distributor that has been approved in writing by the Franchisor because its products and/or services conform to the standards and specifications established by the Franchisor and the Franchisor has determined that its business reputation, quality standards, delivery performance, credit rating and other factors are satisfactory. The Franchisor or an Affiliate of the Franchisor may be an Approved Supplier.

29.4.   Business Day.   "Business day" will mean any day other than Saturdays, Sundays or national holidays on which federally-chartered banks are authorized to close.

29.5.   Brand Fund.   "Brand Fund" will have the meaning provided in Section 10.1 of the Franchise Agreement.

29.6.   Brand Fund Contribution.   "Brand Fund Contribution" will have the meaning provided in Section 10.1 of the Franchise Agreement.



{00078600.DOC. }
[2017 FA v1F]

B-46

29.7.   Certified Training Restaurant.   "Certified Training Restaurant" will have the meaning provided in Section 6.1 of the Franchise Agreement.

29.8.   Claims.   "Claims" will mean any and all demands, complaints, actions, suits, proceedings, filings, assertions, requests for payment, compensation or damages, challenges, allegations of liability, causes of action, and/or lawsuits.

29.9.   Competitive Business.   "Competitive Business" will mean a business, other than another Old Chicago Restaurant, that looks like, copies, imitates, or operates in a manner that resembles or is similar to an Old Chicago Restaurant including, but not limited to, any casual dining restaurant that operates as a full service, sit-down restaurant having a menu directed substantially to the offer of deep-dish (Chicago style) pizza, or whose actual sales are fifteen percent (15%) or greater generated by or derived from the sale of deep-dish (Chicago style) pizza or that has more than twenty-four (24) draft beer tap handles. Notwithstanding the foregoing, "Competitive Business" shall not include the direct or indirect ownership solely as an investment, of securities of any Entity which are traded on any national securities exchange if applicable owner thereof (i) is not a controlling person of, or a member of a group which controls, such Entity and (ii) does not, directly or indirectly, own 5% or more of any class of securities of such Entity.

29.10.   Computer System.   "Computer System" will mean the point-of-sale system, cash register, computer hardware and software, communication equipment, communication services, security equipment, security cameras, audio and visual equipment, Internet services (including the requirement to maintain a high-speed Internet connection), Wi-Fi, dedicated telephone and power lines, modems, printers, and other related accessories or peripheral equipment that meet the specifications set forth in the Manual or otherwise in writing by the Franchisor for the operation of the Restaurant.

29.11.   Controlling Interest.   "Controlling Interest" will mean (a) if the Franchisee is a corporation, that an Owner or the Owners, either individually or cumulatively, (1) directly or indirectly own at least 51% of the shares of each class of the Franchisee's issued and outstanding capital stock and (2) are entitled, under its governing documents or under any agreements among shareholders, to cast a sufficient number of votes to require the corporation to take or omit to take any action that the Franchisee is required to take or omit to take under this Agreement; or (b) if the Franchisee is a partnership, that an Owner or the Owners (1) own at least a 51% interest in the profits and losses of the partnership, as well as at least a 51% Ownership Interest in the partnership (and at least a 51% interest in the shares of each class of capital stock of any corporate general partner) and (2) are entitled under its partnership agreement or applicable law to act on behalf of the partnership without the approval or consent of any other partner or are able to cast a sufficient number of votes to require the partnership to take or omit to take any action that the Franchisee is required to take or omit to take under this Agreement.

29.12.   Damages.   "Damages" will include all judgments, losses, injuries, awards, reparations, penalties, interest, lost profits, compensatory, exemplary, incidental, consequential or punitive damages, fines, charges, judgments, court costs, attorneys' fees, litigation or arbitration out-of-pocket costs, settlement payments, deposition and pre-trial costs, Travel Expenses, investigation fees, costs for remedial actions and mitigation, and all other related amounts.

29.13.   Designated Market Area.   "Designated Market Area" or "DMA" will mean each television market exclusive of another based upon a preponderance of television viewing hours as defined by the A.C. Nielsen ratings service or such other ratings service as may be designated by the Franchisor.



29.14.  <u>Designated Supplier</u>.  "Designated Supplier" will mean a supplier, vendor or distributor designated by the Franchisor in writing as the only source for those foods, food items, recipe ingredients, products and services used or sold in the Restaurant that the Franchisor has determined must meet certain quality and uniformity standards to protect the valuable goodwill and uniformity associated with the Marks and the Restaurant System.  The Franchisor or an Affiliate of the Franchisor may be a Designated Supplier.

29.15.  <u>Development Agreement</u>.  "Development Agreement" will mean an agreement between the Franchisor and the Franchisee or one of its Affiliates pursuant to which the Franchisee or its Affiliate undertakes the development of more than one Old Chicago Restaurant in the market in which the Restaurant is located.

29.16.  <u>Dollars</u>.  "Dollars" will mean United States of America dollars.

29.17.  <u>Effective Date</u>.  "Effective Date" will mean the date set forth on Page 1 of this Agreement.  If the Franchisee leases the Licensed Location, then the Effective Date of this Agreement will be the same date as the date on which the term of the Lease for the Licensed Location commences.

29.18.  <u>Electronic Commerce</u>.  "Electronic Commerce" will mean advertising and promoting merchandise and services, and accepting orders and receiving payment for such merchandise and services, by means of electronic communication.

29.19.  <u>Entity</u>.  "Entity" will mean a corporation, limited liability company, partnership, limited partnership or any other type of entity formed in compliance with applicable law.

29.20.  <u>Facilities Operator</u>.  "Facilities Operator" will mean the third party that is in charge of the operations of the Reserved Venue.

29.21.  <u>FF&E</u>.  "FF&E" will mean the furniture, fixtures, décor items, equipment, games, vending machines, merchandise, supplies, signs, inventory, vehicles and Computer System used in the Restaurant.

29.22.  <u>Financial Records</u>.  "Financial Records" will mean all accounting books, records and ledgers maintained in a written form, on a computer disk or hard drive, and in any other electronic or other form including, but not limited to, sales ledgers, sales slips, coupons, purchase orders, credit card transmission records, payroll records, employee meal records, cash receipts and disbursements, work papers, journals, general ledgers, summaries, schedules, bank statements, cancelled checks, deposit slips, federal and state income tax returns, state sales tax returns, Royalty Reports, Financial Statements, daily cash register tapes, records of EFT transactions and other financial information.

29.23.  <u>Financial Statements</u>.  "Financial Statements" will mean a balance sheet, profit and loss statement, statement of cash flows, and explanatory footnotes prepared in accordance with generally accepted accounting principles applied on a consistent basis.

29.24.  <u>Foods, Products and Services</u>.  "Foods, Products and Services" will include the foods, beverages, menu items, recipes, ingredients, products, merchandise, services and other items offered or sold by the Franchisee or used in the Franchisee's Restaurant.

29.25.  <u>Franchise</u>.  "Franchise" will mean the right granted by the Franchisor to the Franchisee authorizing the Franchisee to operate an Old Chicago Restaurant at the Licensed Location in conformity with the Restaurant System using the name "Old Chicago ®" and the other Marks.



29.26. <u>Franchisee</u>. "Franchisee" will mean and include, collectively and individually, the Franchisee's spouse, if the Franchisee is an individual; all officers and directors of the Franchisee (including the officers and directors of any general partner of the Franchisee); all holders of an Ownership Interest in the Franchisee and in any Entity directly or indirectly controlling the Franchisee; and any other person or Entity that controls, is controlled by, or is under common control with the Franchisee.

29.27. <u>Gross Sales</u>. "Gross Sales" includes all revenues received or receivable by the Franchisee as payment, whether in cash or for credit or barter, or other means of exchange (and, if for credit or barter, whether or not payment is received), on account of any and all goods, merchandise, services or products sold in or from the Restaurant, or which are promoted or sold under any of the trademarks or by using the System. Gross Sales excludes: (i) sales taxes, value added or other tax, excise or duty charged to customers, based on sales at or from the Restaurant; (ii) tips, gratuities or service charges paid directly by customers to the Franchisee's employees or paid to the Franchisee and promptly turned over to its employees in lieu of direct tips or gratuities; (iii) discounts for employee shift meals up to $500 per period; and (iv) all sales discounts, comps and promotions including discounts for local restaurant marketing approved by Franchisor (collectively, "Sales Discounts"). Sales Discounts must be fully disclosed on all reports submitted to the Franchisor and the Franchisor reserves the right, in its sole discretion, to disallow any Sales Discounts not meeting the requirements stated in the operations manual or otherwise in writing. Sales Discounts may not exceed 5% of weekly Gross Sales.

29.28. <u>Lease</u>. "Lease" will mean the written lease or sublease agreement and all related documents signed by the Franchisee for the Licensed Location.

29.29. <u>Manual</u>. "Manual" will mean the Franchisor's confidential manuals (including its Training, Operations and Development Manuals) and all bulletins, memoranda and other written materials through which the Franchisor communicates policies, standards and procedures to operators of Old Chicago Restaurants, as may be revised by the Franchisor from time to time. The Franchisor may convert the Manual to an exclusively electronic format and require the Franchisee to access the document through the Internet or an intranet created and supported by the Franchisor.

29.30. <u>Marks</u>. "Marks" will include the name "Old Chicago®" and such other trademarks, trade names, service marks, logos, commercial symbols, phrases, slogans and tag lines as the Franchisor has or may develop for use in connection with Old Chicago Restaurants.

29.31. <u>Month</u>. "Month" or "Monthly" for the purposes of calculating and paying Royalty Fees, Brand Fund Contributions, local advertising expenditures and reporting obligations will mean a calendar month unless another sales period is specified in writing by the Franchisor.

29.32. <u>Opening Date</u>. "Opening Date" will mean the actual date on which the Restaurant commences operations and opens for business to customers.

29.33. <u>Owner</u>. "Owner" will mean any person or Entity that has an Ownership Interest in the Franchisee.

29.34. <u>Ownership Interest</u>. "Ownership Interest" will mean (a) capital stock if the Franchisee is a corporation, (b) membership interest if the Franchisee is a limited liability company, (c) partnership interest if the Franchisee is a general partnership, (d) limited or general partnership interest if the Franchisee is a limited partnership, (e) proprietorship interest if the Franchisee is an individual and the sole Owner of the Franchisee, and (f) every other type of ownership in the Franchisee as defined by the



applicable laws of the state in which the Owner(s) of the Franchisee formed the Entity that is the Franchisee.

    29.35.  <u>Permanent Disability</u>.  "Permanent disability" will mean any physical, emotional or mental injury, illness or incapacity which would prevent a person from performing the obligations set forth in this Agreement or in the guaranty made part of this Agreement for at least 90 consecutive days and from which condition recovery within 90 days from the date of determination of disability is unlikely. Permanent disability will be determined by a licensed practicing physician selected by the Franchisor, upon examination of the person.  If the person refuses to submit to an examination, such person will automatically be deemed permanently disabled as of the date of such refusal for the purpose of this Article.  The costs of any examination required by this provision will be paid by the Franchisor.

    29.36.  <u>Protected Area</u>.  "Protected Area" will mean the area described in <u>Attachment A</u>.  The Protected Area may be further described in a map attached as an exhibit to this Agreement.

    29.37.  <u>Publicly-Held Corporation</u>.  "Publicly-held Corporation" will mean a corporation registered pursuant to Article 12 of the Securities Exchange Act of 1934, as amended, or a corporation subject to the requirements of Article 15(d) of that Act.

    29.38.  <u>Required Opening Date</u>.  "Required Opening Date" will mean the date that is 270 days after the Effective Date of this Agreement, or such other date which is specified in the Development Agreement or another written agreement between the parties to this Agreement.

    29.39.  <u>Reserved Venue</u>.  "Reserved Venue" will include any enclosed area of retail sales establishments, airport, train station, hospital, university and college campus, sports stadium, convention center, military base, and other mass gathering location or event designated by the Franchisor.

    29.40.  <u>Restaurant Assets</u>.  "Restaurant Assets" will include, as applicable: (a) the Franchisee's Restaurant business; (b) the Lease for the Licensed Location (if applicable); (c) the FF&E, inventory, point-of-sale system, customer lists and all other assets used in the Franchisee's Restaurant; (d) this Agreement; (e) all FF&E leases; and (f) the land, building and related real estate used for the Franchisee's Restaurant, if the land, building and real estate are owned by the Franchisee or any Owner of the Franchisee.

    29.41.  <u>Restaurant System</u>.  "Restaurant System" will mean the distinctive foods, beverages, food products, customer participation procedures and other products and services which are associated with the Marks, copyrights, distinctive decor, furnishings, equipment, menus, recipes, uniforms, signs, color combinations, uniformity requirements, standards of consistency and quality, procedures, cleanliness, sanitation, controls, specifications, training, advertising and standards promulgated by the Franchisor.

    29.42.  <u>Salaries and Benefits</u>.  "Salaries and Benefits" will mean the salaries, fringe benefits, including life insurance, medical insurance and retirement plans, payroll taxes, unemployment compensation, workers' compensation insurance, and all other costs and expenses related to an individual's employment.

    29.43.  <u>Sales Period</u>.  "Sales Period" will mean the accounting period designated by the Franchisor in the Manual or otherwise in writing, which will be either (a) a Month or (b) a similar accounting period as designated by the Franchisor and adjusted by the Franchisor from time to time.

    29.44.  <u>Taxes</u>.  "Taxes" will mean any present or future taxes, levies, imposts, duties or other charges of whatsoever nature, including any interest or penalties thereon, imposed by any government or



political subdivision of such government on or relating to the operation of the Restaurant, the payment of monies, or the exercise of rights granted pursuant to this Agreement, except Taxes imposed on or measured by the Franchisor's net income.

29.45. <u>Transfer</u>. "Transfer" will mean to sell, assign, transfer, convey, give away, pledge, bequest, trade, lease or sublease. A "Transfer" will include a sale, assignment, transfer, conveyance, gift, pledge, bequest, trade, lease or sublease.

29.46. <u>Travel Expenses</u>. "Travel Expenses" will mean all costs incurred for travel, transportation, food, lodging, telephone, automobile rental and all related travel costs.

29.47. <u>Unauthorized Advertising Fee</u>. "Unauthorized Advertising Fee" will have the meaning provided in Section 10.6 of the Franchise Agreement.

29.48. <u>Week</u>. "Week" or "Weekly" will mean a period of seven consecutive days from Sunday through Saturday.

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed by its duly authorized representative as of the date first above written.

FRANCHISOR:                              FRANCHISEE:

OLD CHICAGO FRANCHISING LLC              TAC VENTURES, LLC

By: _____              By: _____

Name: Mark Belanger                      Name: Tom Willis

Title: VP Global Franchise Ops & Dev     Title: Managing Member



{00078600.DOC }
[2017 FA v1F]

**ATTACHMENT A
TO FRANCHISE AGREEMENT**

**FRANCHISE DATA SHEET**

1. <u>Effective Date</u>.  The Effective Date set forth in the introductory Paragraph of the Agreement is: _March 23_____, 2018.

2. <u>Franchise Owner</u>.  The Franchise Owner set forth in the introductory Paragraph of the Agreement is: TAC Ventures, LLC

3. <u>General Description of Area for Licensed Location</u>.  If the Licensed Location for the Restaurant has been selected and approved at the time of the signing of this Agreement, it shall be entered on <u>Attachment A-1</u> as the Licensed Location and the Licensed Location shall have the Protected Area listed in <u>Attachment A-1</u>.  If the Licensed Location has not been selected and approved at the time of the signing of this Agreement, this Section 3 of this Attachment A will describe the location in general terms below in the "General Description."  The General Description does not confer any territory rights to the Franchisee and is only used for a reference.  The Franchisor may sell other franchised locations in the area in the General Description.  After the Franchisor has approved the Licensed Location for the Restaurant, the Franchisor shall complete the Approved Location and the Protected Area in <u>Attachment A-1</u>.  As the Protected Area is dependent on the location of the Restaurant, the Franchisor will present the Franchisee with Protected Area upon the identification of the site for the Restaurant.  If the Franchisee does not wish to accept the Protected Area, the Franchisee may choose another site location and the Franchisor will present the Franchisee with another Protected Area based on the site selected.

The General Description of Area for the Licensed Location is (if the Licensed Location is not specified in <u>Attachment A-1</u> as of the signing of the Agreement): To be determined, within the Development Area of the Area Development Agreement between Franchisor and Franchisee of even date herewith.

4. <u>Notice Address</u>.  The notice address for Franchise Owner set forth in Article 24 of the Agreement is:

        Attn:  Tom Willis
        TAC Ventures, LLC
        1701 N. Kansas Avenue
        Liberal, KS 67901

5. <u>Protected Area</u>.  The Protected Area in Section 1.3 of the Agreement shall be the geographic area described and depicted in <u>Attachment A-1</u>.

*(Signatures on Following Page)*



**FRANCHISOR:**

OLD CHICAGO FRANCHISING LLC

By: _____

Name: Mark Belanger

Title: VP Global Franchise Ops & Dev.

**FRANCHISEE:**

TAC VENTURES, LLC

By: _____

Name:  Tom Willis

Title:  Managing Member

**ATTACHMENT A-1**
**TO THE FRANCHISE AGREEMENT**

The Franchisee has received approval for Licensed Location for the Restaurant that satisfies the demographics and location requirements minimally necessary for a Restaurant. The Franchisor and the Franchisee have mutually agreed upon a Protected Area based on the Licensed Location for the Restaurant which is indicated below. The Franchisee acknowledges that the Protected Area is in conformance with the territory guidelines stated in Item 12 of the Franchise Disclosure Document.

Licensed Location for Restaurant:

The Licensed Location for the Franchisee's Restaurant as provided in Section 1.1 of the Agreement is:

Protected Area:

The Protected Area as provided in Section 1.3 of the Agreement shall be the geographic area described below and as depicted in the following map:

FRANCHISOR:                                    FRANCHISEE:

OLD CHICAGO FRANCHISING LLC                    TAC VENTURES, LLC

By: _____                   By: _____

Name: Mark Belanger                            Name: Tom Willis

Title: VP Global Franchise Ops + Dev.          Title: Managing Member

**ATTACHMENT B**
**TO FRANCHISE AGREEMENT**

**OWNERS AGREEMENT**

As a condition to the granting by Old Chicago Franchising LLC ("<u>we</u>" or "<u>us</u>"), of a Franchise Agreement with TAC Ventures, LLC ("<u>Franchisee</u>"), each of the undersigned individuals ("<u>Owners</u>"), who constitute all of the owners of a beneficial interest in Franchisee, as well as their respective spouses, covenant and agree to be bound by this Owners Agreement ("<u>Owners Agreement</u>").

1.      **Acknowledgments.**

1.1      <u>Franchise Agreement</u>.  Franchisee entered into a franchise agreement with us effective as of ___3·23.18___, 2018 ("<u>Franchise Agreement</u>").  Capitalized words not defined in this Owners Agreement will have the same meanings ascribed to them in the Franchise Agreement.

1.2      <u>Owners' Role</u>.  Owners are the beneficial owners of all of the equity interest in Franchisee and acknowledge there are benefits received and to be received by each Owner, jointly and severally, and for themselves, their heirs, legal representatives and assigns.  Franchisee's obligations under the Franchise Agreement, including the confidentiality and non-compete obligations, would be of little value to us if Franchisee's owners were not bound by the same requirements.  Under the provisions of the Franchise Agreement, Owners are required to enter into this Owners Agreement as a condition to our entering into the Franchise Agreement with Franchisee.  Owners will be jointly and severally liable for any breach of this Owners Agreement.

2.      **Non-Disclosure and Protection of Confidential Information.**

Under the Franchise Agreement, we will provide Franchisee with specialized training, proprietary trade secrets, and other Confidential Information relating to the establishment and operation of a franchised business.  The provisions of the Franchise Agreement governing Franchisee's non-disclosure obligations relating to our Confidential Information are hereby incorporated into this Owners Agreement by reference, and Owners agree to comply with each obligation as though fully set forth in this Owners Agreement as a direct and primary obligation of Owners.  Further, we may seek the same remedies against Owners under this Owners Agreement as we may seek against Franchisee under the Franchise Agreement.  Any and all information, knowledge, know-how, techniques, and other data, which we designate as confidential, will also be deemed Confidential Information for purposes of this Owners Agreement.

3.      **Covenant Not To Compete and Not to Solicit.**

3.1      <u>Non-Competition and Non-Solicitation During and After the Term of the Franchise Agreement</u>.  Owners acknowledge that as a participant in our system, they will receive proprietary and confidential information and materials, trade secrets, and the unique methods, procedures and techniques which we have developed.  The provisions of the Franchise Agreement governing Franchisee's restrictions on competition and solicitation both during the term of the Franchise Agreement and following the expiration or termination of the Franchise Agreement are hereby incorporated into this Owners Agreement by reference, and Owners agree to comply with and perform each such covenant as though fully set forth in this Owners Agreement as a direct and primary obligation of Owners.  Further, we may seek the same remedies against Owners under this Owners Agreement as we may seek against Franchisee under the Franchise Agreement.



3.2     <u>Construction of Covenants</u>.  The parties agree that each such covenant related to non-competition and non-solicitation will be construed as independent of any other covenant or provision of this Owners Agreement.  If all or any portion of a covenant referenced in this Section 3 is held unreasonable or unenforceable by a court or agency having valid jurisdiction in a final decision to which we are a party, Owners agree to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Section 3.

3.3     <u>Our Right to Reduce Scope of Covenants</u>.  Additionally, we have the right, in our sole discretion, to unilaterally reduce the scope of all or part of any covenant referenced in this Section 3 of this Owners Agreement, without Owners' consent (before or after any dispute arises), effective when we give Owners written notice of this reduction.  Owners agree to comply with any covenant as so modified.

**4.     <u>Guarantee</u>.**

4.1     <u>Payment</u>.  Owners will pay us (or cause us to be paid) all monies payable by Franchisee under the Franchise Agreement on the dates and in the manner required for payment in the relevant agreement.

4.2     <u>Performance</u>.  Owners unconditionally guarantee full performance and discharge by Franchisee of all of Franchisee's obligations under the Franchise Agreement on the date and times and in the manner required in the relevant agreement.

4.3     <u>Indemnification</u>.  Owners will indemnify, defend and hold harmless us, all of our affiliates, and the respective shareholders, directors, partners, employees, and agents of such entities, against and from all losses, damages, costs, and expenses which we or they may sustain, incur, or become liable for by reason of: (a) Franchisee's failure to pay the monies payable (to us or any of our affiliates) pursuant to the Franchise Agreement, or to do and perform any other act, matter, or thing required by the Franchise Agreement; or (b) any action by us to obtain performance by Franchisee of any act, matter, or thing required by the Franchise Agreement.

4.4     <u>No Exhaustion of Remedies</u>.  Owners acknowledge and agree that we will not be obligated to proceed against Franchisee or exhaust any security from Franchisee or pursue or exhaust any remedy, including any legal or equitable relief against Franchisee, before proceeding to enforce the obligations of the Owners as guarantors under this Owners Agreement, and the enforcement of such obligations can take place before, after, or contemporaneously with, enforcement of any of Franchisee's debts or obligations under the Franchise Agreement.

4.5     <u>Waiver of Notice</u>.  Without affecting Owners' obligations under this Section 4, we can extend, modify, or release any of Franchisee's indebtedness or obligation, or settle, adjust, or compromise any claims against Franchisee, all without notice to the Owners.  Owners waive notice of amendment of the Franchise Agreement and notice of demand for payment or performance by Franchisee.

4.6     <u>Effect of Owner's Death</u>.  Upon the death of an Owner, the estate of such Owner will be bound by the obligations in this Section 4, but only for defaults and obligations hereunder existing at the time of death; and the obligations of any other Owners will continue in full force and effect.



**5.**     **Transfers.**

Owners acknowledge and agree that we have granted the Franchise Agreement to Franchisee in reliance on Owners' business experience, skill, financial resources and personal character. Accordingly, Owners agree not to sell, encumber, assign, transfer, convey, pledge, merge or give away any direct or indirect interest in this Franchisee, unless Owners first comply with the sections in the Franchise Agreement regarding Transfers. Owners acknowledge and agree that any attempted Transfer of an interest in Franchisee requiring our consent under the Franchise Agreement for which our express written consent is not first obtained will be a material breach of this Owners Agreement and the Franchise Agreement.

**6.**     **Notices.**

6.1     Method of Notice. Any notices given under this Owners Agreement shall be in writing and delivered in accordance with the provisions of the Franchise Agreement.

6.2     Notice Addresses. Our current address for all communications under this Owners Agreement is:

> Old Chicago Franchising LLC
> 8001 Arista Place, Suite 500
> Broomfield, CO 80021

The current address of each Owner for all communications under this Owners Agreement is designated on the signature page of this Owners Agreement. Any party may designate a new address for notices by giving written notice to the other parties of the new address according to the method set forth in the Franchise Agreement.

**7.**     **Enforcement of This Owners Agreement.**

7.1     Dispute Resolution. Any claim or dispute arising out of or relating to this Owners Agreement shall be subject to the dispute resolution provisions of the Franchise Agreement. This agreement to engage in such dispute resolution process shall survive the termination or expiration of this Owners Agreement.

7.2     Choice of Law; Jurisdiction and Venue. This Owners Agreement and any claim or controversy arising out of, or relating to, any of the rights or obligations under this Owners Agreement, and any other claim or controversy between the parties, will be governed by the choice of law and jurisdiction and venue provisions of the Franchise Agreement.

7.3     Provisional Remedies. We have the right to seek from an appropriate court any provisional remedies, including temporary restraining orders or preliminary injunctions to enforce Owners' obligations under this Owners Agreement. Owners acknowledge and agree that there is no adequate remedy at law for Owners' failure to fully comply with the requirements of this Owners Agreement. Owners further acknowledge and agree that, in the event of any noncompliance, we will be entitled to temporary, preliminary, and permanent injunctions and all other equitable relief that any court with jurisdiction may deem just and proper. If injunctive relief is granted, Owners' only remedy will be the court's dissolution of the injunctive relief. If the injunctive relief was wrongfully issued, Owners expressly waive all claims for damages they incurred as a result of the wrongful issuance.



8.    <u>**Miscellaneous**</u>.

8.1    <u>No Other Agreements</u>. This Owners Agreement constitutes the entire, full and complete agreement between the parties, and supersedes any earlier or contemporaneous negotiations, discussions, understandings or agreements. There are no representations, inducements, promises, agreements, arrangements, or undertakings, oral or written, between the parties relating to the matters covered by this Owners Agreement, other than those in this Owners Agreement. No other obligations, restrictions or duties that contradict or are inconsistent with the express terms of this Owners Agreement may be implied into this Owners Agreement. Except for unilateral reduction of the scope of the covenants permitted in Section 3.3 (or as otherwise expressly provided in this Owners Agreement), no amendment, change or variance from this Owners Agreement will be binding on either party unless it is mutually agreed to by the parties and executed in writing. Time is of the essence.

8.2    <u>Severability</u>. Each provision of this Owners Agreement, and any portions thereof, will be considered severable. If any provision of this Owners Agreement or the application of any provision to any person, property or circumstances is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Owners Agreement will be unaffected and will still remain in full force and effect. The parties agree that the provision found to be invalid or unenforceable will be modified to the extent necessary to make it valid and enforceable, consistent as much as possible with the original intent of the parties (i.e. to provide maximum protection for us and to effectuate the Owners' obligations under the Franchise Agreement), and the parties agree to be bound by the modified provisions.

8.3    <u>No Third-Party Beneficiaries</u>. Nothing in this Owners Agreement is intended to confer upon any person or entity (other than the parties and their heirs, successors and assigns) any rights or remedies under or by reason of this Owners Agreement.

8.4    <u>Construction</u>. Any term defined in the Franchise Agreement which is not defined in this Owners Agreement will be ascribed the meaning given to it in the Franchise Agreement. The language of this Owners Agreement will be construed according to its fair meaning, and not strictly for or against either party. All words in this Owners Agreement refer to whatever number or gender the context requires. If more than one party or person is referred to as you, their obligations and liabilities must be joint and several. Headings are for reference purposes and do not control interpretation

8.5    <u>Binding Effect</u>. This Owners Agreement may be executed in counterparts, and each copy so executed and delivered will be deemed an original. This Owners Agreement is binding on the parties and their respective heirs, executors, administrators, personal representatives, successors and (permitted) assigns.

8.6    <u>Successors</u>. References to "Franchisor" or "the undersigned," or "you" include the respective parties' heirs, successors, assigns or transferees.

8.7    <u>Nonwaiver</u>. Our failure to insist upon strict compliance with any provision of this Owners Agreement shall not be a waiver of our right to do so. Delay or omission by us respecting any breach or default shall not affect our rights respecting any subsequent breaches or defaults. All rights and remedies granted in this Owners Agreement shall be cumulative.

8.8    <u>No Personal Liability</u>. You agree that fulfillment of any and all of our obligations written in the Franchise Agreement or this Owners Agreement, or based on any oral communications which may be ruled to be binding in a court of law, shall be our sole responsibility and none of our owners, officers,



agents, representatives, nor any individuals associated with us shall be personally liable to you for any reason.

8.9    Owners Agreement Controls. In the event of any discrepancy between this Owners Agreement and the Franchise Agreement, this Owners Agreement shall control.

**IN WITNESS WHEREOF,** the parties have entered into this Owners Agreement as of the effective date of the Franchise Agreement.

**OWNERS:**

_____

Tom Willis
901 Apollo Street
Liberal, KS 67901

_____

Cecil O'Brate
2814 Cummings Road
Garden City, KS 67846

_____

Amro M. Samy
2125 Buffalo Heights Drive
Garden City, KS 67846

Franchisor hereby accepts the Owner(s)' agreements hereunder.

**FRANCHISOR:**

OLD CHICAGO FRANCHISING LLC

By:    _____

Title:    _____



**ATTACHMENT C**
**TO FRANCHISE AGREEMENT**

**STATEMENT OF OWNERSHIP**

Franchisee:  TAC Ventures, LLC

Trade Name (if different from above):  _____

Form of Ownership
(Check One)

_____  Individual  _____  Partnership  _____  Corporation  __X__  Limited Liability Company

If a Partnership, provide name and address of each partner showing percentage owned, whether active in management, and indicate the state in which the partnership was formed.

If a Corporation, give the state and date of incorporation, the names and addresses of each officer and director, and list the names and addresses of every shareholder showing what percentage of stock is owned by each.

If a Limited Liability Company, give the state and date of formation, the name of the manager(s), and list the names and addresses of every member and the percentage of membership interest held by each member.

State and Date of Formation:  Kansas on February 14, 2018

**Management (managers, officers, board of directors, etc.):**

| Name | Title |
|---|---|
| Tom Willis | Managing Member |
| Cecil O'Brate | Member |
| Amro M. Samy | Member |
|  |  |

**Members, Stockholders, Partners:**

| Name | Address | Percentage Owned |
|---|---|---|
| Tom Willis | 1701 N. Kansas Avenue Liberal, KS 67901 | 75% |
| Cecil O'Brate | 2814 Cummings Road Garden City, KS 67846 | 12.5% |
| Amro M. Samy | 2125 Buffalo Heights Drive Garden City, KS 67846 | 12.5% |
|  |  |  |



Franchisee acknowledges this Statement of Ownership applies to the Old Chicago Restaurant Business authorized under the Franchise Agreement.

Use additional sheets if necessary. Any and all changes to the above information must be reported to Franchisor in writing.

**FRANCHISEE:**

TAC VENTURES, LLC

Date: ___March 23, 2018___     By: _____

Name:  Tom Willis

Title:  Managing Member

# Exhibit 2

**ATTACHMENT B**
**TO FRANCHISE AGREEMENT**

**OWNERS AGREEMENT**

As a condition to the granting by Old Chicago Franchising LLC ("we" or "us"), of a Franchise Agreement with TAC Ventures, LLC ("Franchisee"), each of the undersigned individuals ("Owners"), who constitute all of the owners of a beneficial interest in Franchisee, as well as their respective spouses, covenant and agree to be bound by this Owners Agreement ("Owners Agreement").

**1.     Acknowledgments.**

1.1     Franchise Agreement.  Franchisee entered into a franchise agreement with us effective as of ___3-23.18_____, 2018 ("Franchise Agreement").  Capitalized words not defined in this Owners Agreement will have the same meanings ascribed to them in the Franchise Agreement.

1.2     Owners' Role.  Owners are the beneficial owners of all of the equity interest in Franchisee and acknowledge there are benefits received and to be received by each Owner, jointly and severally, and for themselves, their heirs, legal representatives and assigns.  Franchisee's obligations under the Franchise Agreement, including the confidentiality and non-compete obligations, would be of little value to us if Franchisee's owners were not bound by the same requirements.  Under the provisions of the Franchise Agreement, Owners are required to enter into this Owners Agreement as a condition to our entering into the Franchise Agreement with Franchisee.  Owners will be jointly and severally liable for any breach of this Owners Agreement.

**2.     Non-Disclosure and Protection of Confidential Information.**

Under the Franchise Agreement, we will provide Franchisee with specialized training, proprietary trade secrets, and other Confidential Information relating to the establishment and operation of a franchised business.  The provisions of the Franchise Agreement governing Franchisee's non-disclosure obligations relating to our Confidential Information are hereby incorporated into this Owners Agreement by reference, and Owners agree to comply with each obligation as though fully set forth in this Owners Agreement as a direct and primary obligation of Owners.  Further, we may seek the same remedies against Owners under this Owners Agreement as we may seek against Franchisee under the Franchise Agreement.  Any and all information, knowledge, know-how, techniques, and other data, which we designate as confidential, will also be deemed Confidential Information for purposes of this Owners Agreement.

**3.     Covenant Not To Compete and Not to Solicit.**

3.1     Non-Competition and Non-Solicitation During and After the Term of the Franchise Agreement.  Owners acknowledge that as a participant in our system, they will receive proprietary and confidential information and materials, trade secrets, and the unique methods, procedures and techniques which we have developed.  The provisions of the Franchise Agreement governing Franchisee's restrictions on competition and solicitation both during the term of the Franchise Agreement and following the expiration or termination of the Franchise Agreement are hereby incorporated into this Owners Agreement by reference, and Owners agree to comply with and perform each such covenant as though fully set forth in this Owners Agreement as a direct and primary obligation of Owners.  Further, we may seek the same remedies against Owners under this Owners Agreement as we may seek against Franchisee under the Franchise Agreement.



3.2     <u>Construction of Covenants</u>.  The parties agree that each such covenant related to non-competition and non-solicitation will be construed as independent of any other covenant or provision of this Owners Agreement.  If all or any portion of a covenant referenced in this Section 3 is held unreasonable or unenforceable by a court or agency having valid jurisdiction in a final decision to which we are a party, Owners agree to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Section 3.

3.3     <u>Our Right to Reduce Scope of Covenants</u>.  Additionally, we have the right, in our sole discretion, to unilaterally reduce the scope of all or part of any covenant referenced in this Section 3 of this Owners Agreement, without Owners' consent (before or after any dispute arises), effective when we give Owners written notice of this reduction.  Owners agree to comply with any covenant as so modified.

**4.     <u>Guarantee</u>.**

4.1     <u>Payment</u>.  Owners will pay us (or cause us to be paid) all monies payable by Franchisee under the Franchise Agreement on the dates and in the manner required for payment in the relevant agreement.

4.2     <u>Performance</u>.  Owners unconditionally guarantee full performance and discharge by Franchisee of all of Franchisee's obligations under the Franchise Agreement on the date and times and in the manner required in the relevant agreement.

4.3     <u>Indemnification</u>.  Owners will indemnify, defend and hold harmless us, all of our affiliates, and the respective shareholders, directors, partners, employees, and agents of such entities, against and from all losses, damages, costs, and expenses which we or they may sustain, incur, or become liable for by reason of: (a) Franchisee's failure to pay the monies payable (to us or any of our affiliates) pursuant to the Franchise Agreement, or to do and perform any other act, matter, or thing required by the Franchise Agreement; or (b) any action by us to obtain performance by Franchisee of any act, matter, or thing required by the Franchise Agreement.

4.4     <u>No Exhaustion of Remedies</u>.  Owners acknowledge and agree that we will not be obligated to proceed against Franchisee or exhaust any security from Franchisee or pursue or exhaust any remedy, including any legal or equitable relief against Franchisee, before proceeding to enforce the obligations of the Owners as guarantors under this Owners Agreement, and the enforcement of such obligations can take place before, after, or contemporaneously with, enforcement of any of Franchisee's debts or obligations under the Franchise Agreement.

4.5     <u>Waiver of Notice</u>.  Without affecting Owners' obligations under this Section 4, we can extend, modify, or release any of Franchisee's indebtedness or obligation, or settle, adjust, or compromise any claims against Franchisee, all without notice to the Owners.  Owners waive notice of amendment of the Franchise Agreement and notice of demand for payment or performance by Franchisee.

4.6     <u>Effect of Owner's Death</u>.  Upon the death of an Owner, the estate of such Owner will be bound by the obligations in this Section 4, but only for defaults and obligations hereunder existing at the time of death; and the obligations of any other Owners will continue in full force and effect.



**5.**     <u>**Transfers.**</u>

      Owners acknowledge and agree that we have granted the Franchise Agreement to Franchisee in reliance on Owners' business experience, skill, financial resources and personal character. Accordingly, Owners agree not to sell, encumber, assign, transfer, convey, pledge, merge or give away any direct or indirect interest in this Franchisee, unless Owners first comply with the sections in the Franchise Agreement regarding Transfers. Owners acknowledge and agree that any attempted Transfer of an interest in Franchisee requiring our consent under the Franchise Agreement for which our express written consent is not first obtained will be a material breach of this Owners Agreement and the Franchise Agreement.

**6.**     <u>**Notices.**</u>

      6.1    <u>Method of Notice</u>. Any notices given under this Owners Agreement shall be in writing and delivered in accordance with the provisions of the Franchise Agreement.

      6.2    <u>Notice Addresses</u>. Our current address for all communications under this Owners Agreement is:

> Old Chicago Franchising LLC
> 8001 Arista Place, Suite 500
> Broomfield, CO 80021

The current address of each Owner for all communications under this Owners Agreement is designated on the signature page of this Owners Agreement. Any party may designate a new address for notices by giving written notice to the other parties of the new address according to the method set forth in the Franchise Agreement.

**7.**     <u>**Enforcement of This Owners Agreement.**</u>

      7.1    <u>Dispute Resolution</u>. Any claim or dispute arising out of or relating to this Owners Agreement shall be subject to the dispute resolution provisions of the Franchise Agreement. This agreement to engage in such dispute resolution process shall survive the termination or expiration of this Owners Agreement.

      7.2    <u>Choice of Law; Jurisdiction and Venue</u>. This Owners Agreement and any claim or controversy arising out of, or relating to, any of the rights or obligations under this Owners Agreement, and any other claim or controversy between the parties, will be governed by the choice of law and jurisdiction and venue provisions of the Franchise Agreement.

      7.3    <u>Provisional Remedies</u>. We have the right to seek from an appropriate court any provisional remedies, including temporary restraining orders or preliminary injunctions to enforce Owners' obligations under this Owners Agreement. Owners acknowledge and agree that there is no adequate remedy at law for Owners' failure to fully comply with the requirements of this Owners Agreement. Owners further acknowledge and agree that, in the event of any noncompliance, we will be entitled to temporary, preliminary, and permanent injunctions and all other equitable relief that any court with jurisdiction may deem just and proper. If injunctive relief is granted, Owners' only remedy will be the court's dissolution of the injunctive relief. If the injunctive relief was wrongfully issued, Owners expressly waive all claims for damages they incurred as a result of the wrongful issuance.



8.     **Miscellaneous**.

8.1     No Other Agreements. This Owners Agreement constitutes the entire, full and complete agreement between the parties, and supersedes any earlier or contemporaneous negotiations, discussions, understandings or agreements.   There are no representations, inducements, promises, agreements, arrangements, or undertakings, oral or written, between the parties relating to the matters covered by this Owners Agreement, other than those in this Owners Agreement.   No other obligations, restrictions or duties that contradict or are inconsistent with the express terms of this Owners Agreement may be implied into this Owners Agreement.   Except for unilateral reduction of the scope of the covenants permitted in Section 3.3 (or as otherwise expressly provided in this Owners Agreement), no amendment, change or variance from this Owners Agreement will be binding on either party unless it is mutually agreed to by the parties and executed in writing.  Time is of the essence.

8.2     Severability. Each provision of this Owners Agreement, and any portions thereof, will be considered severable.  If any provision of this Owners Agreement or the application of any provision to any person, property or circumstances is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Owners Agreement will be unaffected and will still remain in full force and effect.   The parties agree that the provision found to be invalid or unenforceable will be modified to the extent necessary to make it valid and enforceable, consistent as much as possible with the original intent of the parties (i.e. to provide maximum protection for us and to effectuate the Owners' obligations under the Franchise Agreement), and the parties agree to be bound by the modified provisions.

8.3     No Third-Party Beneficiaries. Nothing in this Owners Agreement is intended to confer upon any person or entity (other than the parties and their heirs, successors and assigns) any rights or remedies under or by reason of this Owners Agreement.

8.4     Construction. Any term defined in the Franchise Agreement which is not defined in this Owners Agreement will be ascribed the meaning given to it in the Franchise Agreement. The language of this Owners Agreement will be construed according to its fair meaning, and not strictly for or against either party.   All words in this Owners Agreement refer to whatever number or gender the context requires.  If more than one party or person is referred to as you, their obligations and liabilities must be joint and several.  Headings are for reference purposes and do not control interpretation

8.5     Binding Effect. This Owners Agreement may be executed in counterparts, and each copy so executed and delivered will be deemed an original.  This Owners Agreement is binding on the parties and their respective heirs, executors, administrators, personal representatives, successors and (permitted) assigns.

8.6     Successors.   References to "Franchisor" or "the undersigned," or "you" include the respective parties' heirs, successors, assigns or transferees.

8.7     Nonwaiver.   Our failure to insist upon strict compliance with any provision of this Owners Agreement shall not be a waiver of our right to do so.  Delay or omission by us respecting any breach or default shall not affect our rights respecting any subsequent breaches or defaults.  All rights and remedies granted in this Owners Agreement shall be cumulative.

8.8     No Personal Liability. You agree that fulfillment of any and all of our obligations written in the Franchise Agreement or this Owners Agreement, or based on any oral communications which may be ruled to be binding in a court of law, shall be our sole responsibility and none of our owners, officers,



{00078600 DOC. }
[2017 FA v1F]

B-B-4

agents, representatives, nor any individuals associated with us shall be personally liable to you for any reason.

     8.9   <u>Owners Agreement Controls</u>.  In the event of any discrepancy between this Owners Agreement and the Franchise Agreement, this Owners Agreement shall control.

     **IN WITNESS WHEREOF,** the parties have entered into this Owners Agreement as of the effective date of the Franchise Agreement.

<strong>OWNERS:</strong>

_____
Tom Willis
901 Apollo Street
Liberal, KS 67901


_____
Cecil O'Brate
2814 Cummings Road
Garden City, KS 67846


_____
Amro M. Samy
2125 Buffalo Heights Drive
Garden City, KS 67846


Franchisor hereby accepts the Owner(s)' agreements hereunder.

**FRANCHISOR:**

OLD CHICAGO FRANCHISING LLC

By:     _____

Title:   _____


{00078600.DOC }
[2017 FA v1F]

B-B-5

# Exhibit 3

## EXHIBIT C



**AREA DEVELOPMENT AGREEMENT**

**OLD CHICAGO FRANCHISING LLC**
8001 Arista Place Suite #500
Broomfield, CO 80021
Telephone:  (303) 664-4000

Name of Area Developer:

TAC VENTURES, LLC



{00078603.DOC. }
[2017 ADA v1F]

## TABLE OF CONTENTS

**Article**                                                                                                    **Page**

ARTICLE 1    GRANT OF DEVELOPMENT RIGHTS ............................................................... 1

ARTICLE 2    AREA DEVELOPER'S DEVELOPMENT OBLIGATION .............................................. 2

ARTICLE 3    DEVELOPMENT AREA .................................................................................... 3

ARTICLE 4    TERM OF AREA DEVELOPMENT AGREEMENT ..................................................... 3

ARTICLE 5    PAYMENTS BY AREA DEVELOPER .................................................................... 5

ARTICLE 6    EXECUTION OF INDIVIDUAL FRANCHISE AGREEMENTS .................................... 6

ARTICLE 7    ASSIGNMENT AND SUBFRANCHISING ............................................................. 8

ARTICLE 8    NON-COMPETITION .................................................................................... 11

ARTICLE 9    TERMINATION ........................................................................................... 11

ARTICLE 10   ARBITRATION ............................................................................................ 13

ARTICLE 11   GENERAL CONDITIONS AND PROVISIONS ...................................................... 14

ARTICLE 12   SUBMISSION OF AD AGREEMENT ................................................................. 17

ARTICLE 13   ADDITIONAL COVENANTS ........................................................................... 17

ARTICLE 14   ACKNOWLEDGMENT .................................................................................. 20

ATTACHMENTS:

Appendix 1 - Definitions

Attachment A   Development Area
Attachment B   Development Obligation
Attachment C   Entity Information



{00078603.DOC  }
[2017 ADA v1F]

## OLD CHICAGO
## AREA DEVELOPMENT AGREEMENT

THIS **AREA DEVELOPMENT AGREEMENT** (the "**AD Agreement**") is made by and between Old Chicago Franchising, LLC, a Delaware limited liability company ("**Franchisor**") and the Area Developer ("**Area Developer**") identified on the signature page of this AD Agreement as of the date specified as the "**Effective Date**" set forth in <u>Attachment A</u>.

A.      Franchisor has the right to sublicense the "Old Chicago" names and service marks, and such other trademarks, trade names, service marks, logotypes, insignias, trade dress and designs used in connection with the development, operation and maintenance of "Old Chicago" restaurants operated in accordance with Franchisor's prescribed methods and business practices (the "**Restaurants**").

B.      Franchisor desires to expand and develop Restaurants in the Development Area (defined below), and Area Developer wishes to develop Restaurants in the Development Area, upon the terms and conditions as set forth in this AD Agreement.

**NOW, THEREFORE**, the parties agree as follows:

## ARTICLE 1
## GRANT OF DEVELOPMENT RIGHTS

1.1     <u>Certain Fundamental Definitions and Applicable Information</u>.  In this AD Agreement, in addition to those terms defined in Appendix 1 and elsewhere in this AD Agreement, the following terms, shall have the meanings set forth below, unless the context otherwise requires:  The "**Expiration Date**" of this AD Agreement is that certain date set forth in <u>Attachment B</u>.

"**Area Developer Notice Address**" is:  That address set forth in <u>Attachment A</u>.

"**Development Fee**" means $50,000.  Area Developers must also pay the full initial franchise fee the first Restaurant upon execution of the Franchise Agreement and an initial franchise fee deposit equal to 50% of the initial franchise fee for each additional Restaurant required to be opened during the Term pursuant to the Development Obligation when they sign the Franchise Agreement for each Restaurant (See Section 5.1).

"**Operating Principal**" means that person specified as "Operating Principal" in <u>Attachment A</u>, or such other individual hereafter designated by Area Developer, and accepted by Franchisor (and until subsequently disapproved by Franchisor), to serve as the authorized representative of Area Developer, who Area Developer acknowledges and agrees shall act as Area Developer's representative, who shall hold 10% or more of the Equity of Area Developer, and who shall have the authority to act on behalf of Area Developer during the Term.

1.2     <u>Grant of Development Rights</u>

1.2.1   Upon the terms and subject to the conditions of this AD Agreement, Franchisor hereby grants to Area Developer, and Area Developer hereby accepts, the right and obligation, during the Term (defined below), to develop Restaurants (defined below) in the geographic area defined in <u>Attachment A</u>, which is attached hereto and by this reference made a part hereof (the "**Development Area**").

1.2.2   No right or license is granted to Area Developer hereunder to use any trademarks, trade names, service marks, logotypes, insignias, trade dress or designs owned by Franchisor, such right and license being granted solely pursuant to Franchise Agreements executed pursuant hereto.  Without limiting the



generality of the foregoing, nothing in this AD Agreement shall permit Area Developer to own or operate a Restaurant, except pursuant to duly executed and subsisting Franchise Agreement. Area Developer shall not use such trademarks, trade names, service marks, logotypes, insignias, trade dress or designs in any manner or for any purpose, including in connection with any offering of securities or any request for credit, without the prior express written approval of Franchisor.

    1.3    <u>Exclusivity</u>

    1.3.1    Subject to Section 3.1 below, during the Term of this AD Agreement, Franchisor and its Affiliates shall not operate or grant a license or franchise to any other person to operate a Restaurant within the Development Area. Failure by Area Developer to adhere to the Development Schedule (including any extensions approved by Franchisor) shall result in a loss of the territorial rights granted in this Section.

    1.3.2    Except to the limited extent expressly provided in Section 1.3.1, the rights granted under this AD Agreement are non-exclusive and Franchisor expressly reserves all other rights, including the exclusive, unrestricted right, in its discretion, directly and indirectly, through its employees, Affiliates, representatives, licensees, assigns, agents and others, (i) to own or operate and to franchise or license others to own or operate Restaurants at any location outside the Development Area and regardless of their proximity to any Restaurant developed or under development or consideration by Area Developer, (ii) to own or operate and to franchise or license others to own or operate restaurants under names other than "Old Chicago" at any location whatsoever, and regardless of their proximity to any Restaurant developed or under development or consideration by Area Developer, (iii) to own or operate and to franchise or license others to own or operate Restaurants in any shopping center which is over 500,000 square feet in size provided that Franchisor shall first have given, and Area Developer shall not have accepted, a right-of-first-refusal for at least 7 days to execute a Franchise Agreement to open a Restaurant, and pay the then-current initial franchise fee; and (iv) to produce, license, distribute and market "Old Chicago" brand named products, and products bearing other marks, including pre-packaged food, snacks, beverage and other products; books; clothing; souvenirs and novelty items, at or through any location or outlet, including grocery stores and convenience stores (including those which may be located within the Development Area), and through any distribution channel, at wholesale or retail, including by means of mail order catalogs, direct mail advertising, Internet marketing and other distribution methods.

## ARTICLE 2
## AREA DEVELOPER'S DEVELOPMENT OBLIGATION

    2.1    <u>Development Obligation</u>

    2.1.1    Within each Development Period specified in <u>Attachment B</u>, Area Developer shall construct, equip, open and thereafter continue to operate within the Development Area, not less than the cumulative number of Restaurants required by the Development Obligation for that Development Period.

    2.1.2    Restaurants developed hereunder which are open and operating and which have been assigned to Affiliates of Area Developer in accordance with Section 7.2.2 with Franchisor's consent, shall count in determining whether Area Developer has satisfied the Development Obligation for so long as the applicable Affiliate continues to satisfy the conditions set forth in Section 7.2.2.

    2.2    <u>Timing of Execution of Leases and Franchise Agreements.</u> Notwithstanding anything to the contrary contained herein, on or before the date which is 180 days before the end of each Development Period, Area Developer shall have executed (in accordance with this AD Agreement) a lease (or purchase agreement) and Franchise Agreement and paid the required Initial Franchise Fee, for each Restaurant that is required to be constructed, equipped, opened and thereafter operated by the end of such Development Period.



2.3    <u>Force Majeure</u>

2.3.1    Subject to Area Developer's continuing compliance with Section 2.3.2, should Area Developer be unable to meet the Development Obligation for any Development Period solely as the result of Force Majeure or any legal disability of Franchisor to deliver a Franchise Disclosure Document pursuant to Section 6.2 of this AD Agreement, which results in the inability of Area Developer to construct or operate the Restaurants in all or substantially all of the Development Area pursuant to the terms of this AD Agreement, the particular Development Period during which the event of Force Majeure (or Franchisor's legal disability to deliver a Franchise Disclosure Document) occurs shall be extended by an amount of time equal to the time period during which the Force Majeure (or Franchisor's legal disability to deliver a Franchise Disclosure Document) shall have existed during that Development Period. Development Periods during which no such Force Majeure (or legal disability) existed shall not be extended. Other than as a result of Force Majeure, any delay in Franchisor's issuance of acceptance of any site under Article 6, including, as a result of Area Developer's failure to satisfy the conditions set forth in Section 6.3 of this AD Agreement, shall not extend any Development Period.

2.3.2    In the event of the occurrence of an event constituting Force Majeure, Area Developer shall notify Franchisor in writing within 5 days following commencement of the alleged Force Majeure of the specific nature and extent of the Force Majeure, and how it has impacted Area Developer's performance hereunder. Area Developer shall continue to provide Franchisor with updates and all information as may be requested by Franchisor, including Area Developer's progress and diligence in responding to and overcoming the Force Majeure.

2.4    <u>Area Developer May Not Exceed the Development Obligation.</u> Unless Franchisor shall otherwise consent in writing, Area Developer may not construct, equip, open and operate more than the total number of Restaurants comprising the Development Obligation.

### ARTICLE 3
### DEVELOPMENT AREA

3.1    <u>Franchisor's Right to Develop.</u> Notwithstanding Section 1.3.1 above, if during the Term of the AD Agreement, Area Developer fails to satisfy its Development Obligation, Area Developer shall lose the exclusive right to the Development Area. If during the Term of this AD Agreement, Area Developer is unable or unwilling, or fails for any reason (except due to Force Majeure as provided in Section 2.3), to satisfy the Development Obligation on two or more occasions, then Franchisor shall have the right, in its full and absolute discretion, to either: (i) terminate all rights of Area Developer hereunder upon notice by Franchisor to Area Developer; or (ii) reduce or otherwise modify the Development Area as Franchisor deems appropriate.

### ARTICLE 4
### TERM OF AREA DEVELOPMENT AGREEMENT

4.1    <u>Term.</u> The term of this AD Agreement shall commence on the Effective Date and, unless otherwise negotiated, terminated or extended as provided herein, shall continue until the earlier of (i) the Expiration Date, or (ii) the date of execution of the Franchise Agreement granting Area Developer the right to open the last Restaurant necessary for Area Developer to fully satisfy the Development Obligation (the "**Term**").

4.2    <u>Limited Additional Development Right.</u> If Area Developer shall determine that it desires to engage in further development of the Development Area in excess of the Development Obligation, Area Developer shall at the earlier of (i) 180 days prior to the scheduled expiration of the Term or (ii) the date on which acceptance of the proposed site for the last Restaurant required to meet the Development Obligation is



issued, notify Franchisor in writing ("**Additional Development Notice**") of Area Developer's desire to develop additional Restaurants in the Development Area and a plan for such development over a new term, setting forth the number of proposed Restaurants and the deadlines for the development of each of them within such proposed term. This right of additional development by Area Developer shall be exercised only in accordance with Section 4.2 and is subject to the conditions set forth in Section 4.4. This AD Agreement is not otherwise renewable.

4.3     Exercise of Right of Additional Development

4.3.1   If Franchisor determines the additional development obligation proposed by the Additional Development Notice is unacceptable in any respect(s), Franchisor and Area Developer shall (subject to Section 4.4) negotiate during the following 60 days in an effort to reach a mutually agreeable additional development obligation. Each party may negotiate to protect its own interests as it deems appropriate in its discretion.

4.3.2   If the additional development obligation proposed by the Additional Development Notice is acceptable to Franchisor, or if Franchisor and Area Developer reach agreement on an alternative additional development obligation (the "**Additional Development Obligation**") within said 60 day period, then Franchisor shall deliver to Area Developer a copy of Franchisor's Then-current Franchise Disclosure Document, if required by Applicable Law, and two copies of the then-current area development agreement, which may vary substantially from this AD Agreement, setting forth the agreed upon Additional Development Obligation. Within 30 days after Franchisor's delivery of the said area development agreement, but no sooner than immediately after the expiration of any applicable waiting period(s) prescribed by Applicable Law, Area Developer shall execute two copies of the area development agreement and return them to Franchisor for the Restaurants required by the Additional Development Obligation. Franchisor may waive the development fee if Area Developer had met its Development Obligations under the original area development agreement. If Area Developer has so executed and returned the copies and has satisfied the conditions set forth in Section 4.4, Franchisor will execute the copies and return one fully executed copy to Area Developer.

4.4     Conditions to Exercise of Right of Additional Development. Area Developer's right to additional development described in Section 4.2 shall be subject to Area Developer's fulfillment of the following conditions precedent:

4.4.1   Area Developer (and each of its Affiliates which have developed or operate Restaurants in the Development Area) shall have fully performed all of its obligations under this AD Agreement and all other agreements between Franchisor and Area Developer (or the applicable Affiliate).

4.4.2   Area Developer shall have demonstrated to Franchisor Area Developer's financial capacity to perform the Additional Development Obligations set forth in the area development agreement. In determining if Area Developer is financially capable, Franchisor will apply the same criteria to Area Developer as it applies to prospective area developer franchisees at that time.

4.4.3   At the expiration of each Development Period and at the expiration of the Term, Area Developer shall have opened and shall thereafter have continued to operate, in the Development Area, not less than the aggregate number of Restaurants then required by the Development Obligation.

4.4.4   Franchisor and Area Developer shall have executed a new area development agreement pursuant to Section 4.3.

4.4.5   Area Developer and all Affiliates of Area Developer who then have a currently effective franchise agreement or area development agreement with Franchisor shall have executed and



delivered to Franchisor a general release, on a form prescribed by Franchisor, of any and all known and unknown claims against Franchisor or its Affiliates, and their respective officers, directors, agents, shareholders and employees.

    4.4.6 Area Developer must meet Franchisor's then-current qualifications for successor area development which may include certain operational requirements of Area Developer's existing Restaurants.

   4.5 <u>Effect of Expiration</u>. Unless an Additional Development Obligation shall have been agreed upon, and a new area development agreement shall have been executed by the parties pursuant to Sections 4.2 and 4.3, following the expiration of the Term, or the sooner termination of this AD Agreement, (a) Area Developer shall have no further right to construct, equip, own, open or operate additional Restaurants which are not, at the time of such termination or expiration, the subject of a then existing Franchise Agreement between Area Developer (or an Affiliate of Area Developer) and Franchisor which is then in full force and effect, and (b) Franchisor or its Affiliates may thereafter itself construct, equip, open, own or operate, and license others to (or grant development rights to) construct, equip, open, own or operate Restaurants at any location(s) (within or outside of the Development Area), without any restriction, subject only to the territorial rights granted, if any, for any then-existing Restaurant pursuant to a validly subsisting Franchise Agreement executed for such Restaurant.

**ARTICLE 5**
**PAYMENTS BY AREA DEVELOPER**

   5.1 <u>Development Fee</u>. Concurrently with the execution of this AD Agreement, Area Developer shall pay to Franchisor, in cash or by certified check, the Development Fee. The Development Fee is paid to reserve the rights in the Development Area. The Development Fee is uniform and is nonrefundable under any circumstances, including if Developer fails to open any or all Restaurants under the Development Obligation.

   5.2 <u>Initial Franchise Fee & IFF Deposit</u>. Concurrently with the execution of this AD Agreement, Area Developer shall pay to Franchisor, in cash or by certified Check; (i) the initial franchise fee (the "**Initial Franchise Fee**") equal to $40,000 for the first Restaurant to be opened pursuant to the Development Obligation, plus (ii) an initial franchise fee deposit (the "**IFF Deposit**") equal to the number of additional Restaurants under the Development Obligation (beyond the first Restaurant) multiplied by $20,000. The IFF Deposit amount Area Developer must pay to Franchisor is calculated on <u>Attachment B</u> to this Agreement. Franchisor will credit the IFF Deposit against the initial franchise fee for the second and each subsequent Franchise Agreement to be signed under the Development Obligation. $20,000 from the balance of the IFF Deposit will be credited towards the initial franchise fee of the second and each subsequent franchise agreement signed by Area Developer under the Development Obligation until the IFF Deposit is exhausted. The IFF Deposit is nonrefundable under any circumstances, including if Developer fails to open any or all Restaurants under the Development Obligation. Area Developer must execute the Franchise Agreement for the first Restaurant to be opened concurrently with the execution of this AD Agreement.

   5.3 <u>Royalty Fee</u>. The Franchise Agreement executed for each Restaurant developed pursuant hereto, shall provide that the continuing Royalty (as defined therein) shall be equal to 4% of Gross Sales (as defined therein).



## ARTICLE 6
## EXECUTION OF INDIVIDUAL FRANCHISE AGREEMENTS

6.1     Site Review

6.1.1     When Area Developer has located a proposed site for construction of a Restaurant, Area Developer shall submit to Franchisor such demographic and other information regarding the proposed site and neighboring areas as Franchisor shall require, in the form prescribed by Franchisor ("**Site Information**"). Franchisor may seek such additional information as it deems necessary within 14 days of submission of Area Developer's Site Information, and Area Developer shall respond promptly to such request for additional information. The Franchisee will not purchase or lease a proposed site until the Franchisee has provided the Site Information to the Franchisor, the Franchisor has reviewed the Site Information, and the Franchisor has provided the Franchisee with a no-objection letter for the proposed site. The review of any Site Information, any visits by the Franchisor to a proposed site, and/or the issuance of a no-objection letter by the Franchisor will not constitute an approval of the site by the Franchisor or a warranty or representation by the Franchisor or any other party that the site for the Licensed Location chosen by the Franchisee will be a financial or operational success. The issuance of a no-objection letter by the Franchisor will mean only that it has received and reviewed the Site Information provided by the Franchisee, and will not be deemed to be an approval of the site by the Franchisor.

6.1.2     Although Franchisor may voluntarily (without obligation) assist Area Developer in locating an acceptable site for a Restaurant, neither Franchisor's said assistance, if any, nor its acceptance of any proposed site, whether initially proposed Area Developer or by Franchisor, shall be construed to insure or guarantee the profitable or successful operation of the Restaurant at that site by Area Developer, and Franchisor hereby expressly disclaims any responsibility therefor. Area Developer acknowledges its sole responsibility for finding each site for the Restaurants it develops pursuant to this AD Agreement.

6.2     Delivery of Franchise Disclosure Document, Execution of Lease and Franchise Agreement

6.2.1     Promptly following Area Developer's receipt of acceptance, Area Developer shall proceed to negotiate a lease or purchase agreement for the site and shall submit to Franchisor a copy of the proposed lease or purchase agreement, as applicable. Following Franchisor's receipt of the proposed lease or purchase agreement, as applicable, which meets Franchisor's requirements, Franchisor shall notify Area Developer of its acceptance of the proposed lease or purchase agreement, as applicable.

6.2.2     Franchisor's review and acceptance of the lease is solely for Franchisor's benefit and is solely an indication that the lease meets Franchisor's minimum Standards and specification at the time of acceptance of the lease (which may be different that the requirements of this AD Agreement). Franchisor's review and acceptance of the lease shall not be construed to be an endorsement of such lease, confirmation that such lease complies with Applicable Law, or confirmation that the terms of such lease are favorable to Area Developer, and Franchisor hereby expressly disclaims any responsibility therefore.

6.2.3     Subject to Section 6.3, after Franchisor's acceptance of each proposed site, Franchisor shall deliver to Area Developer a copy of Franchisor's Then-current Franchise Disclosure Document as may be required by Applicable Law (the "**Franchise Disclosure Document**") and two copies of the then-current Franchise Agreement. Immediately upon receipt of the Franchise Disclosure Document, Area Developer shall return to Franchisor a signed copy of the Acknowledgment of Receipt of the Franchise Disclosure Document. Area Developer acknowledges that the new Franchise Agreement may vary substantially from the current Franchise Agreement. If Franchisor is not legally able to deliver a Franchise Disclosure Document to Area Developer by reason of any lapse or expiration of its franchise registration, or because Franchisor is in the process of amending any such registration, or for any reason beyond Franchisor's reasonable control,



Franchisor may delay acceptance of the site for Area Developer's proposed Restaurant, or delivery of a Franchise Agreement, until such time as Franchisor is legally able to deliver a Franchise Disclosure Document.

6.2.4    Within 30 days after Area Developer's receipt of the Franchise Disclosure Document and the Then-current Franchise Agreement, but no sooner than immediately after any applicable waiting periods prescribed by Applicable Law have passed, Area Developer shall execute two copies of the Franchise Agreement described in the Franchise Disclosure Document and return them to Franchisor together with the applicable Initial Franchise Fee.  If Area Developer has so executed and returned the copies and Initial Franchise Fee and has satisfied the conditions set forth in Section 6.3, Franchisor shall execute the copies and return one fully executed copy of such Franchise Agreement to Area Developer.

6.2.5    Area Developer shall not execute any lease or purchase agreement for any Restaurant, unless and until Franchisor has accepted the proposed site and Franchisor has delivered to Area Developer a fully executed Franchise Agreement counter-signed by Franchisor pursuant to Section 6.2.4.  After Franchisor's acceptance of the site and (sub)lease, if leased or subleased, and its delivery to Area Developer of the fully executed Franchise Agreement, Area Developer shall then within 60 days procure the site, pursuant to the (sub)lease which has been reviewed and accepted by Franchisor, if (sub)leased, and shall forward to Franchisor, within ten days after its execution, one copy of the executed lease or, if purchased, the deed evidencing Area Developer's right to occupy the site.  Area Developer shall then commence construction and operation of the Restaurant pursuant to the terms of the applicable Franchise Agreement.

6.3    <u>Condition Precedent to Franchisor's Obligations</u>.  It shall be a condition precedent to Franchisor's obligations pursuant to Sections 6.1 and 6.2, and to Area Developer's right to develop each and every Restaurant, that Area Developer shall have satisfied all of the following conditions precedent prior to Franchisor's acceptance of the proposed Restaurant and the site and lease or purchase agreement therefor, and the Franchisor's execution of the Franchise Agreement therefor:

6.3.1    Area Developer (and each of its Affiliates which have developed or operate Restaurants in the Development Area) shall have fully performed all of its obligations under this AD Agreement and all Franchise Agreements and other written agreements between Franchisor and Area Developer (or any such Affiliate of Area Developer), and must not at any time following Area Developer's submission of its Site Information, and until Franchisor grants its acceptance of the proposed site, be in default of any of its contractual or other legal obligations to Franchisor or any of its Affiliates, or any approved vendor or supplier, or to any federal, state, county or municipal agency.

6.3.2    Area Developer shall have demonstrated to Franchisor, in Franchisor's discretion, Area Developer's financial and other capacity to perform the obligations set forth in the proposed new Franchise Agreement, including Area Developer's submission of a comprehensive management plan acceptable to, and accepted by Franchisor, which shall include among other reasonable requirements as may be established by Franchisor, an organization chart and supervisory requirements for the proposed Restaurant.  In determining if Area Developer is financially or otherwise capable, Franchisor shall apply the same criteria to Area Developer as it applies to prospective area developer franchisees at that time.

6.3.3    Area Developer shall continue to operate, in the Development Area, not less than the cumulative number of Restaurants required by the Development Obligation set forth in <u>Attachment B</u> to be in operation as of the end of the immediately preceding Development Period.

6.3.4    Area Developer, and each of its Affiliates who then has a currently effective Franchise Agreement or area development agreement with Franchisor, must sign a general release of any claims they may have against Franchisor and its Affiliates, on a form prescribed by Franchisor.



## ARTICLE 7
## ASSIGNMENT AND SUBFRANCHISING

7.1     <u>Assignment by Franchisor</u>.  This AD Agreement is fully transferable by Franchisor, in whole or in part, without the consent of Area Developer and shall inure to the benefit of any transferee or their legal successor to Franchisor's interests herein; provided, however, that such transferee and successor shall expressly agree to assume Franchisor's obligations under this AD Agreement.  Without limiting the foregoing, Franchisor may (i) assign any or all of its rights and obligations under this AD Agreement to an Affiliate; (ii) sell its assets, its marks, or its System outright to a third party; (iii) engage in a public offering of its securities; (iv) engage in a private placement of some or all of its securities; (v) merge, acquire other corporations, or be acquired by another corporation; or (vi) undertake a refinancing, recapitalization, leveraged buy-out or other economic or financial restructuring.  Franchisor shall be permitted to perform such actions without liability or obligation to Area Developer who expressly and specifically waives any claims, demands or damages arising from or related to any or all of the above actions (or variations thereof).  In connection with any of the foregoing, at Franchisor's request, Area Developer shall deliver to Franchisor a statement in writing certifying (a) that this AD Agreement is unmodified and in full force and effect (or if there have been modifications that the AD Agreement as modified is in full force and effect and identifying the modifications); (b) that Area Developer is not in default under any provision of this AD Agreement, or if in default, describing the nature thereof in detail; and (c) as to such other matters as Franchisor may reasonably request; and Area Developer agrees that any such statements may be relied upon by Franchisor and any prospective purchaser, assignee or lender of Franchisor.

7.2     <u>No Subfranchising by Area Developer</u>

7.2.1     Area Developer shall not offer, sell, or negotiate the sale of "Old Chicago" franchises to any third party, either in Area Developer's own name or in the name and/or on behalf of Franchisor, or otherwise subfranchise, subcontract, sublicense, share, divide or partition this AD Agreement, and nothing in this AD Agreement will be construed as granting Area Developer the right to do so.  Area Developer shall not execute any Franchise Agreement with Franchisor, or construct or equip any Restaurant with a view to offering or assigning such Franchise Agreement or Restaurant to any third party.

7.2.2     Notwithstanding Section 7.2.1, Area Developer may, with Franchisor's prior written consent, execute and contemporaneously assign a Franchise Agreement executed pursuant hereto to a separate Entity controlled by Area Developer (each a "**Subsidiary**"); provided and on condition that:

(a)     Upon Franchisor's request, Area Developer has delivered to Franchisor a true, correct and complete copy of the Subsidiary's articles of incorporation or articles of organization, bylaws, operating agreement, partnership agreement, and other organizational documents, and Franchisor has accepted the same;

(b)     The Subsidiary's articles of incorporation or articles of organization, bylaws, operating agreement, and partnership agreement, as applicable, shall provide that its activities are confined exclusively to operating Restaurants;

(c)     Area Developer, directly owns and controls not less than 100% of the Equity and voting rights of the Subsidiary;

(d)     the Subsidiary is in good standing in its jurisdiction of organization and each other jurisdiction where the conduct of its business or the operation of its properties requires it to be so qualified;



(e)    the person designated by Area Developer as the Operating Principal has exclusive day-to-day operational control over the Subsidiary;

(f)    the Subsidiary conducts no business other than the operation of the Restaurant;

(g)    the Subsidiary assumes all of the obligations under the Franchise Agreement as area developer pursuant to written agreement, the form and substance of which shall be acceptable to Franchisor;

(h)    each person or Entity comprising Area Developer, and all present and future Owners of 10% or more (directly or indirectly), in the aggregate, of the Equity or voting rights of any area developer under any and all Franchise Agreements executed pursuant to this AD Agreement shall execute a written guaranty in a form prescribed by Franchisor, personally, irrevocably and unconditionally guaranteeing, jointly and severally, with all other guarantors, the full payment and performance of all of the obligations to Franchisor and to Franchisor's Affiliates under this AD Agreement and each Franchise Agreement executed pursuant hereto (for purposes of determining whether said 10% threshold is satisfied, holdings of spouses, family members who live in the same household, and Affiliates shall be aggregated);

(i)    none of the Owners of the Equity of the area developer under the applicable Franchise Agreement is engaged in Competitive Activities;

(j)    at Franchisor's request, Area Developer shall, and shall cause each of its Affiliates to execute and deliver to Franchisor a general release, on a form prescribed by Franchisor of any and all known and unknown claims against Franchisor and its Affiliates and their officers, directors, agents, shareholders and employees; and

(k)    Area Developer shall reimburse Franchisor for all direct and indirect costs and expense it may incur in connection with the transfer and assignment, including attorney's fees.

7.2.3    In the event that Area Developer exercises its rights under Section 7.2.2, Area Developer and such Subsidiary shall, in addition to any other covenants contained in the applicable Franchise Agreement, affirmatively covenant to continue to satisfy each of the conditions set forth in Section 7.2.2 throughout the term of such Franchise Agreement.

7.3    Assignment by Area Developer

7.3.1    This AD Agreement has been entered into by Franchisor in reliance upon and in consideration of the singular personal skill, qualifications and trust and confidence reposed in Area Developer. Neither Area Developer nor any Owner shall cause or permit any Assignment unless Area Developer shall have obtained Franchisor's prior written consent, which consent may be withheld for any reason whatsoever in Franchisor's judgment, and shall comply with Franchisor's right of first refusal pursuant to Section 7.3.4. Except as provided in Section 7.2.2, Area Developer acknowledges and agrees that it will not be permitted to make an Assignment of this AD Agreement or sell, gift, convey, assign or transfer the assets used in any of the Restaurants developed hereunder or any Franchise Agreement executed pursuant to this AD Agreement except in conjunction with a concurrent Assignment to the same approved assignee of all of the assets used in all of said Restaurants, and all of the Franchise Agreements executed pursuant to this AD Agreement or at Franchisor's election the execution by the assignee of new Franchise Agreements on Franchisor's then-current form for each of the Restaurants then developed or under development by Area Developer, and otherwise in accordance with the terms and conditions of Area Developer's Franchise Agreement(s). If Area Developer is an Entity, Area Developer shall promptly provide Franchisor with written notice (stating such information as



Franchisor may from time to time require) of each and every transfer, assignment, encumbrance, gift and other conveyance, voluntarily or involuntarily, in whole or in part, by operation of Applicable Law or otherwise by any Owner of any direct or indirect Equity or voting rights in Area Developer, notwithstanding that the same may not constitute an "Assignment" as defined by this AD Agreement.

7.3.2    Area Developer shall not, directly or indirectly, pledge, encumber, hypothecate or otherwise grant any third party a security interest in this AD Agreement in any manner whatsoever without the prior express written consent of Franchisor.  To the extent that the foregoing prohibition may be ineffective under Applicable Law, Area Developer shall provide not less than 10 days prior written notice (which notice shall contain the name and address of the secured party and the terms of such pledge, encumbrance, hypothecation or security interest) of any pledge, encumbrance, hypothecation or security interest in this AD Agreement.

7.3.3    Securities, partnership or other ownership interests in Area Developer may not be offered to the public under the Securities Act of 1933, as amended, nor may they be registered under the Securities Exchange Act of 1934, as amended, or any comparable federal, state or foreign law, rule or regulation.  Such interests may be offered by private offering or otherwise only with the prior written consent of Franchisor, which consent shall not be unreasonably withheld.  All materials required for any such private offering by federal or state law shall be submitted to Franchisor for a limited review as discussed below prior to being filed with any governmental agency; and any materials to be used in any exempt offering shall be submitted to Franchisor for such review prior to their use.  No such offering by Area Developer shall imply that Franchisor is participating in an underwriting, issuance or offering of securities of Area Developer or Franchisor, and Franchisor's review of any offering materials shall be limited solely to the subject of the relationship between Franchise and Franchisor and its Affiliates.  Franchisor may, at its option, require Area Developer's offering materials to contain a written statement prescribed by Franchisor concerning the limitations described in the preceding sentence.  Area Developer, its Owners and the other participants in the offering must fully defend and indemnify Franchisor, and its Affiliates, their respective partners and the officers, directors, manager(s) (if a limited liability company), shareholders, members, partners, agents, representatives, independent contractors, servants and employees of each of them, from and against any and all losses, costs and liability in connection with the offering and shall execute any additional documentation required by Franchisor to further evidence this indemnity.  For each proposed offering, Area Developer shall pay to Franchisor the greater of (a) a non-refundable fee equal to 50% of our then-current initial franchise fee; or, our reasonable costs and expenses associated with reviewing the proposed offering, including without limitation, legal and accounting fees.  Area Developer shall give Franchisor written notice at least thirty (30) days prior to the date of commencement of any offering or other transaction covered by this Section.

7.3.4    Area Developer's written request for consent to any Assignment must be accompanied by an offer to Franchisor of a right of first refusal to purchase the interest which is proposed to be transferred, on the same terms and conditions offered by the third party; provided that Franchisor may substitute cash for any non-cash consideration proposed to be given by such third party (in an amount determined by Franchisor reasonably and in good faith as the approximate equivalent value of said non-cash consideration); and provided further that Area Developer shall make representations and warranties to Franchisor customary for transactions of the type proposed (the "**ROFR**").  If Franchisor elects to exercise the ROFR, Franchisor or its nominee, as applicable, shall send written notice of such election to Area Developer within 60 days of receipt of Area Developer's request.  If Franchisor accepts such offer, the closing of the transaction shall occur within 60 days following the date of Franchisor's acceptance.  Any material change in the terms of an offer prior to closing or the failure to close the transaction within 60 days following the written notice provided by Area Developer (the "**ROFR Period**") shall cause it to be deemed a new offer, subject to the same right of first refusal by Franchisor, or its third-party designee, as in the case of the initial offer.  Franchisor's failure to exercise such right of first refusal shall not constitute consent to the transfer or a waiver of any other provision of this AD Agreement, including any of the requirements of this Article with respect to the proposed transfer.

## ARTICLE 8
## NON-COMPETITION

8.1     <u>In Term</u>.  During the Term, no Restricted Person shall in any capacity, either directly or indirectly, through one or more Affiliates or otherwise, engage in any Competitive Activities at any location, whether within or outside the Development Area, unless Franchisor shall consent thereto in writing.

8.2     <u>Post-Term</u>.  To the extent permitted by Applicable Law, upon (i) the expiration or termination of this AD Agreement, (ii) the occurrence of any Assignment, or (iii) the cession of any Restricted Person's relationship with Area Developer, each person who was a Restricted Person before such event shall not for a period of 24 months thereafter, either directly or indirectly, own, operate, advise, be employed by, or have any financial interest in any business engaged in Competitive Activities within the Development Area, without the Franchisor's prior written consent.  In applying for such consent, Area Developer will have the burden of establishing that any such activity by it will not involve the use of benefits provided under this AD Agreement or constitute unfair competition with Franchisor or other area developers of the Franchisor.

8.3     <u>Modification</u>

8.3.1     The parties have attempted in Sections 8.1 and 8.2 above to limit the Area Developer's right to compete only to the extent necessary to protect the Franchisor from unfair competition. The parties hereby expressly agree that if the scope or enforceability of Section 8.1 or 8.2 is disputed at any time by Area Developer, a court or arbitrator, as the case may be, may modify either or both of such provisions to the extent that it deems necessary to make such provision(s) enforceable under Applicable Law.  In addition, Franchisor reserves the right to reduce the scope of either, or both, of said provisions without Area Developer's consent, at any time or times, effective immediately upon notice to Area Developer.

8.3.2     In view of the importance of the Franchisor's trademarks and the incalculable and irreparable harm that would result to the parties in the event of a Default under this Article 8, the parties agree that each party may seek specific performance and/or injunctive relief to enforce the covenants and agreements in this AD Agreement, in addition to any other relief to which such party may be entitled at law or in equity. Each party submits to the exclusive jurisdiction of the courts of the State of Colorado and the U.S. federal courts sitting in Colorado for purposes thereof.  The parties agree that venue for any such proceeding shall be the state and federal courts located nearest to Broomfield, Colorado.

## ARTICLE 9
## TERMINATION

9.1     <u>Termination Pursuant to a Default of this AD Agreement</u>

9.1.1     Subject to Applicable Law to the contrary, this AD Agreement may be terminated by Franchisor in the event of any Default by Area Developer of this AD Agreement, unless such Default is cured by Area Developer within 10 days following written notice of the Default (in the case of a failure to pay money), or 30 days following written notice of the Default (in the case of any other Default); provided that in the case of a Default by Area Developer (or its Affiliate) under any Franchise Agreement or other written agreement, the notice and cure provisions of the Franchise Agreement or other agreement shall control, and provided, further, however, that any Default described in Sections 9.1.2(a), (b) or (e) below shall be deemed incurable.



9.1.2    The term "default," as used herein, includes the following:

(a)    Any Assignment or attempted Assignment in violation of the terms of Section 7.1 or 7.3 of this AD Agreement, or without the written consents required pursuant to this AD Agreement; provided, however, (i) upon prompt written request to Franchisor following the death or legal incapacity of an Area Developer who is an individual, Franchisor shall allow a period of up to one year after such death or six months after such legal incapacity for his or her heirs, personal representatives, or conservators (the "**Heirs**") to seek and obtain Franchisor's consent to the Assignment his or her rights and interests in this AD Agreement to the Heirs or to another person acceptable to Franchisor; or (ii) upon prompt written request to Franchisor following the death or legal incapacity of an Owner of an Area Developer which is an Entity, directly or indirectly, owning more than 20% or more of the Equity or voting power of Area Developer, Franchisor shall allow a period of up to one year after such death or six months after such legal incapacity for his or her Heir(s) to seek and obtain Franchisor's consent to the Assignment of such Equity and voting power to the Heir(s) or to another person or persons acceptable to Franchisor.  If, within said one-year or six-month period, said Heir(s) fail to receive Franchisor's consent as aforesaid or to effect such consented to Assignment, then this AD Agreement shall immediately terminate at Franchisor's election.

(b)    Failure of Area Developer to satisfy the Development Obligation within the Development Periods set forth herein on two or more occasions.

(c)    Failure of Area Developer (or any Affiliate of Area Developer) to pay any Initial Franchise Fee or Royalty Fee in a timely manner as required by this AD Agreement or any Franchise Agreement signed by Area Developer.

(d)    Area Developer's opening of any Restaurant in the Development Area except in strict accordance with the procedures set forth in Sections 6.1 through 6.3 of this AD Agreement.

(e)    Failure of Area Developer to fully comply with the requirements of Section 8.1 of this AD Agreement.

(f)    Any Default of any other agreement between Area Developer (or any Affiliate of Area Developer) and Franchisor (or any Affiliate of Franchisor), including any Franchise Agreement executed pursuant hereto.

9.2    Other Remedies

9.2.1    Upon Default shall have the right, at its option, and in its sole discretion, to do any or all of the following:

(a)    terminate this Agreement;

(b)    terminate the territorial exclusivity granted to Area Developer;

(c)    reduce the size of the Area Developer's Development Territory; or

(d)    permit Area Developer to extend the Development Schedule.

9.3    Costs. In the event of a default by Area Developer, all of Franchisor's costs and expenses arising from such default, including reasonable accountant fees, attorney fees, and reasonable hourly charges of administrative employees shall be paid to Franchisor within 5 days after cure or upon demand by Franchisor if such default is not cured.



## ARTICLE 10
## ARBITRATION

10.1  <u>Arbitration</u>.  Except as precluded by Applicable Law, any controversy or claim between Franchisor and Area Developer arising out of or relating to this AD Agreement or any alleged breach hereof, and any issues pertaining to the arbitrability of such controversy or claim and any claim that this AD Agreement or any part hereof is invalid, illegal, or otherwise voidable or void, shall be submitted to binding arbitration.  Said arbitration shall be conducted before and will be heard in accordance with the then-current Rules of Practice and Procedure of Judicial Arbitration & Mediation Services, Inc. ("**JAMS**"); if JAMS or any successor is no longer in existence at the time the arbitration is commenced, Franchisor and Area Developer will agree on another arbitration organization to conduct the arbitration proceeding.  If the amount involved is more than $300,000, either party will have the right to demand that arbitration be conducted by three arbitrators, one of which must be a retired judge.  Judgment upon any award rendered may be entered in any Court having jurisdiction thereof.  Except to the extent prohibited by Applicable Law, the proceedings shall be held in Broomfield, Colorado.  All arbitration proceedings and claims shall be filed and prosecuted separately and individually in the name of Area Developer and Franchisor, and not in any class action or representative capacity, and shall not be joined with or consolidated with claims asserted by or against any other area developer.  The arbitrator shall have no power or authority to grant punitive or exemplary damages as part of its award.  In no event may the material provisions of this AD Agreement including, but not limited to the method of operation, authorized product line sold or monetary obligations specified in this AD Agreement, amendments to this AD Agreement or in the Manual be modified or changed by the arbitrator at any arbitration hearing.  The arbitration and the parties' agreement therefor shall be deemed to be self-executing, and if either party fails to appear at any properly noticed arbitration proceeding, an award may be entered against such party despite said failure to appear.  All issues relating to arbitrability or the enforcement of the agreement to arbitrate contained herein shall be governed by the Federal Arbitration Act (9 U.S.C. § 1 et seq.), notwithstanding any provision of this AD Agreement specifying the state law under which this AD Agreement shall be governed and construed.

10.2  <u>Awards</u>.  The arbitrator will have the right to award or include in his award any relief which he or she deems proper in the circumstances, including money damages (with interest on unpaid amounts from the date due), specific performance, injunctive relief and attorneys' fees and costs, in accordance with Section 11.13 of this AD Agreement, provided that the arbitrator will not have the authority to award exemplary or punitive damages.  The award and decision of the arbitrator will be conclusive and binding upon all parties and judgment upon the award may be entered in any court of competent jurisdiction.  Each party waives any right to contest the validity or enforceability of such award.  The parties shall be bound by the provisions of any limitation on the period of time by which claims must be brought.  The parties agree that, in connection with any such arbitration proceeding, each will submit or file any claim which would constitute a compulsory counter-claim (as defined by Rule 13 of the Federal Rules of Civil Procedure) within the same proceedings as the claim to which it relates.  Any such claim which is not submitted or filed in such proceeding will be barred.

10.3  <u>Permissible Parties</u>.  Area Developer and Franchisor agree that arbitration will be conducted on an individual, not a class wide, basis and that any arbitration proceeding between Area Developer and Franchisor will not be consolidated with any other arbitration proceeding involving company and any other person or entity.

10.4  <u>Survival</u>.  The provisions of this Article 10 will continue in full force and effect subsequent to and notwithstanding the expiration or termination of this AD Agreement.  The terms of this article shall survive termination, expiration or cancellation of this AD Agreement.



## ARTICLE 11
## GENERAL CONDITIONS AND PROVISIONS

11.1    <u>Relationship of Area Developer to Franchisor</u>. It is expressly agreed that the parties intend by this AD Agreement to establish between Franchisor and Area Developer the relationship of franchisor and area developer franchisee. It is further agreed that Area Developer has no authority to create or assume in Franchisor's name or on behalf of Franchisor, any obligation, express or implied, or to act or purport to act as agent or representative on behalf of Franchisor for any purpose whatsoever. Neither Franchisor nor Area Developer is the employer, employee, agent, partner or co-venturer of or with the other, each being independent. Area Developer agrees that it will not hold itself out as the agent, employee, partner or co-venturer of Franchisor. All employees hired by or working for Area Developer shall be the employees of Area Developer and shall not, for any purpose, be deemed employees of Franchisor or subject to Franchisor control. Each of the parties agrees to file its own tax, regulatory and payroll reports with respect to its respective employees and operations, saving and indemnifying the other party hereto of and from any liability of any nature whatsoever by virtue thereof.

11.2    <u>Indemnity by Area Developer</u>. Area Developer hereby agrees to protect, defend and indemnify Franchisor, and all of its past, present and future Owners, Affiliates, officers, directors, employees, attorneys and designees and hold them harmless from and against any and all costs and expenses, including attorneys' fees, court costs, losses, liabilities, damages, claims and demands of every kind or nature on account of any actual or alleged loss, injury or damage to any person, firm or corporation or to any property arising out of or in connection with Area Developer's construction, development or operation of Restaurants pursuant hereto, except to the extent caused by intentional acts of the Franchisor in breach of this AD Agreement. The terms of this Section 11.2 shall survive the termination, expiration or cancellation of this AD Agreement.

11.3    <u>No Consequential Damages for Legal Incapacity</u>. Franchisor shall not be liable to Area Developer for any consequential damages, including lost profits, interest expense, increased construction or occupancy costs, or other costs and expenses incurred by Area Developer by reason of any delay in the delivery of Franchisor's Franchise Disclosure Document caused by legal incapacity during the Term, or other conduct not due to the gross negligence or intentional misfeasance of Franchisor.

11.4    <u>Waiver and Delay</u>. No waiver by Franchisor of any Default or Defaults, or series of Defaults in performance by Area Developer, and no failure, refusal or neglect of Franchisor to exercise any right, power or option given to it hereunder or under any Franchise Agreement or other agreement between Franchisor and Area Developer, whether entered into before, after or contemporaneously with the execution hereof (and whether or not related to the Restaurants), or to insist upon strict compliance with or performance of Area Developer's (or its Affiliates) obligations under this AD Agreement or any Franchise Agreement or other agreement between Franchisor and Area Developer (or its Affiliates), whether entered into before, after or contemporaneously with the execution hereof (and whether or not related to the Restaurants), shall constitute a waiver of the provisions of this AD Agreement with respect to any continuing or subsequent Default or a waiver by Franchisor of its right at any time thereafter to require exact and strict compliance with the provisions thereof.

11.5    <u>Survival of Covenants</u>. The covenants contained in this AD Agreement which, by their nature or terms, require performance by the parties after the expiration or termination of this AD Agreement shall be enforceable notwithstanding said expiration or other termination of this AD Agreement for any reason whatsoever.

11.6    <u>Successors and Assigns</u>. This AD Agreement shall be binding upon and inure to the benefit of the successors and assigns of Franchisor and shall be binding upon and inure to the benefit of Area Developer



and his or their respective, heirs, executors, administrators, and its successors and assigns, subject to the prohibitions and restrictions against Assignment contained herein.

11.7    <u>Joint and Several Liability</u>.  If Area Developer consists of more than one person or Entity, or a combination thereof, the obligations and liabilities of each of such person or Entity to Franchisor are joint and several, and such person(s) or Entities shall be deemed to be general partnership.

11.8    <u>Governing Law</u>.  This AD Agreement shall (without giving effect to any conflict of laws) be governed in accordance with the laws of the State where the Development Area is located, and any state law relating to (1) the offer and sale of franchises, (2) franchise relationships, or (3) business opportunities, will not apply unless the applicable jurisdictional requirements are met independently with reference to this paragraph.

11.9    <u>Entire Agreement</u>.   This AD Agreement and the Manual contain all of the terms and conditions agreed upon by the parties with reference to the subject matter of this AD Agreement.  No other agreements concerning the subject matter of this AD Agreement, oral or otherwise, shall be deemed to exist or to bind any of the parties.  All prior or contemporaneous agreements, understandings and representations relating to the subject matter of this AD Agreement, are merged and are expressly and superseded by this AD Agreement, except such representations as are made in the franchise disclosure document delivered to Area Developer and any representations made by Area Developer in acquiring this AD Agreement.  Nothing in this AD Agreement or any related agreement is intended to disclaim the representations made by Franchisor in the franchise disclosure document delivered to Area Developer.  No officer or employee or agent of Franchisor has any authority to make any representation or promise not contained in this AD Agreement or in the franchise disclosure document delivered to Area Developer, and Area Developer agrees that it has executed this AD Agreement without reliance upon any such representation or promise.  This AD Agreement cannot be amended, modified or changed except by written instrument signed by all of the parties.

11.10    <u>Titles for Convenience</u>.   Article and paragraph titles used this AD Agreement are for convenience only and shall not be deemed to affect the meaning or construction of any of the terms, provisions, covenants, or conditions of this AD Agreement.

11.11    <u>Gender and Construction</u>.  The terms of all Attachments hereto are hereby incorporated into and made a part of this AD Agreement as if the same had been set forth in full herein.  All terms used in any one number or gender shall extend to mean and include any other number and gender as the facts, context, or sense of this AD Agreement or any article or Section hereof may require.  As used in this AD Agreement, the words "include," "includes" or "including" are used in a non-exclusive sense.  Unless otherwise expressly provided herein to the contrary, any consent, approval, acceptance or authorization of Franchisor which Area Developer may be required to obtain hereunder may be given or withheld by Franchisor in its sole discretion, and on any occasion where Franchisor is required or permitted hereunder to make any judgment, determination or use its discretion, including any decision as to whether any condition or circumstance meets Franchisor's Standards or satisfaction, Franchisor may do so in its sole subjective judgment and discretion.  No provision herein expressly identifying any particular breach of this AD Agreement as material shall be construed to imply that any other breach which is not so identified is not material.  Neither this AD Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against the drafter hereof, whether under any rule of construction or otherwise.  On the contrary, this AD Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.  Franchisor and Area Developer intend that if any provision of this AD Agreement is susceptible to two or more constructions, one of which would render the provision enforceable and the other or others of which would render the provision unenforceable, then the provision shall be given the meaning that renders it enforceable.



11.12   Severability, Modification.   Nothing contained in this AD Agreement shall be construed as requiring the commission of any act contrary to Applicable Law.   Whenever there is any conflict between any provisions of this AD Agreement and any present or future statute, law, ordinance or regulation contrary to which the parties have no legal right to contract, the latter shall prevail, but in such event the provisions of this AD Agreement thus affected shall be curtailed and limited only to the extent necessary to bring it within the requirements of the law.   In the event that any part, article, paragraph, sentence or clause of this AD Agreement shall be held to be indefinite, invalid or otherwise unenforceable, the indefinite, invalid or unenforceable provision shall be deemed deleted, and the remaining part of this AD Agreement shall continue in full force and effect.

11.13   Counterparts.   This AD Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

11.14   Fees and Expenses.   If any party to this AD Agreement shall bring any arbitration, action or proceeding for any relief against the other, declaratory or otherwise, arising out of this AD Agreement, the losing party shall pay to the prevailing party a reasonable sum for attorney fees and costs incurred in bringing or defending such arbitration, action or proceeding and/or enforcing any judgment granted therein, all of which shall be deemed to have accrued upon the commencement of such arbitration, action or proceeding and shall be paid whether or not such action or proceedings is prosecuted to final judgment.   Any judgment or order entered in such action or proceeding shall contain a specific provision providing for the recovery of attorney fees and costs, separate from the judgment, incurred in enforcing such judgment.   The prevailing party shall be determined by the trier of fact based upon an assessment of which party's major arguments or positions on major disputed issues.   For the purposes of this Section, attorney fees shall include fees incurred in the following:  (1) post-judgment motions; (2) contempt proceedings; (3) garnishment, levy, debtor and third party examinations; (4) discovery; and (5) bankruptcy litigation.   This Section is intended to be expressly severable from the other provisions of this AD Agreement, is intended to survive any judgment and is not to be deemed merged into the judgment.

11.15   Waiver of Jury Trial; Venue

11.15.1 TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES:  (1) HEREBY WAIVE THEIR RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY DISPUTE ARISING UNDER THIS AD AGREEMENT; AND (2) THEY AGREE THAT, COLORADO SHALL BE THE VENUE FOR ANY LITIGATION ARISING UNDER THIS AD AGREEMENT.   THE PARTIES ACKNOWLEDGE THAT THEY HAVE REVIEWED THIS SECTION AND HAVE HAD THE OPPORTUNITY TO SEEK INDEPENDENT LEGAL ADVISE AS TO ITS MEANING AND EFFECT.

| _____ | _____ |
| AREA DEVELOPER | FRANCHISOR |
| INITIALS | INITIALS |

11.16   Notices.   Except as otherwise expressly provided herein, all written notices and reports permitted or required to be delivered by the parties pursuant hereto shall be deemed so delivered at the time delivered by hand; one business day after electronically confirmed transmission by facsimile or other electronic system; one business day after delivery by Express Mail or other recognized, reputable overnight courier; or 3 business days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid and addressed as follows:

If to Franchisor:              Old Chicago Franchising, LLC
8001 Arista Place, Suite #500
Broomfield, CO 80021
Attention: President
Telephone: (303) 664-4000
Facsimile: (303) 942-7414

If to Area Developer:    See Attachment A or to such other address as such party may designate by 10 days' advance written notice to the other party.

## ARTICLE 12
## SUBMISSION OF AD AGREEMENT

12.1    General. The submission of this AD Agreement does not constitute an offer and this AD Agreement shall become effective only upon the execution thereof by Franchisor and Area Developer.

## ARTICLE 13
## ADDITIONAL COVENANTS

13.1    Entity Area Developer Information. If Area Developer is an Entity, Area Developer represents and warrants that the information set forth in Attachment C which is annexed hereto and by this reference made a part hereof, is accurate and complete in all material respects. Area Developer shall notify Franchisor in writing within 10 days of any change in the information set forth in Attachment C, and shall submit to Franchisor a revised Attachment C, which shall be certified by Area Developer as true, correct and complete and upon acceptance thereof by Franchisor shall be annexed to this AD Agreement as Attachment C. Area Developer promptly shall provide such additional information as Franchisor may from time to time request concerning all persons who may have any direct or indirect financial interest in Area Developer, including providing copies of all amendments to Area Developer's "**Entity Documents**" as defined in Attachment C. Area Developer shall conduct no business other than the business contemplated hereunder and under any currently effective Franchise Agreement between Franchisor and Area Developer. The Entity Documents of Area Developer shall recite that the issuance and transfer of any interest therein is subject to the restrictions set forth in the AD Agreement and any Franchise Agreement executed pursuant thereto.

13.2    Operating Principal; Director of Operations; Multi-Unit Supervisor

13.2.1  The Operating Principal shall be principally responsible for communicating and coordinating with Franchisor regarding business, operational and other ongoing matters concerning this AD Agreement and the Restaurants developed pursuant hereto. The Operating Principal shall have the full authority to act on behalf of Area Developer in regard to performing, administering or amending this AD Agreement and all Franchise Agreements executed pursuant hereto. Franchisor may, but is not required to, deal exclusively with the Operating Principal in such regards unless and until Franchisor's actual receipt of written notice from Area Developer of the appointment of a successor Operating Principal, who shall have been accepted by Franchisor.

13.2.2  Commencing on the date which Area Developer, directly or indirectly through one or more Affiliate(s), opens its 2nd Restaurant within the Development Area, and at all times throughout the Term and the term of each Franchise Agreement executed pursuant hereto after such date, Area Developer shall employ and retain, or shall cause the Entity to which each Franchise Agreement is assigned in accordance with Section 7.1 hereof to employ and retain, an individual (the "**Director of Operations**") who shall be vested with the authority and responsibility for the day-to-day operations of all Restaurants owned or operated, directly or indirectly, by Area Developer within the Development Area. The Director of Operations shall,



during the entire period he/she serves as such, unless otherwise agreed in writing by Franchisor devote 100% of his/her time and best efforts solely to operation of the all Restaurants owned or operated, directly or indirectly, by Area Developer in the Development Area and to no other business activities. The Director of Operations may, with the prior written consent of Franchisor, may be the same individual as the Operating Principal. The Director of Operations shall be responsible for all actions necessary to ensure that all Restaurants owned or operated, directly or indirectly, by Area Developer in the Development Area are operated in compliance with this AD Agreement, all Franchise Agreements therefor and the Manual. If, during the Term hereof or any Franchise Agreement executed pursuant hereto, the Director of Operations is not able to continue to serve in such capacity or no longer qualifies to act as such in accordance with this Section, Area Developer shall promptly notify Franchisor and designate a replacement within 30 days after the Director of Operations ceases to serve.

13.2.3   Franchisee has the option, commencing on the date which Area Developer, directly or indirectly through one or more Affiliate(s), opens its 2nd Restaurant within the Development Area, to employ and retain, or shall cause the Entity to which each Franchise Agreement is assigned in accordance with Section 7.2.2 hereof to employ and retain, one or more individuals (each a "**Multi-Unit Supervisor**") vested with the authority and responsibility for the day-to-day supervision of two (2) or more of the Restaurants owned or operated, directly or indirectly, by Area Developer within the Development Area. The Multi-Unit Supervisor shall, during the entire period he/she serves as such, unless otherwise agreed in writing by Franchisor devote 100% of his/her time and best efforts solely to operation of two (2) or more of the Restaurants owned or operated, directly or indirectly, by Area Developer in the Development Area and to no other business activities. Multi-Unit Supervisors, if any, shall report to the Director of Operations.

13.2.4   Area Developer shall notify Franchisor in writing at least 10 days prior to employing the Director of Operations and Multi-Unit Supervisor, if any, setting forth in reasonable detail all information reasonably requested by Franchisor. Franchisor's acceptance of the Operating Principal shall not constitute Franchisor's endorsement of such individual or a guarantee by Franchisor that such individual will perform adequately for Area Developer or its Affiliates, nor shall Franchisor be estopped from subsequently disapproving or otherwise challenging such person's qualifications or performance. Any Director of Operations and Multi-Unit Supervisor (and any of Area Developer's officers who do not own equity in Area Developer, if it is an entity), must sign the System Protection Agreement, the current form of which is attached to the Franchise Disclosure Document.

13.2.5   After Area Developer, directly or indirectly through one or more Affiliate(s), opens its 2nd Restaurant within the Development Area, neither the Operating Principal nor the Director of Operations may serve as the general manager of any Restaurant. Multi-Unit Supervisors, if any, may serve as the general manager of any Restaurant, provided he/she meets Franchisor's training and other requirements for general managers.

13.3   <u>Business Practices</u>.  Area Developer represents, warrants and covenants to Franchisor that:

13.3.1   As of the date of this AD Agreement, Area Developer and each of its Owners (if Area Developer is an Entity) shall be and, during the Term shall remain, in full compliance with all applicable laws in each jurisdiction in which Area Developer or any of its Owners (if Area Developer is an Entity), as applicable, conducts business that prohibits unfair, fraudulent or corrupt business practices in the performance of its obligations under this AD Agreement and related activities, including the following prohibitions:

(a)   No government official, official of an international organization, political party or official thereof, or candidate is an owner or has any investment interest in the revenues or profit of Area Developer;



(b)     None of the property or interests of Area Developer or any of its Owners is subject to being "blocked" under any Anti-Terrorism Laws.  Neither Area Developer, nor any of its respective funding sources (including any legal or beneficial owner of any equity in Area Developer) or any of its Affiliates is or has ever been a terrorist or suspected terrorist within the meaning of the Anti-Terrorism Laws or identified by name or address on any Terrorist List.  Each of Area Developer and its Owners are in compliance with Applicable Law, including all such Anti-Terrorism Laws;

(c)     Neither Area Developer nor any of its Owners conducts any activity, or has failed to conduct any activity, if such action or inaction constitutes a money laundering crime, including any money laundering crime prohibited under the International Money Laundering Abatement and Anti-Terrorist Financing Act, as amended, and any amendments or successors thereto.

(d)     Area Developer is neither directly nor indirectly owned or controlled by the government of any country that is subject to a United States embargo.  Nor does Area Developer or its Owners act directly or indirectly on behalf of the government of any country that is subject to a United States embargo.

13.3.2   Area Developer has taken all necessary and proper action required by Applicable Law and has the right to execute this AD Agreement and perform under all of its terms.  Area Developer shall implement and comply with anti-money laundering policies and procedures that incorporate "know-your-customer" verification programs and such other provisions as may be required by applicable law.

13.3.3   Area Developer shall implement procedures to confirm, and shall confirm, that (a) none of Area Developer, any person or entity that is at any time a legal or beneficial owner of any interest in Area Developer or that provides funding to Area Developer is identified by name or address on any Terrorist List or is an Affiliate of any person so identified; and (b) none of the property or interests of Area Developer is subject to being "blocked" under any Anti-Terrorism Laws.

13.3.4   Area Developer shall promptly notify Franchisor upon becoming aware of any violation of this Section or of information to the effect that any person or entity whose status is subject to confirmation pursuant to Section 13.3.1(c) above is identified on any Terrorist List, any list maintained by OFAC or to being "blocked" under any Anti-Terrorism Laws, in which event Area Developer shall cooperate with Franchisor in an appropriate resolution of such matter.

13.3.5   In accordance with Applicable Law, none of Area Developer nor any of its Affiliates, principals, partners, officers, directors, managers, employees, agents or any other persons working on their behalf, shall offer, pay, give, promise to pay or give, or authorize the payment or gift of money or anything of value to any officer or employee of, or any person or entity acting in an official capacity on behalf of, the Governmental Authority, or any political party or official thereof or while knowing that all or a portion of such money or thing of value will be offered, given or promised, directly or indirectly, to any official, for the purpose of (a) influencing any action or decision of such official in his or its official capacity; (b) inducing such official to do or omit to do any act in violation of his or its lawful duty; or (c) inducing such official to use his or its influence with any Governmental Authority to affect or influence any act or decision of such Governmental Authority in order to obtain certain business for or with, or direct business to, any person.

13.3.6   The provisions of this Section shall not limit, restrain or otherwise affect any right or cause of action which may accrue to Franchisor for any infringement of, violation of, or interference with, this AD Agreement, or Franchisor's marks, System, trade secrets, or any other proprietary aspects of Franchisor's business.



## ARTICLE 14
## ACKNOWLEDGMENT

14.1   <u>General</u>

14.1.1   Area Developer acknowledges that it has carefully read this AD Agreement and all other related documents to be executed concurrently or in conjunction with the execution hereof, that it has obtained the advice of counsel in connection with entering into this AD Agreement, that it understands the nature of this AD Agreement, and that it intends to comply herewith and be bound hereby.

14.1.2   Franchisor expressly disclaims making, and Area Developer acknowledges that it or they have not received or relied on any warranty or guarantee, express or implied, as to the potential volume, profits, expenses, or success of the business venture contemplated by this AD Agreement.

*(Signature Page Follows)*



{00078603 DOC }
[2017 ADA v1F]

IN WITNESS WHEREOF, the parties hereto have caused this AD Agreement to be executed as of the first date set forth above.

**FRANCHISOR:**

OLD CHICAGO FRANCHISING, LLC

By: _____

Name: _Mark Belanger_

Title: _VP Global Franchise Ops + Dev._


**AREA DEVELOPER:**

TAC VENTURES, LLC,
a Kansas limited liability company

By: _____

Name:  Tom Willis

Title:  Managing Member



{00078603 DOC. }
[2017 ADA v1F]

C-21

**ATTACHMENT A**

**DEVELOPMENT AREA**

     1.     **Effective Date.**  The "Effective Date" set forth in the introductory Paragraph of this AD Agreement is _____3 - 23 - 18_____, 2018.

     2.     **Area Developer.**  The "Area Developer" set forth in the introductory Paragraph of the AD Agreement is:  TAC Ventures, LLC

     3.     **Notice Address.**  The Area Developer Notice Address in Section 1.1 of the AD Agreement shall be the following:

> Attn:  Tom Willis
> TAC Ventures, LLC
> 1701 N. Kansas Avenue
> Liberal, KS 67901

     4.     **Operating Principal**.  The Operating Principal set forth in Section 1.1 of the AD Agreement is the following: Tom Willis

     5.     **Development Area**.  The Development Area* is defined as the territory within the boundaries described below: (1) Cache County, Utah; (2) Bonneville County, Idaho; (3) Bannock County, Idaho; (4) Davis County, Utah; (5) Davis County, Utah; (6) Weber County, Utah; (7) Summit County, Utah; and (8) Twin Falls County, Idaho.

*If the Development Area is defined by streets, highways, freeways or other roadways, or rivers, streams, or tributaries, then the boundary of the Development Area shall extend to the center line of each such street, highway, freeway or other roadway, or river, stream, or tributary.

***(Signature Page Follows)***

**FRANCHISOR:**

OLD CHICAGO FRANCHISING, LLC

By: _____

Name: _Mark Belanger_____

Title: _VP Global Franchise Ops+Dev.__

**AREA DEVELOPER:**

TAC VENTURES, LLC,
a Kansas limited liability company

By: _____

Name:  Tom Willis

Title:  Managing Member

## ATTACHMENT B

## DEVELOPMENT OBLIGATION

1.  Number of Restaurants to be developed under this AD Agreement:   5

2.  The Expiration Date in Section 1.1 of this AD Agreement shall be the earlier of the date the Development Obligation is complete or 4 years from the Effective Date of this AD Agreement.

3.  The total Development Fee and IFF Deposit amount payable to Franchisor under Sections 5.1 and 5.2 of this AD Agreement is as follows:

    | | |
    |---|---|
    | Development Fee: | $50,000 |
    | IFF Deposit = 4 additional Restaurants x $20,000 | + $80,000 |
    | Total: | $130,000 |

4.  Development Obligation:

    | Old Chicago Restaurant # | Development Period Ending | Franchise Agreement Execution Deadline |
    |---|---|---|
    | 1 | Effective Date to 1 year from Effective Date | Date of execution of Area Developer Agreement |
    | 2 | 2 years from Effective Date to 3 years from Effective Date | 2 years from Effective Date |
    | 3 | 2 years from Effective Date to 3 years from Effective Date | 2 years from Effective Date |
    | 4 | 3 years from Effective Date to 4 years from Effective Date | 3 years from Effective Date |
    | 5 | 3 years from Effective Date to 4 years from Effective Date | 3 years from Effective Date |

*(Signature Page Follows)*



**FRANCHISOR:**

OLD CHICAGO FRANCHISING, LLC

By: _____

Name: Mark Belanger

Title: VP Global Franchise Ops & Dev.


**AREA DEVELOPER:**

TAC VENTURES, LLC,
a Kansas limited liability company

By: _____

Name:  Tom Willis

Title:  Managing Member



[00078603 DOC. ]
[2017 ADA v1F]

C-B-2

## ATTACHMENT C

## ENTITY INFORMATION

Area Developer represents and warrants that the following information is accurate and complete in all material respects:

(1)     Area Developer is a (check as applicable):
        [ ] corporation
        [ X ] limited liability company
        [ ] general partnership
        [ ] limited partnership
        [ ] Other (specify): _____

(2)     Area Developer shall provide to Franchisor concurrently with the execution hereof true and accurate copies of its charter documents including Articles of Incorporation, Bylaws, Operating Agreement, Regulations Partnership Agreement, resolutions authorizing the execution hereof, and any amendments to the foregoing ("**Entity Documents**").

(3)     Area Developer promptly shall provide such additional information as Franchisor may from time to time request concerning all persons who may have any direct or indirect financial interest in Area Developer.

(4)     The name and address of each of Area Developer's Owners, members, or general and limited partner:

| Name | Address | Number of Shares/ % Interest |
|---|---|---|
| Tom Willis | 901 Apollo Street Liberal, KS 67901 | 75% |
| Cecil O'Brate | 2814 Cummings Road Garden City, KS 67846 | 12.5% |
| Amro M. Samy | 2125 Buffalo Heights Drive Garden City, KS 67846 | 12.5% |
|  |  |  |

(5)     There is set forth below the names, and addresses and titles of Area Developer's principal officers or partners who will be devoting their full time to the Business:

| Name | Address | Title |
|---|---|---|
| Tom Willis | 901 Apollo Street Liberal, KS 67901 | Managing Member |
| Cecil O'Brate | 2814 Cummings Road Garden City, KS 67846 | Member |
| Amro M. Samy | 2125 Buffalo Heights Drive Garden City, KS 67846 | Member |
|  |  |  |



{00078603.DOC. }
[2017 ADA v1F]

(6)     The address where Area Developer's Financial Records and Entity Documents are maintained is:

1701 N. Kansas Avenue
Liberal, KS 67901

**AREA DEVELOPER:**

TAC VENTURES, LLC,
a Kansas limited liability company

Date:  ___8/23/2018___          By:  _____

Name:  Tom Willis

Title:  Managing Member

# APPENDIX 1

"**Additional Development Notice**" shall have the meaning set forth in Section 4.2 of this AD Agreement.

"**Additional Development Obligation**" shall have the meaning set forth in Section 4.3.2 of this AD Agreement.

"**Affiliate**" when used herein in connection with Franchisor or Area Developer, includes each person or Entity which directly, or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with Franchisor or Area Developer, as applicable. Without limiting the foregoing, the term "Affiliate" when used herein in connection with Area Developer includes any Entity 10% or more of whose Equity or voting control, is held by person(s) or Entities who, jointly or severally, hold 10% or more of the Equity or voting control of Area Developer. For purposes of this definition, control of a person or Entity means the power, direct or indirect, to direct or cause the direction of the management and policies of such person or Entity whether by contract or otherwise. Notwithstanding the foregoing definition, if Franchisor or its Affiliate has any ownership interest in Area Developer, the term "Affiliate" shall not include or refer to the Franchisor or that Affiliate (the "**Franchisor Affiliate**"), and no obligation or restriction upon an "Affiliate" of Area Developer, shall bind Franchisor, or said Franchisor Affiliate or their respective direct/indirect parents or subsidiaries, or their respective officers, directors, or managers.

"**Anti-Terrorism Laws**" means Executive Order 13224 issued by the President of the United States of America (or any successor Order), the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT Act) of 2001 (or any successor legislation) and all other present and future national, provincial, federal, state and local laws, ordinances, regulations, policies, lists, Orders and any other requirements of any Governmental Authority addressing or in any way relating to terrorist acts and acts of war.

"**Applicable Law**" means and includes applicable common law and all applicable statutes, laws, rules, regulations, ordinances, policies and procedures established by any Governmental Authority, governing the operation of a Restaurant, including all labor, immigration, disability, food and drug laws and regulations, as in effect on the Effective Date hereof, and as may be amended, supplemented or enacted from time to time.

"**Assignment**" shall mean and refer to any assignment, transfer, gift or other conveyance, voluntarily or involuntarily, in whole or in part, by operation of Applicable Law or otherwise, of any interest in this AD Agreement or any of Area Developer's rights or privileges hereunder or all of any substantial portion of the assets of the Licensed Restaurant, including the lease; provided, further, however, that if Area Developer is an Entity, each of the following shall be deemed to be an Assignment of this AD Agreement: (i) the sale, assignment, transfer, conveyance, gift, pledge, mortgage, hypothecation or other encumbrance of more than 49% in the aggregate, whether in one or more transactions, of the Equity or voting power of Area Developer, by operation of law or otherwise or any other event(s) or transaction(s) which, directly or indirectly, effectively changes control of Area Developer; (ii) the issuance of any securities by Area Developer which itself or in combination with any other transaction(s) results in the Owners, as constituted on the Effective Date, owning less than 51% of the outstanding Equity or voting power of Area Developer; (iii) if Area Developer is a Partnership, the resignation, removal, withdrawal, death or legal incapacity of a general partner or of any limited partner owning more than 49% of the Partnership Rights of the Partnership, or the admission of any additional general partner, or the transfer by any general partner of any of its Partnership Rights in the Partnership, or any change in the ownership or control of any general partner; (iv) the death or legal incapacity of any Owner owning more than 49% of the Equity or voting power of Area Developer; and (v) any merger,

stock redemption, consolidation, reorganization, recapitalization or other transfer of control of the Area Developer, however effected.

"**Authorized Franchisor Products**" means the specific foods products, sauces, marinades and beverages and other food items and ancillary related products, which may include books, cups, coolers, hats, t-shirts and novelty items, as specified by Franchisor from time to time in the Manual, or as otherwise directed by Franchisor in writing, for sale at the Restaurants, prepared, served, sold and/or manufactured in strict accordance with Franchisor's recipes, Standards and specifications, including specifications as to ingredients, brand names, preparation and presentation.

"**Competitive Activities**" means to, own, operate, lend to, advise, be employed by, or have any financial interest in business, other than another Old Chicago Restaurant, that looks like, copies, imitates, or operates in a manner that resembles or is similar to an Old Chicago Restaurant including, but not limited to, any casual dining restaurant that operates as a full service, sit-down restaurant having a menu directed substantially to the offer of deep-dish (Chicago style) pizza, or whose actual sales are fifteen percent (15%) or greater generated by or derived from the sale of deep-dish (Chicago style) pizza or that has more than twenty-four (24) draft beer tap handles. Notwithstanding the foregoing, "Competitive Activities" shall not include the direct or indirect ownership solely as an investment, of securities of any Entity which are traded on any national securities exchange if applicable owner thereof (i) is not a controlling person of, or a member of a group which controls, such Entity and (ii) does not, directly or indirectly, own 5% or more of any class of securities of such Entity. .

"**Default**" or "**default**" means any breach of, or failure to comply with, any of the terms or conditions of an agreement.

"**Development Area**" shall have the meaning set forth in Section 1.2.1 of this AD Agreement.

"**Development Obligation**" shall mean the Area Developer's right and obligation to construct, equip, open and thereafter continue to operate at sites within the Development Area the cumulative number of Restaurants set forth in Attachment B hereto within each Development Period and, if applicable, within the geographic areas specified therein.

"**Development Period**" means each of the time periods indicated on Attachment B during which Area Developer shall have the right and obligation to construct, equip, open and thereafter continue to operate Restaurants in accordance with the Development Obligation.

"**Director of Operations**" shall have the meaning set forth in Section 13.2.2 of this AD Agreement.

"**Entity**" means any limited liability company, Partnership, trust, association, corporation or other entity which is not an individual.

"**Equity**" means capital stock, membership interests, Partnership Rights or other equity ownership interests of an Entity.

"**Franchise Agreement**" means the form of agreement prescribed by Franchisor and used to grant to Area Developer the right to own and operate a single Restaurant in the Development Area, including all exhibits, riders, guarantees or other related instruments, all as amended from time to time.

"**Franchise Disclosure Document**" shall have the meaning set forth in Section 6.2.3.

"**Force Majeure**" means acts of God (such as tornadoes, earthquakes, hurricanes, floods, fire or other



natural catastrophe); strikes, lockouts or other industrial disturbances; war, terrorist acts, riot, or other civil disturbance; epidemics; or other similar forces which Area Developer could not by the exercise of reasonable diligence have avoided; provided however, that neither an act or failure to act by a Governmental Authority, nor the performance, non-performance or exercise of rights under any agreement with Area Developer by any lender, landlord, or other person shall be an event of Force Majeure hereunder, except to the extent that such act, failure to act, performance, non-performance or exercise of rights results from an act which is otherwise an event of Force Majeure. For the avoidance of doubt, Area Developer's financial inability to perform or Area Developer's insolvency shall not be an event of Force Majeure hereunder.

"**Governmental Authority**" means and includes all Federal, state, county, municipal and local governmental and quasi-governmental agencies, commissions and authorities.

"**Initial Franchise Fee**" shall is the fee paid to open each individual Restaurant as such term is defined in the Franchise Agreement.

"**Manual**" means Franchisor's confidential manuals (including its Training, Operations and Development Manuals) and all bulletins, memoranda and other written materials through which the Franchisor communicates policies, standards and procedures to operators of Old Chicago Restaurants, as may be revised by the Franchisor from time to time. The Franchisor may convert the Manual to an exclusively electronic format and require the Franchisee to access the document through the Internet or an intranet created and supported by the Franchisor.

"**Multi-Unit Supervisor**" shall have the meaning set forth in Section 13.2.3 of this AD Agreement.

"**Operating Principal**" shall have the meaning set forth in Section 1.1 of this AD Agreement.

"**Owner**" means any direct or indirect shareholder, member, general or limited partner, trustee, or other equity owner of an Entity, except, that if Franchisor or any Affiliate of Franchisor has any ownership interest in Area Developer, the term "Owner" shall not include or refer to the Franchisor or that Affiliate or their respective direct and indirect parents and subsidiaries, and no obligation or restriction upon the "Area Developer", or its Owners shall bind Franchisor, said Affiliate or their respective direct and indirect parents and subsidiaries or their respective officers, directors, or managers.

"**Partnership**" means any general partnership, limited partnership or limited liability partnership.

"**Partnership Rights**" means voting power, property, profits or losses, or partnership interests of a Partnership.

"**Restaurant**" shall have the meaning set forth in Recital A of this AD Agreement.

"**Restricted Persons**" means the Area Developer, and each of its Owners and Affiliates, and the respective officers, directors, managers, and Affiliates of each of them, and the spouse and family members who live in the same household of each of the foregoing who are individuals.

"**ROFR**" shall have the meaning set forth in Section 7.3.4 of this AD Agreement.

"**ROFR Period**" shall have the meaning set forth in Section 7.3.4 of this AD Agreement.

"**Site Information**" shall have the meaning set forth in Section 6.1 of this AD Agreement.



"**Standards**" mean Franchisor's then-current specifications, standards, policies, procedures and rules prescribed for the development, ownership and operation of Restaurants.

"**System**" means the Franchisor's operating methods and business practices related to its Restaurants, and the relationship between Franchisor and its area developers, including interior and exterior Restaurant designs; other items of trade dress; specifications of equipment, fixtures, and uniforms; defined product offerings and preparation methods; standard operating and administrative procedures; restrictions on ownership; management and technical training programs; and marketing and public relations programs; all as Franchisor may modify the same from time to time.

"**Term**" shall have the meaning set forth in Section 4.1 of this AD Agreement.

"**Terrorist Lists**" means all lists of known or suspected terrorists or terrorist organizations published by any U.S. Government Authority, including U.S. Treasury Department's Office of Foreign Asset Control ("**OFAC**"), that administers and enforces economic and trade sanctions, including against targeted non-U.S. countries, terrorism sponsoring organizations and international narcotics traffickers.

"**Then-current**" as used in this AD Agreement and applied to the Franchise Disclosure Document, an area development agreement and a Franchise Agreement shall mean the form then currently provided by Franchisor to similarly situated prospective franchisees, or if not then being so provided, then such form selected by the Franchisor in its discretion which previously has been delivered to and executed by a licensee or franchisee of Franchisor.

# Exhibit 4

## AMENDMENT TO FRANCHISE AGREEMENT

This Amendment (this "**Amendment**") to Franchise Agreement is made and entered into this 21 day of September, 2018, by and between Old Chicago Franchising, LLC, a Delaware limited liability company ("**Franchisor**"), and TAC Ventures, LLC, a Kansas limited liability company ("**Franchisee**").

## RECITALS

A.    WHEREAS, on or about March 23, 2018, Franchisor and Franchisee entered into a franchise agreement with certain attachments thereto (collectively, the "**Franchise Agreement**") pursuant to which Franchisee intends to operate an Old Chicago Restaurant;

B.    WHEREAS, Franchisor and Franchisee have determined a location for the Old Chicago Restaurant to be operated under the Franchise Agreement; and

C.    WHEREAS, Franchisor and Franchisee desire to amend the terms of the Franchise Agreement to reflect the location and protected territory for the Old Chicago Restaurant to be operated under the Franchise Agreement.

NOW, THEREFORE, IN CONSIDERATION of the mutual covenants and promises of the parties and subject to the following terms and conditions, it is agreed as follows:

1.    **LICENSED LOCATION**.  The Licensed Location set forth in Attachment A-1 to the Franchise Agreement shall be at or near 1400 North 800 East, Logan, UT 84341.

2.    **PROTECTED AREA**.  The Protected Area set forth in Attachment A-1 to the Franchise Agreement shall be the County of Cache, Utah, as depicted in the following map:



3.    **AMENDMENT BINDING.**  This Amendment will be binding upon and inure to the benefit of each party and to each party's respective successors and assigns.

4.    **FURTHER ASSURANCE**. Each of the parties will, upon reasonable request of the other, sign any additional documents necessary or advisable, to fully implement the terms and conditions of this Amendment.

5.      **REAFFIRMATION**. Except as specifically modified by this Amendment, all of the terms and conditions of the Franchise Agreement (including provisions for notice, construction, and dispute resolution) are reaffirmed in their entirety.

6.      **NO FURTHER CHANGES**. Except as specifically provided in this Amendment, all of the terms, conditions and provisions of the Franchise Agreement will remain in full force and effect as originally written and signed. In the event of any inconsistency between the provisions of the Franchise Agreement and this Amendment, the terms of this Amendment shall control.

**IN WITNESS WHEREOF**, the parties duly executed this Amendment as of the date first above written.

FRANCHISOR:                                              FRANCHISEE:

OLD CHICAGO FRANCHISING, LLC                             TAC VENTURES, LLC

By: _____                             By: _____

Name: _Mark Belanger_                                   Name: Tom Willis

Title: _President Global Franchise Dev._                Title: Managing Member

# Exhibit 5

## OLD CHICAGO II FRANCHISING LLC
## ASSUMPTION AGREEMENT

THIS ASSUMPTION AGREEMENT ("**Agreement**") is made and entered into this 8th day of _February_, 2020 to be made effective October 28, 2019 ("**Effective Date**") by and among Old Chicago Franchising II LLC, a Delaware limited liability company ("**Franchisor**"); TAC Ventures, LLC, a Kansas limited liability company ("**Former Franchisee**"); Tom Willis ("**Willis**"); Cecil O'Brate and Amro M. Samy, individuals residing in the State of Kansas (collectively, "**Owners**"); and WD Ventures, LLC, a Kansas limited liability company ("**New Franchisee**", and collectively with Franchisor, Former Franchisee and Owners, the "**Parties**". Willis is an owner of Former Franchisee, and also an owner of New Franchisee.

### WITNESSETH:

**WHEREAS**, Old Chicago Franchising, LLC and Former Franchisee entered into an Area Development Agreement dated March 23, 2018 (the "**Area Development Agreement**"), a copy of which is attached hereto as Exhibit A, pursuant to which Old Chicago Franchising, LLC granted Former Franchisee the right to establish and operate five Old Chicago Restaurants as an Old Chicago Restaurant area developer;

**WHEREAS**, Old Chicago Franchising, LLC and Former Franchisee also entered into a Franchise Agreement dated March 23, 2018, together with certain amendments thereto (the "**Franchise Agreement**"), a copy of which is attached hereto as Exhibit B, pursuant to which Old Chicago Franchising, LLC granted Former Franchisee the right to operate an Old Chicago Restaurant business, as the first restaurant to be developed under the Area Development Agreement;

**WHEREAS**, Franchisor has succeeded and assumed all obligations of Old Chicago Franchising, LLC under the Area Development Agreement and the Franchise Agreement;

**WHEREAS**, Former Franchisee desires to assign and New Franchisee desires to assume all obligations of Former Franchisee under the Franchise Agreement and under the Area Development Agreement (the "**Assumption**");

**WHEREAS**, New Franchisee has been operating the Old Chicago Restaurant under the Franchise Agreement since the Effective Date and Former Franchisee and New Franchisee each desire that the Assumption be made effective on the Effective Date; and

**WHEREAS**, Franchisor is willing to consent to the above Assumption, and the Parties desire that the Assumption be made subject to and in accordance with the following terms and conditions in this Agreement.

**NOW, THEREFORE**, in consideration of the mutual agreements, covenants and undertakings herein contained and other valuable consideration, the adequacy of which is acknowledged by all Parties, the Parties hereby agree as follows:

1.  **RECITALS**.  The above Recitals and references to the Franchise Agreement and Area Development Agreement referred to therein are hereby incorporated into and made part of this Agreement.  Capitalized terms not defined in this Agreement will have the same meanings ascribed to them in the Franchise Agreement.

2.   **ASSIGNMENT, ASSUMPTION, AND CONSENT**.   As of the Effective Date, Former Franchisee hereby assigns all of its right, title, obligations, responsibilities and duties with regard to the Franchise Agreement and the Area Development Agreement to New Franchisee, subject to the terms and conditions of this Agreement.  As of the Effective Date, New Franchisee hereby assumes all of the right, title, obligations, responsibilities and duties of Former Franchisee under the Franchise Agreement and the Area Development Agreement. New Franchisee shall be liable for all direct and indirect obligations owed under the Franchise Agreement and Area Development Agreement arising on and after the Effective Date. Former Franchisee shall continue to be liable for all direct and indirect obligations owed under the Franchise Agreement and Area Development Agreement arising prior to the Effective Date; and this Agreement shall not be construed to be a waiver or forbearance of any such obligations.

Franchisor hereby consents to the Assumption.   Franchisor hereby waives its right of first refusal contained in the Franchise Agreement and Area Development Agreement for the Assumption. Franchisor expressly reserves the right to withhold its consent to and/or to exercise its right of first refusal in connection with any future conveyance, sale or transfer of the franchised business, Franchise Agreement, or Area Development Agreement.

In connection with the Assumption and given that their rights in the Franchise Agreement and Area Development Agreement have terminated as of the Effective Date, Former Franchisee and Owners (other than Willis) hereby agree to comply with all post-termination obligations under the Franchise Agreement and the Area Development Agreement as of the Effective Date.  Willis shall be subject to all obligations of the owners of New Franchisee.

3.   **TRANSFER FEE**.   Notwithstanding anything to the contrary in the Franchise Agreement or the Area Development Agreement, New Franchisee shall pay Franchisor the sum of $2,150 to offset Franchisor's legal fees in connection with the Assumption.  Effectiveness of this Agreement is expressly contingent upon payment thereof.

4.   **REPRESENTATIONS**.  Former Franchisee and Owners warrant and represent that neither any of them nor anyone or any entity acting on behalf of or in the name of Former Franchisee or Owner:  (a) have heretofore assigned, impaired, conveyed or disposed of any interests in the Franchise Agreement or the Area Development Agreement; or (b) have done any acts or omitted to do any act which might prevent Franchisor from, or limit Franchisor in, acting upon or under any of the provisions herein or of the Franchise Agreement or the Area Development Agreement. New Franchisee warrants and represents that New Franchisee is duly formed, validly existing and in good standing under the laws of the State of Kansas, and has full power and authority to consummate the transactions contemplated under this Agreement, the Franchise Agreement, and the Area Development Agreement. Former Franchisee, Owners, and New Franchisee warrant and represent that they have executed documentation concurrently with this Agreement that effectively assigns all Assets (as hereinafter defined) to New Franchisee. For purposes of this Section 4, the "Assets" means all assets of Former Franchisee.

5.   **ACKNOWLEDGMENT**.   Former Franchisee, Owners and New Franchisee acknowledge and agree that: (a) the Assumption, and all related transfers of assets to New Franchisee occurred solely between Former Franchisee and New Franchisee, (b) that Franchisor played no role in such transactions, (c) that Franchisor's involvement was limited to the approval of such transactions, and (d) that any claims, disputes, or issues relating such transactions are between New Franchisee and Former Franchisee, and shall not involve Franchisor.

6.   **RELEASE**.  Former Franchisee and Owners agree to sign the Waiver and Release of Claims attached hereto as Exhibit C.

7.     **GUARANTY OF OBLIGATIONS**.  In consideration of, and as an inducement to, the execution of this Agreement by Franchisor, New Franchisee hereby agrees to cause all of its owners to execute the Owners Agreement attached hereto as Exhibit D.

8.     **FURTHER ACTIONS**.  The Parties each agree to take such further actions as may be required to effectuate the terms of this Agreement, including any and all actions that may be required or contemplated by the Franchise Agreement of the Area Development Agreement.

9.     **OWNERSHIP INTERESTS**.  Attached hereto and incorporated herein as Exhibit E is the Statement of Ownership in the New Franchisee which shall hereby replace the Statement of Ownership set forth in Attachment C of the Franchise Agreement and the Entity Information set forth in Attachment C to the Area Development Agreement.

10.     **BREACH**.  The Parties hereby agree that each of the matters stated herein are important, material and confidential, and substantially affect the effective and successful conduct of the business of Franchisor and its reputation and goodwill.  Any breach of the terms of this Agreement is a material breach of this Agreement, which will result in substantial and irreparable injury to Franchisor, for which the breaching party may be preliminarily and permanently enjoined and for which the breaching party shall also pay to Franchisor all damages (including, but not limited to, compensatory, incidental, consequential and lost profits damages) which arise from the breach, together with interest, costs and Franchisor's reasonable attorney fees (through final unappealable judgment) to enforce this Agreement.  This Agreement does not limit any other remedies available at law or in equity available to Franchisor.

11.     **NO WAIVER**.  Franchisor may waive a provision of this Agreement only in writing executed by an authorized representative.  No party shall rely upon any oral representations as to a waiver of any provision of this Agreement.  No waiver by a party of a breach by another party of any provision of this Agreement shall operate or be construed as a waiver of any subsequent breach by the breaching party.

12.     **BINDING AGREEMENT**.  This Agreement shall be binding upon the Parties' heirs, successors, assigns and legal representatives.  This Agreement shall be enforceable by the successors and assigns of Franchisor, any person or entity which purchases substantially all of the assets of Franchisor, and any subsidiary, affiliate or operation division of Franchisor.

13.     **HEADINGS**.  The paragraph headings of this Agreement are not a substantive part of this Agreement and shall not limit or restrict this Agreement in any way.

14.     **FURTHER ASSURANCE**.  Each of the Parties will, upon reasonable request of the other, sign any additional documents necessary or advisable to fully implement the terms and conditions of this Agreement.

15.     **NO FURTHER CHANGES**.  Except as specifically provided in this Agreement, all of the terms, conditions and provisions of the Franchise Agreement and Area Development Agreement will remain in full force and effect as originally written and signed.  In the event of any inconsistency between the provisions of either the Franchise Agreement or the Area Development Agreement and this Agreement, the terms of this Agreement shall control.

16.     **CHOICE OF LAW AND VENUE**.  This Agreement shall be governed by the choice of law and jurisdiction and venue provisions of the Franchise Agreement.

17.     **SEVERANCE AND REFORMATION**.  In case any one or more of the provisions or restrictions contained in this Agreement, or any part thereof shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions or restrictions of this Agreement.  In case any one or more of the provisions or restrictions contained in this Agreement shall, for any reason, be held to be unreasonable, improper, overbroad or unenforceable in any manner, it is agreed that they are divisible and separable and should be valid and enforceable to the extent allowed by law.  The intention of the Parties is that Franchisor shall be given the broadest protection allowed by law with respect to this Agreement.

18.     **ENTIRE AGREEMENT**.     No change, addition, deletion or amendment of this Agreement shall be valid or binding upon any party unless in writing and signed by the Parties.  Insofar as matters within the scope of this Agreement are concerned, this Agreement is the entire Agreement between the Parties and replaces and supersedes all prior agreements and understandings pertaining to the matters addressed in this Agreement.  There are no oral or other agreements or understandings between the Parties affecting this Agreement.

19.     **COUNTERPARTS**.  This Agreement may be executed in any number of counterparts, all of which shall be deemed to constitute one and the same instrument, and each counterpart shall be deemed an original.

***(Signature Page Follows)***

IN WITNESS WHEREOF, the parties hereto affix their signatures and execute this Agreement as of the day and year first above written, effective as of the Effective Date.

**FRANCHISOR:**

**OLD CHICAGO FRANCHISING II LLC,**
a Delaware limited liability company

By: _Edward J M'Graw_

Printed Name: _Edward J. McGraw_

Title: _VP Development_

**FORMER FRANCHISEE:**

**TAC VENTURES, LLC,**
a Kansas limited liability company

By: _Tom Willis_

Printed Name:  Tom Willis

Title:  Managing Member

**NEW FRANCHISEE:**

**WD VENTURES, LLC,**
a Kansas limited liability company

By: _Tom Willis_

Printed Name:  Tom Willis

Title:  Managing Member

**OWNERS OF FORMER FRANCHISEE, as individuals:**

By: _Tom Willis_

Printed Name:  Tom Willis

By: _Cecil O'Brate_

Printed Name:  Cecil O'Brate

By: _____

Printed Name:  Amro M. Samy

IN WITNESS WHEREOF, the parties hereto affix their signatures and execute this Agreement as of the day and year first above written, effective as of the Effective Date.

**FRANCHISOR:**

**OLD CHICAGO FRANCHISING II LLC,**
a Delaware limited liability company

By: _____

Printed Name: _____

Title: _____

**FORMER FRANCHISEE:**

**TAC VENTURES, LLC,**
a Kansas limited liability company

By: _____

Printed Name:  Tom Willis

Title:  Managing Member

**NEW FRANCHISEE:**

**WD VENTURES, LLC,**
a Kansas limited liability company

By: _____

Printed Name:  Tom Willis

Title:  Managing Member

**OWNERS OF FORMER FRANCHISEE, as individuals:**

By: _____

Printed Name:  Tom Willis

By: _____

Printed Name:  Cecil O'Brate

By: _____

Printed Name:  Amro M. Samy

**EXHIBIT A**

**AREA DEVELOPMENT AGREEMENT**

(*Included under separate cover*)

## EXHIBIT B

### FRANCHISE AGREEMENT

(*Included under separate cover*)

## EXHIBIT C

## WAIVER AND RELEASE OF CLAIMS

This Waiver and Release of Claims ("Release") is made as of Ｆebruary ８th, 2024 by TAC Ventures, LLC, a Kansas limited liability company ("Franchisee"), and each individual holding an ownership interest in Franchisee (collectively with Franchisee, "Releasor") in favor of Old Chicago Franchising II LLC, a Delaware limited liability company ("Franchisor," and together with Releasor, the "Parties").

**WHEREAS,** Old Chicago Franchising, LLC and Franchisee entered into a Franchise Agreement ("Franchise Agreement") pursuant to which Franchisee was granted the right to own and operate an Old Chicago Restaurant business and also entered into an Area Development Agreement ("Area Development Agreement") pursuant to which Franchisee was granted the right to establish and operate five Old Chicago Restaurants as an Old Chicago Restaurant area developer;

**WHEREAS,** Franchisor has succeeded and assumed all obligations of Old Chicago Franchising, LLC under the Area Development Agreement and the Franchise Agreement;

**WHEREAS,** Franchisee has notified Franchisor of its desire to transfer the Franchise Agreement and the Area Development Agreement and all rights related thereto to WD Ventures, LLC, a Kansas limited liability company, and Franchisor has consented to such transfer; and

**WHEREAS,** as a condition to Franchisor's consent to the transfer of the Franchise Agreement and the Area Development Agreement, Releasor has agreed to execute this Release upon the terms and conditions stated below.

**NOW, THEREFORE,** in consideration of Franchisor's consent to the transfer, and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, and intending to be legally bound, Releasor hereby agrees as follows:

1.      Representations and Warranties.  Releasor represents and warrants that it is duly authorized to enter into this Release and to perform the terms and obligations herein contained, and has not assigned, transferred, or conveyed, either voluntarily or by operation of law, any of its rights or claims against Franchisor or any of the rights, claims, or obligations being terminated and released hereunder. Each individual executing this Release on behalf of Franchisee represents and warrants that he/she is duly authorized to enter into and execute this Release on behalf of Franchisee.  Releasor further represents and warrants that all individuals that currently hold a direct or indirect ownership interest in Franchisee are signatories to this Release.

2.      Release.  Releasor and its subsidiaries, affiliates, parents, divisions, successors and assigns, and all persons or firms claiming by, through, under, or on behalf of any or all of them, hereby release, acquit, and forever discharge Franchisor, any and all of its affiliates, parents, subsidiaries, or related companies, divisions, and partnerships, and its and their past and present officers, directors, agents, partners, shareholders, employees, representatives, successors and assigns, and attorneys, and the spouses of such individuals (collectively, the "Released Parties"), from any and all claims, liabilities, damages, expenses, actions, or causes of action which Releasor may now have or has ever had, whether known or unknown, past or present, absolute or contingent, suspected or unsuspected, of any nature whatsoever, including without limiting the generality of the foregoing, all claims, liabilities, damages, expenses, actions, or causes of action directly or indirectly arising out of or relating to the execution and performance of the Franchise Agreement, the Area Development Agreement, and the offer and sale of the

franchise or franchises related thereto, except to the extent such liabilities are payable by the applicable indemnified party in connection with a third party claim.

3.    <u>Nondisparagement</u>.  Releasor expressly covenants and agrees not to make any false representation of facts, or to defame, disparage, discredit, or deprecate any of the Released Parties or otherwise communicate with any person or entity in a manner intending to damage any of the Released Parties, their business, or their reputation.

4.    <u>Confidentiality</u>.  Releasor agrees to hold in strictest confidence and not disclose, publish, or use the existence of, or any details relating to, this Release to any third party without Franchisor's express written consent, except as required by law.

5.    <u>Miscellaneous</u>.

a.    Releasor agrees that it has read and fully understands this Release and that the opportunity has been afforded to Releasor to discuss the terms and contents of said Release with legal counsel and/or that such a discussion with legal counsel has occurred.

b.    This Release shall be construed and governed by the laws of the State of Colorado.

c.    Each individual and entity that comprises Releasor shall be jointly and severally liable for the obligations of Releasor.

d.    In the event that it shall be necessary for any Party to institute legal action to enforce or for the breach of any of the terms and conditions or provisions of this Release, the prevailing Party in such action shall be entitled to recover all of its reasonable costs and attorneys' fees.

e.    All of the provisions of this Release shall be binding upon and inure to the benefit of the Parties and their current and future respective directors, officers, partners, attorneys, agents, employees, shareholders, and the spouses of such individuals, successors, affiliates, and assigns.  No other party shall be a third-party beneficiary to this Release.

f.    This Release constitutes the entire agreement and, as such, supersedes all prior oral and written agreements or understandings between and among the Parties regarding the subject matter hereof.  This Release may not be modified except in a writing signed by all of the Parties.  This Release may be executed in multiple counterparts, each of which shall be deemed an original and all of which together shall constitute but one and the same document.

g.    If one or more of the provisions of this Release shall for any reason be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect or impair any other provision of this Release, but this Release shall be construed as if such invalid, illegal, or unenforceable provision had not been contained herein.

h.    Releasor agrees to do such further acts and things and to execute and deliver such additional agreements and instruments as any Released Party may reasonably require to consummate, evidence, or confirm the Release contained herein in the matter contemplated hereby.

***(Signature Page Follows)***

**IN WITNESS WHEREOF,** Releasor has executed this Release as of the date first written above.

FRANCHISEE:

TAC VENTURES, LLC,
a Kansas limited liability company

Date: _2-8-21_

By: _____

Printed Name:  Tom Willis

Title:  Managing Member

FRANCHISEE'S OWNERS:

Date: _2-8-21_

_____
Tom Willis

Date: _2-8-21_

_____
Cecil O'Brate

Date: _____

_____
Amro M. Samy

**IN WITNESS WHEREOF,** Releasor has executed this Release as of the date first written above.

FRANCHISEE:

TAC VENTURES, LLC,
a Kansas limited liability company

Date: _____      By: _____

Printed Name:  Tom Willis

Title:  Managing Member

FRANCHISEE'S OWNERS:

Date: _____      _____
Tom Willis

Date: _____      _____
Cecil O'Brate

Date: 12/28/2020                     _____
Amro M. Samy

## EXHIBIT D

## OWNERS AGREEMENT

As a condition to the execution by Old Chicago Franchising II LLC ("we" or "us"), of a Franchise Agreement with WD Ventures, LLC ("Franchisee"), each of the undersigned individuals ("Owners"), who constitute all of the owners of a direct or indirect beneficial interest in Franchisee, as well as their respective spouses, covenant and agree to be bound by this Owners Agreement ("Owners Agreement").

1.  **Acknowledgments.**

1.1  Franchise Agreement. Franchisee entered into an assumption agreement with us effective as of October 28, 2019 ("Assumption Agreement"), under which Franchisee assumed all obligations of that certain franchise agreement (as amended) and area development agreement between TAC Ventures, LLC and us dated March 23, 2018. Capitalized words not defined in this Owners Agreement will have the same meanings ascribed to them in the franchise agreement ("Franchise Agreement").

1.2  Owners' Role. Owners are the beneficial owners or spouses of the beneficial owners of all of the equity interest, membership interest, or other equity controlling interest in Franchisee and acknowledge there are benefits received and to be received by each Owner, jointly and severally, and for themselves, their heirs, legal representatives and assigns. Franchisee's obligations under the Franchise Agreement, including the confidentiality and non-compete obligations, would be of little value to us if Franchisee's owners were not bound by the same requirements. Under the provisions of the Franchise Agreement, Owners are required to enter into this Owners Agreement as a condition to our entering into the Franchise Agreement with Franchisee. Owners will be jointly and severally liable for any breach of this Owners Agreement.

2.  **Non-Disclosure and Protection of Confidential Information.**

Under the Franchise Agreement, we will provide Franchisee with specialized training, proprietary trade secrets, and other Confidential Information relating to the establishment and operation of a franchised business. The provisions of the Franchise Agreement governing Franchisee's non-disclosure obligations relating to our Confidential Information are hereby incorporated into this Owners Agreement by reference, and Owners agree to comply with each obligation as though fully set forth in this Owners Agreement as a direct and primary obligation of Owners. Further, we may seek the same remedies against Owners under this Owners Agreement as we may seek against Franchisee under the Franchise Agreement. Any and all information, knowledge, know-how, techniques, and other data, which we designate as confidential, will also be deemed Confidential Information for purposes of this Owners Agreement.

Owners acknowledge that they could circumvent the purpose of this section by disclosing Confidential Information to an immediate family member (i.e., spouse, parent, sibling, child, or grandchild). Owners also acknowledge that it would be difficult for us to prove whether Owners disclosed the Confidential Information to family members. Therefore, each Owner agrees that he or she will be presumed to have violated the terms of Section 2 if any member of his or her immediate family uses or discloses the Confidential Information or engages in any activities that would constitute a violation of the covenants listed in Section 3, below, if performed by Owners. However, Owners may rebut this presumption by furnishing evidence conclusively showing that Owners did not disclose the Confidential Information to the family member.

**3.**     <u>Covenant Not To Compete.</u>

      3.1     <u>Non-Competition During and After the Term of the Franchise Agreement.</u> Owners acknowledge that as a participant in our system, they will receive proprietary and confidential information and materials, trade secrets, and the unique methods, procedures and techniques which we have developed. The provisions of the Franchise Agreement governing Franchisee's restrictions on competition both during the term of the Franchise Agreement and following the expiration or termination of the Franchise Agreement are hereby incorporated into this Owners Agreement by reference, and Owners agree to comply with and perform each such covenant as though fully set forth in this Owners Agreement as a direct and primary obligation of Owners. Further, we may seek the same remedies against Owners under this Owners Agreement as we may seek against Franchisee under the Franchise Agreement.

      3.2     <u>Construction of Covenants.</u> The parties agree that each such covenant related to non-competition will be construed as independent of any other covenant or provision of this Owners Agreement. If all or any portion of a covenant referenced in this Section 3 is held unreasonable or unenforceable by a court or agency having valid jurisdiction in a final decision to which we are a party, Owners agree to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Section 3.

      3.3     <u>Our Right to Reduce Scope of Covenants.</u> Additionally, we have the right, in our sole discretion, to unilaterally reduce the scope of all or part of any covenant referenced in this Section 3 of this Owners Agreement, without Owners' consent (before or after any dispute arises), effective when we give Owners written notice of this reduction. Owners agree to comply with any covenant as so modified.

**4.**     <u>Guarantee.</u>

      4.1     <u>Payment.</u> Owners will pay us (or cause us to be paid) all monies payable by Franchisee under the Franchise Agreement on the dates and in the manner required for payment in the relevant agreement.

      4.2     <u>Performance.</u> Owners unconditionally guarantee full performance and discharge by Franchisee of all of Franchisee's obligations under the Franchise Agreement on the date and times and in the manner required in the relevant agreement.

      4.3     <u>Indemnification.</u> Owners will indemnify, defend and hold harmless us, all of our affiliates, and the respective shareholders, directors, partners, employees, and agents of such entities, against and from all losses, damages, costs, and expenses which we or they may sustain, incur, or become liable for by reason of: (a) Franchisee's failure to pay the monies payable (to us or any of our affiliates) pursuant to the Franchise Agreement, or to do and perform any other act, matter, or thing required by the Franchise Agreement; or (b) any action by us to obtain performance by Franchisee of any act, matter, or thing required by the Franchise Agreement.

      4.4     <u>No Exhaustion of Remedies.</u> Owners acknowledge and agree that we will not be obligated to proceed against Franchisee or exhaust any security from Franchisee or pursue or exhaust any remedy, including any legal or equitable relief against Franchisee, before proceeding to enforce the obligations of the Owners as guarantors under this Owners Agreement, and the enforcement of such obligations can take place before, after, or contemporaneously with, enforcement of any of Franchisee's debts or obligations under the Franchise Agreement.

4.5     Waiver of Notice.  Without affecting Owners' obligations under this Section 4, we can extend, modify, or release any of Franchisee's indebtedness or obligation, or settle, adjust, or compromise any claims against Franchisee, all without notice to the Owners.  Owners waive notice of amendment of the Franchise Agreement and notice of demand for payment or performance by Franchisee.

4.6     Effect of Owner's Death.  Upon the death of an Owner, the estate of such Owner will be bound by the obligations in this Section 4, but only for defaults and obligations hereunder existing at the time of death; and the obligations of any other Owners will continue in full force and effect.

## 5.    Transfers.

Owners acknowledge and agree that we have granted the Franchise Agreement to Franchisee in reliance on Owners' business experience, skill, financial resources and personal character.  Accordingly, Owners agree not to sell, encumber, assign, transfer, convey, pledge, merge or give away any direct or indirect interest in this Franchisee, unless Owners first comply with the sections in the Franchise Agreement regarding Transfers.  Owners acknowledge and agree that any attempted Transfer of an interest in Franchisee requiring our consent under the Franchise Agreement for which our express written consent is not first obtained will be a material breach of this Owners Agreement and the Franchise Agreement.

## 6.    Notices.

6.1     Method of Notice.  Any notices given under this Owners Agreement shall be in writing and delivered in accordance with the provisions of the Franchise Agreement.

6.2     Notice Addresses.  Our current address for all communications under this Owners Agreement is:

> Old Chicago Franchising II LLC
> 3011 Armory Dr., Ste. 300
> Nashville, TN 37204

The current address of each Owner for all communications under this Owners Agreement is designated on the signature page of this Owners Agreement.  Any party may designate a new address for notices by giving written notice to the other parties of the new address according to the method set forth in the Franchise Agreement.

## 7.    Enforcement of This Owners Agreement.

7.1     Dispute Resolution.  Any claim or dispute arising out of or relating to this Owners Agreement shall be subject to the dispute resolution provisions of the Franchise Agreement.  This agreement to engage in such dispute resolution process shall survive the termination or expiration of this Owners Agreement.

7.2     Choice of Law; Jurisdiction and Venue.  This Owners Agreement and any claim or controversy arising out of, or relating to, any of the rights or obligations under this Owners Agreement, and any other claim or controversy between the parties, will be governed by the choice of law and jurisdiction and venue provisions of the Franchise Agreement.

7.3     Provisional Remedies.  We have the right to seek from an appropriate court any provisional remedies, including temporary restraining orders or preliminary injunctions to enforce Owners' obligations under this Owners Agreement.  Owners acknowledge and agree that there is no adequate remedy at law for Owners' failure to fully comply with the requirements of this Owners Agreement.  Owners further acknowledge and agree that, in the event of any noncompliance, we will be entitled to temporary, preliminary, and permanent injunctions and all other equitable relief that any court with jurisdiction may deem just and proper.  If injunctive relief is granted, Owners' only remedy will be the court's dissolution of the injunctive relief.  If the injunctive relief was wrongfully issued, Owners expressly waive all claims for damages they incurred as a result of the wrongful issuance.

## 8.   **Miscellaneous.**

8.1     No Other Agreements.  This Owners Agreement constitutes the entire, full and complete agreement between the parties, and supersedes any earlier or contemporaneous negotiations, discussions, understandings or agreements.  There are no representations, inducements, promises, agreements, arrangements, or undertakings, oral or written, between the parties relating to the matters covered by this Owners Agreement, other than those in this Owners Agreement.  No other obligations, restrictions or duties that contradict or are inconsistent with the express terms of this Owners Agreement may be implied into this Owners Agreement.  Except for unilateral reduction of the scope of the covenants permitted in Section 3.3 (or as otherwise expressly provided in this Owners Agreement), no amendment, change or variance from this Owners Agreement will be binding on either party unless it is mutually agreed to by the parties and executed in writing.  Time is of the essence.

8.2     Severability.  Each provision of this Owners Agreement, and any portions thereof, will be considered severable.  If any provision of this Owners Agreement or the application of any provision to any person, property or circumstances is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Owners Agreement will be unaffected and will still remain in full force and effect.  The parties agree that the provision found to be invalid or unenforceable will be modified to the extent necessary to make it valid and enforceable, consistent as much as possible with the original intent of the parties (i.e. to provide maximum protection for us and to effectuate the Owners' obligations under the Franchise Agreement), and the parties agree to be bound by the modified provisions.

8.3     No Third-Party Beneficiaries.  Nothing in this Owners Agreement is intended to confer upon any person or entity (other than the parties and their heirs, successors and assigns) any rights or remedies under or by reason of this Owners Agreement.

8.4     Construction.  Any term defined in the Franchise Agreement which is not defined in this Owners Agreement will be ascribed the meaning given to it in the Franchise Agreement.  The language of this Owners Agreement will be construed according to its fair meaning, and not strictly for or against either party.  All words in this Owners Agreement refer to whatever number or gender the context requires.  If more than one party or person is referred to as you, their obligations and liabilities must be joint and several.  Headings are for reference purposes and do not control interpretation

8.5     Binding Effect.  This Owners Agreement may be executed in counterparts, and each copy so executed and delivered will be deemed an original.  This Owners Agreement is binding on the parties and their respective heirs, executors, administrators, personal representatives, successors and (permitted) assigns.

8.6     Successors.  References to "Franchisor" or "the undersigned," or "you" include the respective parties' heirs, successors, assigns or transferees.

8.7     Nonwaiver.   Our failure to insist upon strict compliance with any provision of this Owners Agreement shall not be a waiver of our right to do so.  Delay or omission by us respecting any breach or default shall not affect our rights respecting any subsequent breaches or defaults.  All rights and remedies granted in this Owners Agreement shall be cumulative.

8.8     No Personal Liability.   You agree that fulfillment of any and all of our obligations written in the Franchise Agreement or this Owners Agreement, or based on any oral communications which may be ruled to be binding in a court of law, shall be our sole responsibility and none of our owners, officers, agents, representatives, nor any individuals associated with us shall be personally liable to you for any reason.

8.9     Owners Agreement Controls.   In the event of any discrepancy between this Owners Agreement and the Franchise Agreement, this Owners Agreement shall control.

*(Signature Page Follows)*

**IN WITNESS WHEREOF**, the parties have entered into this Owners Agreement as of October 28, 2019.

**OWNERS:**

_____

Tom Willis, Owner
901 Apollo St.
Liberal, KS 67901

_____

Andy Daniels, Owner
1051 Foxfire Ln., Unit 302
Naples, FL 34104

_____

Thad Willis, Owner
120 S. 100 E. St.
Laketown, UT 84038

Franchisor hereby accepts the Owner(s)' agreements hereunder.

**FRANCHISOR:**

OLD CHICAGO FRANCHISING II LLC.

By: _____

Name: _____Edward J. McGraw_____

Title: _____VP Development_____

**IN WITNESS WHEREOF**, the parties have entered into this Owners Agreement as of October 28, 2019.

OWNERS:

_____

Tom Willis, Owner
901 Apollo St.
Liberal, KS 67901

_____

Andy Daniels, Owner
1051 Foxfire Ln., Unit 302
Naples, FL 34104

_____

Thad Willis, Owner
120 S. 100 E. St.
Laketown, UT 84038

Franchisor hereby accepts the Owner(s)' agreements hereunder.

**FRANCHISOR:**

OLD CHICAGO FRANCHISING II LLC.

By: _____

Name: _____

Title: _____

**IN WITNESS WHEREOF**, the parties have entered into this Owners Agreement as of October 28, 2019.

OWNERS:

_____

Tom Willis, Owner
901 Apollo St.
Liberal, KS 67901

_____

Andy Daniels, Owner
1051 Foxfire Ln., Unit 302
Naples, FL 34104

_____

Thad Willis, Owner
120 S. 100 E. St.
Laketown, UT 84038

Franchisor hereby accepts the Owner(s)' agreements hereunder.

**FRANCHISOR:**

OLD CHICAGO FRANCHISING II LLC.

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, the parties have entered into this Owners Agreement as of October 28, 2019.

OWNERS:

_____
Gun Willis, Owner
901 Apollo St.
Therapy, FL 34689

_____
_____ Daniels, Owner
_____
Naples, FL _____

340 9th Street North
Unit 249
Naples Florida
34102

_____
Fred Willis, Owner
120 S. 100 E. St.
Laketown, UT 84038

Franchisor hereby accepts the Owners' agreements hereunder.

FRANCHISOR:

OLD CHICAGO FRANCHISING II LLC

By: _____

Name: _____

Title: _____

## EXHIBIT E

### STATEMENT OF OWNERSHIP

Franchisee:  WD Ventures, LLC

Trade Name (if different from above): _____

### Form of Ownership
### (Check One)

_____ **Individual** _____ **Partnership** _____ **Corporation** __X__ **Limited Liability Company**

If a **Partnership**, provide name and address of each partner showing percentage owned, whether active in management, and indicate the state in which the partnership was formed.

If a **Corporation**, give the state and date of incorporation, the names and addresses of each officer and director, and list the names and addresses of every shareholder showing what percentage of stock is owned by each.

If a **Limited Liability Company**, give the state and date of formation, the name of the manager(s), and list the names and addresses of every member and the percentage of membership interest held by each member.

State and Date of Formation:  Kansas on May 9, 2019

**Management (managers, officers, board of directors, etc.):**

| Name | Title |
|------|-------|
| Tom Willis | Managing Member |
| Andy Daniels | Member |
| Thad Willis | Member |

**Members, Stockholders, Partners:**

| Name | Address | Percentage Owned |
|------|---------|------------------|
| Tom Willis | 901 Apollo St. Liberal, KS 67901 | 45% |
| Andy Daniels | 1051 Foxfire Ln., Unit 302 Naples, FL 34104 | 45% |
| Thad Willis | 120 S. 100 E. St. Laketown, UT 84038 | 5% |

Franchisee's and Area Developer's Operating Principal is: Tom Willis.

Franchisee acknowledges this Statement of Ownership applies to the Old Chicago Restaurant Business authorized under the Franchise Agreement and under the Area Development Agreement.  Use additional sheets if necessary.  Any and all changes to the above information must be reported to Franchisor in writing.

*(Signature Page Follows)*

**FRANCHISEE:**

WD VENTURES, LLC

Date: _____2-8-21_____

By: _____

Name:  Tom Willis

Title:  Managing Member

# Exhibit 6

## EXHIBIT D

## OWNERS AGREEMENT

As a condition to the execution by Old Chicago Franchising II LLC ("we" or "us"), of a Franchise Agreement with WD Ventures, LLC ("Franchisee"), each of the undersigned individuals ("Owners"), who constitute all of the owners of a direct or indirect beneficial interest in Franchisee, as well as their respective spouses, covenant and agree to be bound by this Owners Agreement ("Owners Agreement").

1.    **Acknowledgments.**

1.1    Franchise Agreement. Franchisee entered into an assumption agreement with us effective as of October 28, 2019 ("Assumption Agreement"), under which Franchisee assumed all obligations of that certain franchise agreement (as amended) and area development agreement between TAC Ventures, LLC and us dated March 23, 2018. Capitalized words not defined in this Owners Agreement will have the same meanings ascribed to them in the franchise agreement ("Franchise Agreement").

1.2    Owners' Role. Owners are the beneficial owners or spouses of the beneficial owners of all of the equity interest, membership interest, or other equity controlling interest in Franchisee and acknowledge there are benefits received and to be received by each Owner, jointly and severally, and for themselves, their heirs, legal representatives and assigns. Franchisee's obligations under the Franchise Agreement, including the confidentiality and non-compete obligations, would be of little value to us if Franchisee's owners were not bound by the same requirements. Under the provisions of the Franchise Agreement, Owners are required to enter into this Owners Agreement as a condition to our entering into the Franchise Agreement with Franchisee. Owners will be jointly and severally liable for any breach of this Owners Agreement.

2.    **Non-Disclosure and Protection of Confidential Information.**

Under the Franchise Agreement, we will provide Franchisee with specialized training, proprietary trade secrets, and other Confidential Information relating to the establishment and operation of a franchised business. The provisions of the Franchise Agreement governing Franchisee's non-disclosure obligations relating to our Confidential Information are hereby incorporated into this Owners Agreement by reference, and Owners agree to comply with each obligation as though fully set forth in this Owners Agreement as a direct and primary obligation of Owners. Further, we may seek the same remedies against Owners under this Owners Agreement as we may seek against Franchisee under the Franchise Agreement. Any and all information, knowledge, know-how, techniques, and other data, which we designate as confidential, will also be deemed Confidential Information for purposes of this Owners Agreement.

Owners acknowledge that they could circumvent the purpose of this section by disclosing Confidential Information to an immediate family member (i.e., spouse, parent, sibling, child, or grandchild). Owners also acknowledge that it would be difficult for us to prove whether Owners disclosed the Confidential Information to family members. Therefore, each Owner agrees that he or she will be presumed to have violated the terms of Section 2 if any member of his or her immediate family uses or discloses the Confidential Information or engages in any activities that would constitute a violation of the covenants listed in Section 3, below, if performed by Owners. However, Owners may rebut this presumption by furnishing evidence conclusively showing that Owners did not disclose the Confidential Information to the family member.

**3.      Covenant Not To Compete.**

3.1      Non-Competition During and After the Term of the Franchise Agreement. Owners acknowledge that as a participant in our system, they will receive proprietary and confidential information and materials, trade secrets, and the unique methods, procedures and techniques which we have developed.   The provisions of the Franchise Agreement governing Franchisee's restrictions on competition both during the term of the Franchise Agreement and following the expiration or termination of the Franchise Agreement are hereby incorporated into this Owners Agreement by reference, and Owners agree to comply with and perform each such covenant as though fully set forth in this Owners Agreement as a direct and primary obligation of Owners.  Further, we may seek the same remedies against Owners under this Owners Agreement as we may seek against Franchisee under the Franchise Agreement.

3.2      Construction of Covenants.  The parties agree that each such covenant related to non-competition will be construed as independent of any other covenant or provision of this Owners Agreement.  If all or any portion of a covenant referenced in this Section 3 is held unreasonable or unenforceable by a court or agency having valid jurisdiction in a final decision to which we are a party, Owners agree to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Section 3.

3.3      Our Right to Reduce Scope of Covenants.  Additionally, we have the right, in our sole discretion, to unilaterally reduce the scope of all or part of any covenant referenced in this Section 3 of this Owners Agreement, without Owners' consent (before or after any dispute arises), effective when we give Owners written notice of this reduction.  Owners agree to comply with any covenant as so modified.

**4.      Guarantee.**

4.1      Payment.  Owners will pay us (or cause us to be paid) all monies payable by Franchisee under the Franchise Agreement on the dates and in the manner required for payment in the relevant agreement.

4.2      Performance.  Owners unconditionally guarantee full performance and discharge by Franchisee of all of Franchisee's obligations under the Franchise Agreement on the date and times and in the manner required in the relevant agreement.

4.3      Indemnification.  Owners will indemnify, defend and hold harmless us, all of our affiliates, and the respective shareholders, directors, partners, employees, and agents of such entities, against and from all losses, damages, costs, and expenses which we or they may sustain, incur, or become liable for by reason of: (a) Franchisee's failure to pay the monies payable (to us or any of our affiliates) pursuant to the Franchise Agreement, or to do and perform any other act, matter, or thing required by the Franchise Agreement; or (b) any action by us to obtain performance by Franchisee of any act, matter, or thing required by the Franchise Agreement.

4.4      No Exhaustion of Remedies.  Owners acknowledge and agree that we will not be obligated to proceed against Franchisee or exhaust any security from Franchisee or pursue or exhaust any remedy, including any legal or equitable relief against Franchisee, before proceeding to enforce the obligations of the Owners as guarantors under this Owners Agreement, and the enforcement of such obligations can take place before, after, or contemporaneously with, enforcement of any of Franchisee's debts or obligations under the Franchise Agreement.

     4.5     <u>Waiver of Notice</u>.  Without affecting Owners' obligations under this Section 4, we can extend, modify, or release any of Franchisee's indebtedness or obligation, or settle, adjust, or compromise any claims against Franchisee, all without notice to the Owners.  Owners waive notice of amendment of the Franchise Agreement and notice of demand for payment or performance by Franchisee.

     4.6     <u>Effect of Owner's Death</u>.  Upon the death of an Owner, the estate of such Owner will be bound by the obligations in this Section 4, but only for defaults and obligations hereunder existing at the time of death; and the obligations of any other Owners will continue in full force and effect.

**5.**     **Transfers.**

     Owners acknowledge and agree that we have granted the Franchise Agreement to Franchisee in reliance on Owners' business experience, skill, financial resources and personal character.  Accordingly, Owners agree not to sell, encumber, assign, transfer, convey, pledge, merge or give away any direct or indirect interest in this Franchisee, unless Owners first comply with the sections in the Franchise Agreement regarding Transfers.  Owners acknowledge and agree that any attempted Transfer of an interest in Franchisee requiring our consent under the Franchise Agreement for which our express written consent is not first obtained will be a material breach of this Owners Agreement and the Franchise Agreement.

**6.**     **Notices.**

     6.1     <u>Method of Notice</u>.  Any notices given under this Owners Agreement shall be in writing and delivered in accordance with the provisions of the Franchise Agreement.

     6.2     <u>Notice Addresses</u>.  Our current address for all communications under this Owners Agreement is:

> Old Chicago Franchising II LLC
> 3011 Armory Dr., Ste. 300
> Nashville, TN 37204

The current address of each Owner for all communications under this Owners Agreement is designated on the signature page of this Owners Agreement.  Any party may designate a new address for notices by giving written notice to the other parties of the new address according to the method set forth in the Franchise Agreement.

**7.**     **Enforcement of This Owners Agreement.**

     7.1     <u>Dispute Resolution</u>.  Any claim or dispute arising out of or relating to this Owners Agreement shall be subject to the dispute resolution provisions of the Franchise Agreement.  This agreement to engage in such dispute resolution process shall survive the termination or expiration of this Owners Agreement.

     7.2     <u>Choice of Law; Jurisdiction and Venue</u>.  This Owners Agreement and any claim or controversy arising out of, or relating to, any of the rights or obligations under this Owners Agreement, and any other claim or controversy between the parties, will be governed by the choice of law and jurisdiction and venue provisions of the Franchise Agreement.

7.3     Provisional Remedies.   We have the right to seek from an appropriate court any provisional remedies, including temporary restraining orders or preliminary injunctions to enforce Owners' obligations under this Owners Agreement.  Owners acknowledge and agree that there is no adequate remedy at law for Owners' failure to fully comply with the requirements of this Owners Agreement.  Owners further acknowledge and agree that, in the event of any noncompliance, we will be entitled to temporary, preliminary, and permanent injunctions and all other equitable relief that any court with jurisdiction may deem just and proper.  If injunctive relief is granted, Owners' only remedy will be the court's dissolution of the injunctive relief.  If the injunctive relief was wrongfully issued, Owners expressly waive all claims for damages they incurred as a result of the wrongful issuance.

## 8.     **Miscellaneous.**

8.1     No Other Agreements.  This Owners Agreement constitutes the entire, full and complete agreement between the parties, and supersedes any earlier or contemporaneous negotiations, discussions, understandings or agreements.   There are no representations, inducements, promises, agreements, arrangements, or undertakings, oral or written, between the parties relating to the matters covered by this Owners Agreement, other than those in this Owners Agreement.  No other obligations, restrictions or duties that contradict or are inconsistent with the express terms of this Owners Agreement may be implied into this Owners Agreement.  Except for unilateral reduction of the scope of the covenants permitted in Section 3.3 (or as otherwise expressly provided in this Owners Agreement), no amendment, change or variance from this Owners Agreement will be binding on either party unless it is mutually agreed to by the parties and executed in writing.  Time is of the essence.

8.2     Severability.  Each provision of this Owners Agreement, and any portions thereof, will be considered severable.  If any provision of this Owners Agreement or the application of any provision to any person, property or circumstances is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Owners Agreement will be unaffected and will still remain in full force and effect.  The parties agree that the provision found to be invalid or unenforceable will be modified to the extent necessary to make it valid and enforceable, consistent as much as possible with the original intent of the parties (i.e. to provide maximum protection for us and to effectuate the Owners' obligations under the Franchise Agreement), and the parties agree to be bound by the modified provisions.

8.3     No Third-Party Beneficiaries.  Nothing in this Owners Agreement is intended to confer upon any person or entity (other than the parties and their heirs, successors and assigns) any rights or remedies under or by reason of this Owners Agreement.

8.4     Construction.  Any term defined in the Franchise Agreement which is not defined in this Owners Agreement will be ascribed the meaning given to it in the Franchise Agreement.  The language of this Owners Agreement will be construed according to its fair meaning, and not strictly for or against either party.  All words in this Owners Agreement refer to whatever number or gender the context requires.  If more than one party or person is referred to as you, their obligations and liabilities must be joint and several.  Headings are for reference purposes and do not control interpretation

8.5     Binding Effect.  This Owners Agreement may be executed in counterparts, and each copy so executed and delivered will be deemed an original.  This Owners Agreement is binding on the parties and their respective heirs, executors, administrators, personal representatives, successors and (permitted) assigns.

8.6     Successors.  References to "Franchisor" or "the undersigned," or "you" include the respective parties' heirs, successors, assigns or transferees.

8.7    <u>Nonwaiver</u>.  Our failure to insist upon strict compliance with any provision of this Owners Agreement shall not be a waiver of our right to do so.  Delay or omission by us respecting any breach or default shall not affect our rights respecting any subsequent breaches or defaults.  All rights and remedies granted in this Owners Agreement shall be cumulative.

8.8    <u>No Personal Liability</u>.  You agree that fulfillment of any and all of our obligations written in the Franchise Agreement or this Owners Agreement, or based on any oral communications which may be ruled to be binding in a court of law, shall be our sole responsibility and none of our owners, officers, agents, representatives, nor any individuals associated with us shall be personally liable to you for any reason.

8.9    <u>Owners Agreement Controls</u>.  In the event of any discrepancy between this Owners Agreement and the Franchise Agreement, this Owners Agreement shall control.

*(Signature Page Follows)*

**IN WITNESS WHEREOF**, the parties have entered into this Owners Agreement as of October 28, 2019.

**OWNERS:**

Tom Willis, Owner
901 Apollo St.
Liberal, KS 67901

Andy Daniels, Owner
1051 Foxfire Ln., Unit 302
Naples, FL 34104

Thad Willis, Owner
120 S. 100 E. St.
Laketown, UT 84038

Franchisor hereby accepts the Owner(s)' agreements hereunder.

**FRANCHISOR:**

OLD CHICAGO FRANCHISING II LLC.

By: _____

Name: Edward J. McGraw

Title: VP Development

**IN WITNESS WHEREOF**, the parties have entered into this Owners Agreement as of October 28, 2019.

OWNERS:

_____
Tom Willis, Owner
901 Apollo St.
Liberal, KS 67901

_____
Andy Daniels, Owner
1051 Foxfire Ln., Unit 302
Naples, FL 34104

_____
Thad Willis, Owner
120 S. 100 E. St.
Laketown, UT 84038

Franchisor hereby accepts the Owner(s)' agreements hereunder.

**FRANCHISOR:**

OLD CHICAGO FRANCHISING II LLC.

By: _____

Name: _____

Title: _____

**IN WITNESS WHEREOF**, the parties have entered into this Owners Agreement as of October 28, 2019.

OWNERS:

Tom Willis, Owner
901 Apollo St.
Liberal, KS 67901

Andy Daniels, Owner
1051 Foxfire Ln., Unit 302
Naples, FL 34104

Thad Willis, Owner
120 S. 100 E. St.
Laketown, UT 84038

Franchisor hereby accepts the Owner(s)' agreements hereunder.

**FRANCHISOR:**

OLD CHICAGO FRANCHISING II LLC.

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, the parties have entered into this Owners Agreement as of October 28, 2019.

OWNERS:

_____
Tim Willis, Owner
901 Apollo St.
Brigham City, UT

_____
Daniels, Owner

Naples, FL

340 9th Street North
Unit 249
Naples Florida
34102

_____
Trent Willis, Owner
120 S. 100 E. St.
Laketown, UT 84038

Franchisor hereby accepts the Owners' agreements hereunder.

FRANCHISOR:

OLD CHICAGO FRANCHISING II LLC

By: _____

Name: _____

Title: _____